COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

## 2384CV01949 Doe, Jane vs. Baystate Health Systems

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Business Litigation | **FILE DATE:** | 08/29/2023 |
| **ACTION CODE:** | BK1 | **CASE TRACK:** | B - Special Track (BLS) |
| **DESCRIPTION:** | Other Complex Commercial Actions | | |
| **CASE DISPOSITION DATE:** | 02/10/2025 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 02/10/2025 |
| **CASE JUDGE:** | | **CASE SESSION:** | Business Litigation 1 |

### PARTIES

| | |
|---|---|
| **Plaintiff**<br>Doe, Jane | **Attorney** **454220**<br>Jonathan Shapiro<br>Shapiro and Teitelbaum LLP<br>Shapiro and Teitelbaum LLP<br>55 Union St<br>4th Floor<br>Boston, MA 02108<br>Work Phone (617) 742-5800<br>Added Date: 08/29/2023<br><br>**Attorney** **693595**<br>Mia Teitelbaum<br>Shapiro and Teitelbaum LLP<br>Shapiro and Teitelbaum LLP<br>55 Union St<br>4th Floor<br>Boston, MA 02108<br>Work Phone (617) 742-5800<br>Added Date: 08/29/2023 |
| **Defendant**<br>Baystate Health Systems<br>759 Chestnut Street<br>Springfield, MA 01199 | **Attorney** **666841**<br>Lisa Oliver White<br>Shook, Hardy and Bacon L.L.P.<br>Shook, Hardy and Bacon L.L.P.<br>One Federal St<br>Suite 2620<br>Boston, MA 02110<br>Work Phone (617) 531-1411<br>Added Date: 03/22/2024<br><br>**Attorney** **679134**<br>Stephen Hansen<br>Shook, Hardy and Bacon L.L.P.<br>Shook, Hardy and Bacon L.L.P.<br>1 Federal St Suite 2540<br>Boston, MA 02110<br>Work Phone (617) 531-1411<br>Added Date: 10/19/2023 |
| **Other interested party**<br>Sofia M. Rios (PHV atty for Plaintiff)<br>Berger Montague PC<br>8241 La Mesa Blvd<br>Suite A<br>La Mesa, CA 91942 | |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 08/29/2023 | Civil Filing Fee (per Plaintiff) Receipt: 40714 Date: 08/29/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 08/29/2023 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 40714 Date: 08/29/2023 | 20.00 | 20.00 | 0.00 | 0.00 |
| 08/29/2023 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 40714 Date: 08/29/2023 | 15.00 | 15.00 | 0.00 | 0.00 |
| | **Total** | **275.00** | **275.00** | **0.00** | **0.00** |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

**INFORMATIONAL DOCKET ENTRIES**

| Date | Ref | Description | Judge |
|---|---|---|---|
| 08/29/2023 | 1 | Complaint electronically filed. | |
| 08/29/2023 | 2 | Civil action cover sheet filed. | |
| 08/29/2023 | 3 | Plaintiff Jane Doe's Motion to proceed under a pseudonym | |
| 08/30/2023 | 4 | General correspondence regarding Notice of Acceptance into Business Litigation Session<br>Accepted into BLS1<br>(Dated 8/29/2023) Notice sent 8/30/2023 | Salinger |
| 09/12/2023 | | RESTRICTED INFORMATION - Endorsement on Motion to proceed under a pseudonym and for Impoundment of filings Disclosing her name and other personally identifiable information (#3.0): ALLOWED<br>After careful consideration of the parties argument.<br>(Dated 9/7/2023)<br>Notice sent 9/13/23 | Kazanjian |
| 10/16/2023 | 5 | Service Returned for<br>Defendant Baystate Health Systems: Service through person in charge / agent; | |
| 10/19/2023 | 6 | Defendant Baystate Health Systems's Assented to Motion for Extension Of Time To Respond To Complaint | |
| 10/19/2023 | | Attorney appearance electronically filed. | |
| 10/19/2023 | 7 | Defendant Baystate Health Systems's Submission of Cooperate Disclosure Statement | |
| 10/30/2023 | | Endorsement on Motion for Extension Of Time To Respond To Complaint (#6.0): ALLOWED<br>(Dated 10/26/2023)<br>Notice sent 10/31/23 | Ricciuti |
| 12/07/2023 | | Proposed Filings/Orders<br><br>Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in the Vita Cases | |
| 01/03/2024 | 8 | ORDER: Joint Stipulation and Order to Stay all Proceedings Pending Interlocutory Appeal in the Vita Cases<br>See p.8 for full Stipulation and Order.<br>(dated 1/2/2024)<br>Notice sent 1/3/24 | Krupp |
| 03/22/2024 | | Attorney appearance electronically filed. | |
| 01/02/2025 | | Proposed Filings/Orders<br><br>Joint Stipulation and Proposed Consent Order | |
| 01/02/2025 | | Exhibits/Appendix | |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 01/06/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Jonathan Shapiro, Esq. jshapiro@jsmtlegal.com<br>Plaintiff: Mia Teitelbaum , Esq. mteitelbaum@jsmtlegal.com<br>Defendant: Stephen Hansen, Esq. sihansen@shb.com<br>Defendant: Lisa Oliver White, Esq. lowhite@shb.com<br>Sent On: 01/06/2025 13:34:00 | |
| 01/10/2025 | 9 | Plaintiff Jane Doe's Motion to<br>Admit Sophia M. Rios Pro Hac Vice | |
| 01/10/2025 | | Exhibits/Appendix<br><br>Registration Statement | |
| 01/14/2025 | | Endorsement on Motion to Admit Sophia M. Rios Pro Hac Vice (#9.0): ALLOWED<br>(Dated: 1/13/25)<br><br>Notice Sent 1/15/25 | Krupp |
| 01/15/2025 | | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on:<br>01/15/2025 11:00 AM<br>Has been: Held via Video/Phone<br>Hon. Peter B Krupp, Presiding | Krupp |
| 01/15/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Jonathan Shapiro, Esq. jshapiro@jsmtlegal.com<br>Plaintiff: Mia Teitelbaum , Esq. mteitelbaum@jsmtlegal.com<br>Defendant: Stephen Hansen, Esq. sihansen@shb.com<br>Defendant: Lisa Oliver White, Esq. lowhite@shb.com<br>Other interested party: Sofia M. Rios (PHV atty for Plaintiff) Berger Montague PC 8241 La Mesa Blvd Suite A, La Mesa, CA 91942<br>Sent On: 01/15/2025 15:33:08 | |
| 01/22/2025 | 10 | Party(s) file Stipulation<br><br>Applies To: Doe, Jane (Plaintiff); Baystate Health Systems (Defendant) | |
| 01/22/2025 | | Endorsement on Submission of Stipulation (#10.0): Other action taken<br>I will take this up at the hearing on 1/15/2025.<br>(dated 1/7/2025) Notice sent 01/23/2025. | Krupp |
| 01/30/2025 | 11 | ORDER: Scheduling Order<br>See paper #11<br>dated (1/15/25)<br><br>Notice Sent 2/3/25 | Krupp |
| 01/31/2025 | 12 | Amended: amended complaint filed by Jane Doe | |
| 02/07/2025 | | Certificate Of Service<br><br>Applies To: Hansen, Esq., Stephen (Attorney) on behalf of Baystate Health Systems (Defendant) | |

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 02/10/2025 | 13 | Defendant Baystate Health Systems's Notice of Filing of Notice of Removal | |
| 02/10/2025 | | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on: 03/19/2025 02:00 PM<br>Has been: Canceled For the following reason: Request of Defendant<br>Comments: Case removed to federal court.<br>Hon. Peter B Krupp, Presiding | Krupp |
| 02/10/2025 | | REMOVED to the U.S. District Court Of Massachusetts (US Dist #25-cv-10337) | |
| 02/10/2025 | | Case transferred to another court. | |

I HEREBY ATTEST AND CERTIFY ON
Feb.11,2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
First Asst. Clerk

1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.: 23-1949 BLS-1

| |
|---|
| JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>BAYSTATE HEALTH SYSTEM INC.,<br><br>Defendant. |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Jane Doe ("Plaintiff"), individually and on behalf of the classes defined below, through their undersigned counsel, bring this Class Action Complaint against Baystate Health System Inc. ("Baystate" or "Defendant"), and allege as follows.

1. This is a class action arising from Defendant's systematic violation of the privacy rights of its patients and website visitors by wiretapping the electronic communications of visitors to its website, https://www.baystatehealth.org/ and https://providers.baystatehealth.org/ (together, the "Baystate Website"), and violating patients' rights to privacy with respect to their medical information.

2. During the relevant time period, Defendant's Privacy Policy told patients and website users that: "Baystate Health (BH) is committed to protecting your privacy and ***we have taken steps to protect your information***. We have designed our website (baystatehealth.org) to allow you to visit most areas ***without identifying yourself*** or supplying personal information. For those areas where you are requested to provide identifiable information, we assure you that ***it will***

***only be used to support your customer/patient relationship with BH***."[1] Defendant further states that "[a]t Baystate Health, we understand that your medical information is personal, and we are committed to maintaining the privacy of this information."[2]

3. Defendant, however, intentionally used various digital marketing tools on its website that were able to identify the patients and website users on the Baystate Website, and purposefully and intentionally redirected patients' and other Baystate Website users' communications containing Personal Health Information ("PHI") and other sensitive information to third parties. Defendant's use of these re-routing tools caused Baystate Website users' and patients' Personally Identifiable Information ("PII") and the contents of their communications through the website to be automatically disclosed to third parties in violation of patients' and website users' reasonable expectations of privacy, of their rights as patients, of their rights as citizens of Massachusetts, and of both the express and implied promises of Defendant.

4. Specifically, at all relevant times, Defendant disclosed information about its patients' and website users' communications—including their searches for medical information about conditions and procedures, the identities of their physicians, their requests to schedule appointments with physicians, registrations for support groups, patients' request to log in to the patient portal, and when a patient clicks to make a telephone call in order to schedule an appointment with a specific doctor through the site—to Meta Platforms, Inc. ("Meta") (formerly known as Facebook, Inc.) and/or Google without their knowledge, authorization, or consent.

5. Defendant's conduct in disclosing patients' and website users' private health information and PII/PHI to Meta and Google violates Massachusetts law, including the Wiretap

---

[1] *See* https://web.archive.org/web/20220622132503/https://www.baystatehealth.org/privacy-policy (emphasis added).

[2] *See* https://www.baystatehealth.org/notice-of-privacy-practices.

Act, G.L. c. 272, § 99; G.L. c. 214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

6. On behalf of herself and the alleged Classes, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of her and Class members' personal information; awarding liquidated damages in the amount of $1,000 per Website User Class member, general damages and benefit of the bargain damages for Patient Class members, attorneys' fees and costs; and granting any other equitable relief the Court deems appropriate.

## PARTIES

7. Defendant Baystate Health, Inc. is a Massachusetts non-profit corporation with its principal offices at 759 Chestnut Street, Springfield, Massachusetts. Defendant touts that it is "a 716-bed independent academic medical center" and is "the community's major referral hospital," providing services that include: cancer care; critical care medicine; digestive disorder care; heart and vascular disease care; laboratory services; neurological disorders; obstetrics and gynecology care; and care for other injuries, illnesses, and conditions.[3] Baystate designs and maintains, and/or directs the design and maintenance, of the Baystate Website from its offices in Massachusetts.

8. Plaintiff is an individual residing in Ludlow, Massachusetts. Plaintiff has visited the Baystate Website numerous times and has been treated by Defendant's physicians.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business in Springfield. G.L. c. 223A, §§ 2 and 3.

[3] *See* https://www.baystatehealth.org/locations/baystate-medical-center.

10. Venue is proper in Hampden County pursuant to G.L. c. 223, sec. 8(4) because plaintiff resides in Hampden County and Defendant might sue or be sued in Hampden County. However, Plaintiff is seeking acceptance into the Business Litigation Session pursuant to Superior Court Administrative Directive 17-1 because this case is a consumer matter involving complex issues and cases based on similar claims have been assigned to the Business Litigation Session. *See Doe et al. v. Partners Healthcare System, Inc. et al.*, No. 1984CV01651, and *Doe v. Boston Medical Center Corporation*, No. 2384CV00326.

## FACTUAL BACKGROUND

### I. Massachusetts protects personal privacy.

11. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

12. Patient health information is specifically protected by the law. The prohibitions against disclosing patient personal health information include prohibitions against disclosing PII/PHI such as patient names, IP addresses, and other unique characteristics or codes. Massachusetts law subjects medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. G.L. c 111B, § 11.

13. Massachusetts law also protects residents from having the contents of their communications intercepted without their consent. Specifically, the Wiretap Act, G.L. c. 272, § 99, prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

14. As a health care provider, Defendant has common law and statutory duties to protect the confidentiality of patient information and communications with individuals regarding its services.

**II. Defendant systematically violates its patients' and website users' privacy rights.**

15. Defendant maintains the Baystate Website. The Baystate Website is designed for patients, prospective patients, and other website users to communicate with Defendant, including by allowing individuals to research doctors and request to schedule appointments with doctors, register for support groups, research health conditions and learn about related services offered by Defendant, learn about medical procedures offered by Defendant, and sign in to a personal patient portal called MyBaystate. Website users can use search bars on Defendant's website to type in the specific information, medical condition, medical procedure, type of doctor, or doctor that they want more information about.

16. Defendant provides medical care and serves Western Massachusetts and the so-called Knowledge Corridor Region of Massachusetts and Connecticut (including the greater Hartford-Springfield area).

17. Defendant knows that many of its patients reside in the state of Massachusetts and that its website is frequented by users who reside in Massachusetts or who seek its medical services in Massachusetts.

18. According to Joel Vengco, Vice President of Information & Technology and Chief Information Officer for Baystate Health, in or about the beginning of 2015, Defendant's website added "My Baystate Health," the online patient portal "that gives individuals access to portions of their medical records after they sign up."[4]

19. Below is an example of the top of the Baystate Website homepage as it appeared on January 18, 2023.[5] As depicted, the homepage provides website users with tools to sign into

---

[4] *See* https://healthcarenews.com/think-tank-techspring-center-brings-silicon-valley-model-to-springfield/.

[5] *See* https://web.archive.org/web/20221223120755/https://www.baystatehealth.org/.

MyBaystate under the "Patient Log In" button, find a provider, explore medical services provided by Baystate and conditions that it treats, find a location, conduct a general search of the website, and more.




### A. Patients and Website Visitors Reasonably Expect that Their Communications with Baystate on the Baystate Website Will Remain Confidential.

20. Defendant has statutory, regulatory, contractual, fiduciary, and common law duties to safeguard patients' and website users' PII and PHI from disclosure and ensure it remains private and confidential, and also expressly promises patients and website users that Defendant will maintain the confidentiality of patient information and communications and will use that information "only for your customer/patient relationship with Baystate Health."

21. As displayed at the bottom of its homepage, Defendant provides patients and website visitors links to access Defendant's Notice of Privacy Practices and Privacy Policy.

22. As shown below, Defendant's Privacy Policy is located at the bottom of the Baystate Website in small font among several other links. Before it was last updated on May 15,

2023, Defendant stated in its Privacy Policy that "Baystate Health (BH) is committed to protecting your privacy. We have designed our website (baystatehealth.org) to allow you to visit most areas without identifying yourself or supplying personal information."[6] Defendant went on to promise that "We do not disclose your personal information unless the following conditions are met: · You provide to us a specific written consent, or · We are required by law."[7] Defendant also misleadingly




stated that "If you are browsing the BH web site, a cookie identifies only your browser!"[8] As explained below, these promises of confidentiality and anonymity were illusory.

23. Defendant's Notice of Privacy Practices is also located at the bottom of the Baystate Website. In it, Defendant states "At Baystate Health, we understand that your medical information is personal, and we are committed to maintaining the privacy of this information," and links to the HIPAA Notice of Privacy Practices in both English and Spanish. HIPAA, short for the Health Insurance Portability and Accountability Act, is a federal law that establishes

---

[6] https://web.archive.org/web/20220622132503/https://www.baystatehealth.org/privacy-policy.
[7] *Id.*
[8] *Id.*

national standards to protect individuals' medical records and other individually identifiable health information.

24. The HIPAA Notice is a two-page document entitled "Baystate Health Notice of Privacy Practices – Your Information. Your Rights. Our Responsibilities" (effective March 1, 2021).[9] Those Privacy Practices explain:

> This notice describes how medical information about you may be used and disclosed and how you can get access to this information. Please review it carefully. If you have questions about this notice, please contact the Baystate Health Privacy Office at (413) 794-7955 or complianceoffice@baystatehealth.org. This notice describes the privacy practices of Baystate Health, Inc. ("Baystate") and its affiliated entities.

Those Privacy Practices also provide numerous assurances for the privacy of information and Baystate's responsibilities, including the following statements:

> **YOUR CHOICES:**
>
> **For certain health information, you can tell us your choices about what we share.** …
>
> If you are not able to tell us your preference, for example if you are unconscious, we may go ahead and share your information if we believe it is in your best interest. We may also share your information when needed to lessen a serious and imminent threat to health or safety. In these cases we never share your information unless you give us written permission:
>
> • Marketing purposes
>
> • Sale of your information ….
>
> OUR RESPONSIBILITIES
>
> • We are required by law to maintain the privacy and security of your protected health information.

[9] *See* https://www.baystatehealth.org/-/media/files/about-us/corporate-information/hipaa-notice-of-privacy-practice-english.pdf?la=en.

• We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information.

• We must follow the duties and privacy practices described in this notice and give you a copy of it.

• We will not use or share your information other than as described here unless you tell us we can in writing.

25. These repeated promises by Defendant inform website users that they can use Defendant's website anonymously and that Defendant will not disclose PII/PHI and other sensitive information to third parties.

26. Moreover, before January 2023, Defendant's website did not feature any notification to patients and website users that cookies were used on the website. At some point in January 2023, Defendant began prompting patients and website users with the following "pop up" notification at the bottom of its homepage. There was no such warning and no prompt to "accept" the use of cookies on the Baystate Website before January 2023.




27. As described above, the Privacy Policy in January 2023 did not disclose to patients and website visitors that their communications on the website would be shared, along with PII, with third parties. The pop-up notification was therefore insufficient to obtain patients' and website users' consent to disclose their communications, PII, and PHI to third parties.

28. Despite these express promises and its legal duties, Defendant chose to share the content of its patients' and website users' communications with Meta and Google by intentionally installing tracking technology on the Baystate Website. Defendant disclosed the communications to Meta and Google without the knowledge or consent of website users or patients.

**B. Defendant's Use of the Meta Pixel.**

29. The Meta Pixel is a snippet of code, invisible to website users as they view a website, that tracks users as they navigate the web, logging which pages they visit, which buttons they click, and certain information they enter into forms or search requests.

30. Defendant began using the Meta Pixel by at least January 1, 2021. The presence of the Meta Pixel on Defendant's website can be shown using the Wayback Machine,[10] as shown in the image below reflecting the code that Defendant installed on its website to enable the Meta Pixel on January 1, 2021.[11]

```
<!-- Facebook Pixel Code -->
▼<script>
    !function(f,b,e,v,n,t,s)
    {if(f.fbq)return;n=f.fbq=function(){n.callMethod?
    n.callMethod.apply(n,arguments):n.queue.push(arguments)};
    if(!f._fbq)f._fbq=n;n.push=n;n.loaded=!0;n.version='2.0';
    n.queue=[];t=b.createElement(e);t.async=!0;
    t.src=v;s=b.getElementsByTagName(e)[0];
    s.parentNode.insertBefore(t,s)}(window, document,'script',
    'https://web.archive.org/web/20210101101705/https://connect.facebook.net/en_US/fbevents.js');
    fbq('init', '247095132483787');
    fbq('track', 'PageView');
</script>
▼<noscript>
   "<img height="1" width="1" style="display:none"
   src="https://web.archive.org/web/20210101101705im_/https://www.facebook.com/tr?
   id=247095132483787&amp;ev=PageView&amp;noscript=1"/> "
</noscript>
<!-- End Facebook Pixel Code -->
```

31. Discovery will show that Defendant programmed the Meta Pixel to send information to Facebook about all website visitors—including Facebook users and non-Facebook users.

---

[10] The Wayback Machine is a digital archive of the World Wide Web founded by the Internet Archive, a nonprofit based in San Francisco, California. Created in 1996 and launched to the public in 2001, it allows the user to go "back in time" and see how websites looked in the past.
[11] *See* https://web.archive.org/web/20210101101705/https://www.baystatehealth.org//.

32. The Meta Pixel sends information to Facebook via scripts running in a person's internet browser, so each data packet comes labeled with an IP address that can be used by Facebook in combination with other data to identify an individual or household.

33. An IP address is a number that identifies a specific device connected to the Internet and reveals geolocation. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), an IP address is considered PII (45 C.F.R. § 164.514(b)(2)(i)(0)).

34. If a website user is logged into Facebook when they visit a website that has installed the Meta Pixel, the communications can also be linked to a specific Facebook account which identifies a Facebook user's name, photo, and profile.

35. Facebook has over 2.9 billion active monthly users.[12] Facebook's Community Standards require users to use their real identities when signing up on the platform. This means users are only allowed one account and must use the name they use in "everyday life,"[13] including first and last name.[14] Users must also provide their birthday and gender.

36. When a user logs into Facebook using an internet browser, such as Google Chrome or Microsoft Edge, Facebook places several cookies on the user's browser.

37. A cookie is a piece of code placed on a browser by a server that contains information. A cookie can store different types of information, but the basic premise is to identify a) you and b) the website you visited that placed the cookie to begin with.

[12] *See* https://www.reuters.com/technology/facebook-owner-meta-forecasts-q1-revenue-below-estimates-2022-02-02/.
[13] *See* https://transparency.fb.com/policies/community-standards/?source=https%3A%2F%2Fwww.facebook.com%2Fcommunitystandards%2Fintegrity_authenticity.
[14] *See* https://www.facebook.com/help/229715077154790/.

38. One of the cookies placed by Facebook on a user's browser upon login is the "c_user" cookie which contains the user's Facebook ID number. This cookie remains on a user's browser as long as they do not hit "Log Out" when they leave Facebook. Even if the person never visits Facebook.com using that browser again, the cookie will remain on the device for one year since the last visit to Facebook.

39. The long life of the c_user cookie is intentional—not only does the cookie allow Meta to identify users when they visit Facebook.com, it also allows Meta to track the user's activity across the web on the same browser. Because the Facebook ID is specific to a person, Meta can also match up a user's activity across devices using different browsers if that user has also logged in on another device.[15]

40. Website owners can also set additional Meta cookies, such as the "fr" or "_fbp" cookies and others, that unlike the c_user cookie, collect information on all website users—not just logged in Facebook users. Like the c_user cookie, these additional Meta cookies appear to contain unique identification numbers that are disclosed to Facebook along with the information tracked by the Meta Pixel, thereby permitting Facebook to target website users with personalized ads across different websites even if they are not Facebook users.

41. By tracking a specific person's movements across the web and across devices, Facebook collects enormous amounts of data regarding website users' interests, behavior, and connections.[16] The quantity and quality of this data allows Meta to generate billions in advertising revenue—allowing businesses to target people with specific interests, target advertisements to specific people who visited their site but did not complete a purchase, and analyze the types of

[15] *See* https://www.facebook.com/business/news/cross-device-measurement.
[16] *See* https://www.facebook.com/business/ads/ad-targeting.

people that are visiting their site by leveraging user demographics, interests, and behaviors on other websites.

42. Businesses—like Defendant—access these services from Meta in part by installing the Meta Pixel on their website.

43. Pixels, also known as "web beacons," are often small transparent images that an internet browser downloads like any other image on a website. When you visit a web page which contains the Meta Pixel, the pixel essentially contacts the Facebook ad server.

44. The business installing the pixel can program the pixel to record specific acts and communications, such as when a user places an item in their shopping cart, clicks a certain button, types in a search into a search bar, or otherwise interacts with the website.[17] Meta receives the event information along with personal identifying information contained in the cookies described above.

45. The disclosures to Meta occur contemporaneously with communications between the website user and the website. The code causes the communications to be recorded on the user's device and then transmitted in a package to Meta. By design, Meta receives the exact contents of the communications before the full response from the website has been rendered on the website users' screen and while the communication between the website and the website user is ongoing.

46. If a business does not install the Meta Pixel, information on a user's actions on the website would not be communicated to Meta.

47. Once the information is in the possession of Meta, Meta uses it for advertising and analytics purposes. Businesses know that Meta can identify the Facebook users visiting their website and track people who are not Facebook users across websites. The value for the business

[17] *See* https://developers.facebook.com/docs/meta-pixel/advanced.

in programming their website with the pixel is derived from Meta's ability to identify the website visitors, track their behavior on their website, and link them to Meta data on their interests, behaviors, and connections, and to allow the business to target advertisements to specific users.

48. In some cases, a Facebook user can confirm that a website has shared information about their visit to that website with Meta via the Meta Pixel on a certain date by reviewing their "Off-Facebook Activity." Off-Facebook activity is "a summary of activity that businesses and organizations share with [Facebook] about [a user's] interactions, such as visiting their apps or websites."[18] The Off-Facebook Activity report provided by Facebook to users, however, is an incomplete report of all activity on non-Facebook sites that has been shared with Meta by third parties such as Defendant.

49. On June 16, 2022, an article was published on The Markup titled "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[19] The Markup is a nonprofit newsroom that investigates and publishes stories regarding technology. The article detailed how hospitals using the Meta Pixel were allowing the tracking tool to collect patients' sensitive health information, including details about their medical conditions, prescriptions, and doctor's appointments, along with users' IP addresses. As detailed by the article, several hospitals removed the Meta Pixel from the most sensitive parts of their websites, such as pages used to book appointments, or removed the Meta Pixel altogether after the article highlighted the privacy violations occurring.

50. After the Markup article was published, and as more and more lawsuits were filed against hospitals and healthcare providers for privacy violations related to the Meta Pixel,

---

[18] *See* https://www.facebook.com/help/2207256696182627.
[19] *See* https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

Defendant likely recognized the privacy violations on its own website. Thus, as evidenced by the disappearance of the Meta Pixel code as viewable on the Wayback Machine, Defendant removed the Meta Pixel from its website by April 2023. Defendant also added the cookie pop up notification to its website in January 2023 and modified its Privacy Policy in May 2023 to add additional disclosures regarding the use of cookies.

### C. Defendant's Use of Google Analytics.

51. Defendant began using Google Analytics by at least January 1, 2021. The presence of the Google Analytics code and other Google code can be shown using the Wayback Machine, as in the image below reflecting the code Defendant installed on its website to enable transmissions to Google from Defendant's website.

```
<!-- Google Tag Manager -->
▼<noscript>
  "<iframe src="//web.archive.org/web/20210101101705if_/https://www.googletagmanager.com/ns.html?
  id=GTM-W98BKP" height="0" width="0" style="display:none;visibility:hidden"></iframe>"
</noscript>
▼<script>
  (function(w,d,s,l,i){w[l]=w[l]||[];w[l].push({'gtm.start':
  new Date().getTime(),event:'gtm.js'});var f=d.getElementsByTagName(s)[0],
  j=d.createElement(s),dl=l!='dataLayer'?'&l='+l:'';j.async=true;j.src=
  '//web.archive.org/web/20210101101705/https://www.googletagmanager.com/gtm.js?
  id='+i+dl;f.parentNode.insertBefore(j,f);
  })(window,document,'script','dataLayer','GTM-W98BKP');
</script>
<!-- End Google Tag Manager -->
```

52. Defendant also installed Google Analytics code on https://providers.baystatehealth.org/, the part of its website where patients can search for doctors and request appointments with specific doctors.

53. Defendant sends patient information to Google using Google Analytics, a web analytics service, which allows website owners to track visitor actions on their website and measure the effectiveness of advertising. Specifically, Defendant uses technology such as Google

tag manager and cookies to send the contents of website users' and patients' communications with the Baystate Website and IP addresses to Google.

54. Google Analytics automatically collects IP addresses of individual Internet users in order to facilitate and track Internet communications. However, Google Analytics offers website owners an opt-in IP anonymization feature. According to Google, this feature is designed to help site owners comply with their own privacy policies and the recommendations of data protection authorities. If the IP anonymization feature is enabled by the website owner, an additional parameter is added to the communications between website visitors' computers and the Google Analytics server, defined as aip=1. Accordingly, when the "aip" parameter does not appear, the IP address is not anonymized, enabling Google to identify a website user's IP address connected with their communications made via the website.

55. Baystate did not opt-in to Google Analytics' IP anonymization feature, as evidenced by the absence of the aip=1 parameter on communications sent to Google from the Baystate Website.

56. Simply put, Defendant intentionally programmed Google Analytics in such a way as to disclose the content of website users' communications with the Baystate Website along with website users' PII/PHI in the form of IP addresses.

57. While Defendant has removed the Google code from https://providers.baystatehealth.org/, Defendant continues to use Google Analytics on https://www.baystatehealth.org/ and to share patients' and website visitors' sensitive communications on that website with Google to this day.

**D. The nature of defendant's intentional, unauthorized, unnecessary, and unlawful disclosures.**

58. As intentionally implemented by Defendant, the Meta Pixel and Google Analytics tag causes PII/PHI, as well as the exact contents of the communications exchanged between Defendant and its website users and patients, to be sent to Meta and Google.

59. Defendant's third-party disclosures occur contemporaneously with communications by Plaintiff and Class members to Defendant's website.

60. By design, Meta and Google receive and record the exact contents of these communications before the full response from Defendant to Plaintiff or a Class Member has been rendered on the screen of the website users' devices and while the communications between defendant and website users remains ongoing.

61. Defendant installed the Google and Meta code on its website in a way that enabled transmissions from across Defendant's website, not just the web pages detailed herein. Discovery will show the full scope of Defendant's disclosures to Meta and Google. The examples provided below are for illustrative purposes only and do not attempt to describe the full scope of Defendant's privacy and wiretap violations.

62. When a website user clicks on the "Find a Provider" links provided by Defendant on the home page, they are directed to https://providers.baystatehealth.org/, where Defendant installed the Google tracking technology.




63. At this website, patients can navigate to a page providing a list of doctors and where they are able to search for a doctor by name, condition, specialty, location, gender, language, and more.




64. As shown in the image to the right, patients can enter the parameters they would like to use to search for a doctor. When a patient entered the parameters, Defendant disclosed the parameters and search terms used by patients and website users to Google.




65. After a patient or website user conducts a search for a provider, Defendant displays a list of doctors that meet the search criteria, such as the list shown below.




66. Patients and website users can then select a doctor that they are interested in. Once patients or website users select a doctor, Defendant also sent this information to Google.




67. For example, as shown below, when a patient searches for a female doctor who specializes in infectious diseases for adults and accepts patients in Springfield, specifically in

Franklin Medical Center and speaks English, and then enters Dr. Megan C. Gallagher's profile page, Defendant sent all of this information to Google along with the patient's IP address.

▾ General
Request URL: https://www.google-analytics.com/collect?v=1&_v=j96&a=503589314&t=timing&_s=2&dl=https%3A%2F%2Fproviders.baystatehealth.org%2Fprovider%2FMegan%28C.%28Gallagher%2F7590
71%3Fdisplay_location%3DSpringfield%252C%2520VA%252C%2520USA%26distance%3D0%26filter%3Dspecialties.specialty.untouched%253AInfectious%2520Diseases%26filter%3Dnetwork_affiliation
s.name%253ABaystate%2520Franklin%2520Medical%2520Center%26filter%3Dage_groups_seen.name%253AAdults%26filter%3Dgender%253AFemale%26filter%3Dlanguages.language%253AEnglish%26locati
on%3D38.7892801%252C-77.18720359999999%26from%3Dsearch-list&ul=he-il&de=UTF-8&dt=Dr.%20Megan%20C.%20Gallagher%2C%20MD%20-%20Springfield%2C%20MA%20-%20Infectious%20Diseases%20-%20
Schedule%20Appointment&sd=24-bit&sr=1920x1080&vp=1472x961&je=0&plt=3883&pdt=380&dns=207&rrt=3&srt=965&tcp=403&dit=2622&clt=2622&_gst=1625&_gbt=1702&_cst=1626&_cbt=1694&_u=SDCACEA
BBAAAAC~&jid=&gjid=&cid=1424047393.1654590255&tid=UA-9927205-1&_gid=498425997.1654590285&gtm=2wg560P3QWM8F&z=1321258638

68. Defendant offers patients and prospective patients the option to schedule an appointment with a doctor from the provider search results page and on the doctor's profile page, as reflected in the green "Schedule Appointment" buttons in the images above.

69. The fact that a person is a patient of a medical provider is PHI under HIPAA.

70. For example, as shown below, when a patient clicks the "Schedule Appointment" button, Defendant disclosed to Google that the patient was scheduling an appointment with a specific doctor, the search that led the patient to that specific doctor, and again the patient's IP address.

▾ General
Request URL: https://www.google-analytics.com/collect?v=1&_v=j96&a=499566268&t=event&
ni=0&_s=7&dl=https%3A%2F%2Fproviders.baystatehealth.org%2Fsearch%3Fdisplay_location%
3DSpringfield%252C%2520MA%252001199%252C%2520USA%26distance%3D25%26filter%3Dnetwork
s.network%253AEmployed%2520Network%26filter%3Dspecialties.specialty.untouched%253AIn
fectious%2520Diseases%26filter%3Dnetwork_affiliations.name%253ABaystate%2520Frankli
n%2520Medical%2520Center%26filter%3Dnetwork_affiliations.name%253ABaystate%2520Medic
al%2520Center%26filter%3Dage_groups_seen.name%253AAdults%26filter%3Dgender%253AFemal
e%26filter%3Dlanguages.language%253AEnglish%26filter%3Dnetwork_affiliations.name%253
ABaystate%2520Noble%2520Hospital%26location%3D42.1208719%252C-72.6029199%26sort%3Dne
tworks%252Crelevance&ul=en-us&de=UTF-8&dt=Dr.%20Megan%20C.%20Gallagher%2C%20MD%20-%2
0Springfield%2C%20MA%20-%20Infectious%20Diseases%20-%20Schedule%20Appointment&sd=24-
bit&sr=1920x1080&vp=1286x961&je=0&ec=user_action&ea=user_action.cta&el=user_action.c
ta&_u=WjCICEFBBAAAAC~&jid=&gjid=&cid=1332318207.1649655651&tid=UA-3927205-1&_gid=172
2676519.1650185520&gtm=2wg4d0P8QWM8F&z=1051408031

71. On https://www.baystatehealth.org/, Defendant offers patients the option to participate in various support groups. Patients are able to click the "Patients & Visitors" button on the main page and choose "Get Support", or search for a specific event through the search bar. Support groups offered include, for example, a virtual weight loss surgery support group which is open to patients enrolled in Baystate Health's bariatric surgery program, cancer support groups which are open to those who have been diagnosed with cancer, breast cancer support groups open to those who have been diagnosed with breast cancer, and grief support groups.




72. Information relating to past, present, or future physical or mental health or condition of an individual including specific diagnoses, is PHI under HIPAA.

73. Defendant's website allows patients and website users the ability to register for support groups on the website.

JOURNEY THROUGH GRIEF SUPPORT GROUP

Please join us for a weekly bereavement support group

JOURNEY THROUGH GRIEF

Journey Through Grief is a weekly bereavement support group for adults who are struggling with the loss of a loved one. Registration is required. The group is free of charge.

This educational support group will provide materials and information on the grieving process to assist better understand the grief experience and gather tools to cope with loss.

Wednesdays, 10-11 am

January 16 - March [illegible], 2019

[illegible] Main St. 4th Floor, Room # [illegible]

Springfield, MA

To register please call or email, Betsy Flores, Bereavement Coordinator [illegible] at 413-794-[illegible] or [illegible]

[illegible]

74. However, when a patient or website user clicks the "Register" button, Defendant sends this information to Meta and Google along with the patients' IP address and identifying Facebook cookies.

Request URL: https://www.google-analytics.com/collect?v=1&_v=j96&a=1184011751&t=event&ni=0&_s=1&dl=https%3A%2F%2Fwww.baystatehealth.org%2Fabout-us%2Fcalendar%2Fspiritual-services%2Fjourney-through-grief&ul=en-us&de=UTF-8&dt=Journey%20Through%20Grief%20%7C%20Baystate%20Health&sd=24-bit&sr=1920x1080&vp=1196x961&je=0&ec=mailto&ea=REGISTER&el=https%3A%2F%2Fwww.baystatehealth.org%2Fabout-us%2Fcalendar%2Fspiritual-services%2Fjourney-through-grief&_u=SCCAiEABB~&jid=&gjid=&cid=1332328207.1649685651&tid=UA-9927205-1&_gid=126151795.1651479903&gtm=2wg4r0W983KP&cg1=Service%20Line&z=1082919632

75. Defendant also allows patients and website users to request specific information by submitting requests in the search bar provided at the top of the home page. Patients and website users can search for doctors, information about conditions that Baystate Health treats, treatment options, and more.

76. Defendant disclosed to Meta and Google the text of the searches typed into the search bar by patients and website users, along with their IP addresses and other PII.

77. As also shown in the images above, next to the search bar on the home page, Defendant provided a green "PATIENT LOG IN" button to patients. This button directs patients to https://mybaystate.baystatehealth.org/#/login, where they can log in to the patient portal and access medical records, make payments, view appointments and make appointments, and more.

The button was provided by Defendant throughout the Baystate Website and other links to the patient portal were provided to patients as well, such as on the medical records page: https://www.baystatehealth.org/patients/medical-records.

78. The fact that a person is a patient of a medical provider is PHI under HIPAA.

79. When a patient clicked this button or the other links provided to the MyBaystate portal login page, Defendant programmed its website to disclose to Google the information highlighted below, which contains the fact that the patient was requesting to log in to the patient portal, along with PII such as their IP address. The code shown below is visible using the WayBack Machine to interact with the page as it was during the relevant time period:

https://web.archive.org/web/20190801140235/https://www.google-analytics.com/r/collect?v=1&_v=j77&a=789417493&t=event&ni=0&_s=1&dl=https%3A%2F%2Fwww.baystatehealth.org%2Fpatients%2Fmedical-records&ul=en-us&de=UTF-8&dt=Medical%20Records%20%7C%20Baystate%20Health&sd=24-bit&sr=1920x1080&vp=1718x1034&je=0&fl=32.0%20r0&ec=Outbound&ea=Click&el=https%3A%2F%2Fmybaystate.baystatehealth.org%2F%3F_ga%3D2.222881438.460604823.1657167446-1194375229.1657167446%23%2Flogin&_u=aGDACEABB~&jid=154672583&gjid=249462703&cid=1194375229.1657167446&tid=UA-9927205-1&_gid=460604823.1657167446&_r=1&gtm=2wg7o0W98BKP&z=105919696

80. These third-party disclosures were made by Defendant without the website users' or patients' knowledge, consent, or any affirmative action taken. As described above, Defendant does not provide any information to patients or website users that would alert them to the fact that the contents of their communications on the Baystate Website are disclosed to Meta and Google. In fact, Defendant misled patients and website users to believe that they can use the website confidentially.

**III. Defendant chose to make the disclosures to enrich itself.**

81. Defendant is not required to make disclosures to Meta or Google in the ordinary course of business. The Baystate Website and services can function without the code that Defendant installed on the Baystate Website to enable the interceptions, as evidenced by Defendant's removal of the tracking code from many places on the website. For example, the

disclosures are not necessary for Defendant to maintain a website or use social media marketing tools.

82. It is possible for Defendant to allow patients to search for information about their health conditions and find doctors without disclosing those searches to third parties. It is also possible for Defendant to allow patients to schedule appointments with providers and register for support groups without disclosing those communications to third parties.

83. Despite these facts, Defendant affirmatively chose to provide Meta and Google secret and invisible "windows" that allowed them to record the exact contents of patient and website user communications on the Baystate Website and PII/PHI.

84. Defendant chose to install the tracking technology on the Baystate Website for marketing and/or analytics purposes. In exchange for PII/PHI about Defendant's patients and website users, Meta and Google use the information to provide enhanced online advertising services and/or analytical services to Defendant.

85. Further, once the information is shared by Defendant with Meta and Google, Defendant loses the ability to further control the dissemination and use of the PII/PHI and the disclosed communications. Discovery will show that Meta and Google use the information disclosed by Defendant for their own purposes.

86. The monetization of the data disclosed by Defendant, both for its own purposes and those of the third parties, demonstrates the inherent value of the information collected.

87. By sending this sensitive information and communications to third parties, Defendant violates Plaintiff's and Class members' rights to privacy in that information and communications and their right not to have their PII and PHI shared without their knowledge or consent.

## FEDERAL REGULATORY WARNINGS

88. On July 20, 2023, the Federal Trade Commission ("FTC") and the U.S. Department of Health and Human Services' Office for Civil Rights ("OCR") issued a press release explicitly cautioning hospitals and telehealth providers, such as Baystate, about "the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties."[20]

89. In that press release, Samuel Levine, Director of the FTC's Bureau of Consumer Protection admonished that:

> When consumers visit a hospital's website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties .... The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation.

90. The press release further advised that HHS and the FTC had "sent the joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app."

91. In their letter to healthcare providers dated July 20, 2023, HHS and the FTC "reiterated the risks posed by the unauthorized disclosure of an individual's personal health

---

[20] *See* https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment." *Id.*[21]

92. Indeed, as reported, "HHS highlighted these concerns in a bulletin it issued late last year that reminded entities covered by the Health Insurance Portability and Accountability Act (HIPAA) of their responsibilities to protect health data from unauthorized disclosure under the law." Those admonitions even extended to companies not covered by HIPAA as providers "still have a responsibility to protect against the unauthorized disclosure of personal health information—even when a third party developed their website or mobile app. Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule."

93. Earlier this year, in a March 16, 2023, the FTC Office of Technology issued a blog posting titled "Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking," in which the FTC provided further cautionary warnings to about the use of pixel tracking, such as the Meta Pixel, and the serious privacy violations such tracking causes.[22] In that blog, the FTC discussed its recent

---

[21] A copy of the letter dated July 20, 2023, that was signed by the Director of HHS's Office for Civil Rights, Melanie Fontes Rainer, and the Director of the FTC's Bureau of Consumer Protection is available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf.

[22] *See* https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking.

enforcement actions against GoodRx and BetterHelp, two digital healthcare platforms, for allegedly sharing user health data with third parties for advertising.

**PLAINTIFF'S EXPERIENCE**

94. Plaintiff Jane Doe has and had objectively reasonable expectations of privacy in communications with the Baystate Website that are grounded in her status as a patient of Defendant's, Defendant's legal obligations to maintain the confidentiality of wire communications and communications with patients, state and federal laws protecting the confidentiality of patient communications and medical information, and Defendant's express promises, as described above.

95. Plaintiff has been a patient of Defendant's for at least 10 years and is a current patient. Plaintiff regularly exchanged communications with Defendant on the Baystate Website during the relevant time period.

96. In the last few years, Plaintiff has communicated on the Website to obtain information related to breast cancer screenings and schedule a mammogram, to log in to the MyBaystate patient portal, and to search for providers.

97. Defendant disclosed Plaintiff's confidential communications with Defendant through the Baystate Website to Meta and Google.

98. Plaintiff has confirmed that Defendant disclosed her communications and sensitive information to Meta through the Off Facebook Activity Report. Plaintiff has been a Facebook user since at least 2010. Even though such reports provided by Facebook are incomplete, a report generated by Plaintiff captured approximately ***80 disclosures*** of Plaintiff's communications by Defendant to Meta between November 19, 2021 through April 10, 2023.

99. The presence of this data on the report confirms that the c_user cookie was present on Plaintiff's device and operating as Defendant intended when it installed it on the Baystate Website during the relevant time period.

100. Google cookies were also present on the device Plaintiff used to visit Defendant's website.

101. The demonstrated operation of the Facebook cookies on Plaintiffs device also indicates that the Google cookies supporting the Google tracking code installed by Defendant on the Baystate Website would also have operated as expected on Plaintiff's device during the relevant time period.[23]

102. The sensitive information exchanged was disclosed along with PII/PHI regarding Plaintiff, such as her IP address, Facebook ID, and other unique identifiers.

103. Plaintiff was not aware that Defendant was disclosing her PII/PHI or the contents of her communications with the Baystate Website to Meta and Google and never consented to or authorized such disclosures.

104. Plaintiff was shocked when she discovered the privacy violations and is distressed that Defendant has been disclosing her private information to third parties without her knowledge or consent.

105. Plaintiff is a Massachusetts resident who was communicating with the Defendant, a Massachusetts corporation, and Defendant illegally caused these communications to be recorded in Massachusetts on Plaintiff's device before causing them to be automatically sent to a third party.

106. Discovery will show that Defendant disclosed the information regarding Plaintiff in exchange for enhanced marketing and analytical services from Meta and Google. Defendant benefitted from Plaintiff's information without ever intending to compensate Plaintiff or to inform her that the disclosures had been made.

[23] As noted the reports are incomplete and the absence of the data would not indicate that either the Meta cookies or Google cookies were not operating as expected on a given device.

107. Defendant violated Plaintiff's rights to privacy in her PII/PHI and sensitive, confidential medical communications.

108. Defendant's conduct injured Plaintiff and will continue to injure Plaintiff.

109. Defendant's disclosures to Google are ongoing.

110. Injuries to Plaintiff are also ongoing because her confidential and private information is now in the hands of Meta and Google who have used the information and can continue to use the information for their own purposes.

## CLASS ALLEGATIONS

111. Plaintiff brings claims on behalf of herself, individually, and on behalf of the following classes:

**The Website User Class**

All Persons who, within the statute of limitations, exchanged communications with the Baystate Website and who (a) are a resident of Massachusetts, and/or (b) received medical care or advice in Massachusetts from Defendant.

**The Patient Class**

All Persons who, within the statute of limitations, were patients of Defendant and exchanged communications with the Baystate Website.

112. Excluded from the Classes are all judges and their staff assigned to this case and any members of their immediate families.

113. Plaintiff reserves the right to redefine the Classes and/or divide the Classes into subclasses at, or prior to, the class certification stage; in response to discovery; or pursuant to instruction by the Court.

114. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

115. Numerosity: The Classes are so numerous that joinder of all class members is impracticable. Given the volume of Defendant's business, there are hundreds or thousands of Class members.

116. Commonality: This case presents common questions of law and fact, including but not limited to:

a. Whether Defendant's practices relating to contemporaneous disclosures of Plaintiff's and Website User Class members' communications with Defendant to Meta and Google attached to PII and/or PHI violates G.L. c. 272, § 99;

b. Whether Defendant's practices relating to the disclosures of Plaintiff's and the Patient Class members' communications with Defendants to Meta and Google attached to PII/PHI violates G.L. c. 214, § 1B;

c. Whether an implied contract exists between Defendant and members of the Patient Class;

d. Whether Defendant's alleged conduct breached the implied contract between Defendant and the Patient Class;

e. Whether Defendant's practices relating to disclosures of Plaintiff's and Class members' communications with Defendant to Meta and Google were intentional;

f. Whether Defendant's conduct harmed and continues to harm Plaintiff and Class members, and, if so, the extent of the injury;

g. Whether and to what extent Plaintiff and Class members are entitled to damages and other monetary relief;

h. Whether and to what extent Plaintiff and Class members are entitled to equitable relief; and

i. Whether and to what extent Plaintiff and Class Members are entitled to attorneys' fees and costs.

117. Typicality: Plaintiff's claims are typical of the members of the Classes. Plaintiff and all members of the Classes visited the same website, programmed in the same way by Defendant, and had the same types of information sent to Meta and Google. Plaintiff and all members of the Patient Class are patients of Defendant.

118. Adequacy: Plaintiff will fairly and adequately protect the interests of the Classes because she and her experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Classes.

119. Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the Wiretap Act, the Privacy Act, as well as Defendant's contractual and common law obligations. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

120. Defendant has acted or refused to act on grounds that apply generally to the Classes such that final injunctive relief is appropriate respecting the Classes as a whole.

121. In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate actions.

122. Yet, the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

**COUNT I**

**INTERCEPTION OF WIRE COMMUNICATIONS IN VIOLATION OF G.L. c. 272, § 99 (Plaintiff Individually and on behalf of the Website User Class)**

123. Plaintiff reiterates each of the allegations in the preceding paragraphs as if set forth at length herein.

124. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communication through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

125. Any person aggrieved by a violation of G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates her personal, property, or privacy interest."

126. Defendant is a "person" under the statute.

127. All communications between Plaintiff or Class members and Defendant are "wire communications" under Massachusetts law because each communication is made using personal computing devices (*e.g.*, computers, smartphones, tables) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

128. An "interception" under the statute "means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire ... communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication[.]" G.L. c. 272, § 99B(4).

129. Defendant engaged and continues to engage in an "interception" by aiding Meta and Google to secretly record the contents of Plaintiff's and Class members' wire communications.

130. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire ... communication[.]" G.L. c. 272, §99B(3) (setting forth exceptions that do not apply here).

131. The "intercepting devices" used in this case include the third-party source code utilized by Defendant which utilized (a) Plaintiff's and Class members' personal computing devices; (b) Plaintiff's and Class members' web-browsers; (c) Plaintiff's and Class members' browser-managed files; (d) Internet cookies; (e) Defendant's own computer servers; and (f) the computer servers of Meta and Google.

132. Under the statute, "contents" is defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or the meaning of that communication." G.L. c. 272, § 99B(5).

133. Defendant aided in and continues to aid in the interception of contents in that the data from the communications exchanged between Plaintiff or Class members and Defendant that were re-directed to and recorded by Meta and Google include information which identifies the parties to each communication, their existence, and their exact contents.

134. Under G.L. c. 272, § 99Q, aggrieved persons are "entitled to recover .. (1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each day

of violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation disbursements reasonably incurred.

135. In addition to statutory damages, Plaintiff and Class members were damaged by Defendant's violation in that:

a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private; and

b. Defendants took valuable information from Plaintiff and Class members and derived benefit therefrom, including obtaining enhanced advertising and analytics services from Meta and Google, without Plaintiff's and Class members' knowledge or informed consent and without sharing the benefits with Plaintiff or Class members.

## COUNT II

## INVASION OF PRIVACY IN VIOLATION OF G.L. c. 214, § 1B
**(Plaintiff Individually and on behalf of the Patient Class)**

136. Plaintiff reiterates each of the allegations in the preceding paragraphs as if set forth at length herein.

137. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with her privacy. The superior court shall have jurisdiction in equity to enforce such a right and in connection therewith to award damages."

138. All health care providers owe their patients a duty not to disclose medical information about the patient without the patient's informed consent.

139. G.L. c. 111, §70E provides that every patient of a Massachusetts health care facility shall have the right "to confidentiality of all records and communications to the extent provided by law."

140. The confidentiality of the patient-provider relationship is a cardinal rule of the medical profession which has come to be justifiably relied upon by patients seeking advice and treatments.

141. Plaintiff and members of the Patient Class are patients of Defendant.

142. Defendant owes Plaintiff and members of the Patient Class a duty of confidentiality.

143. Despite their duty not to disclose without informed consent, Defendant disclosed information relating to Plaintiff's and Patient Class members' medical treatment to Meta and Google without their knowledge or informed consent.

144. The information disclosed includes confidential medical information, including PHI such as Plaintiff's and Patient Class members' status as patients of Defendant, the contents of communications exchanged between Plaintiff or Patient Class members with Defendant, details regarding which doctors or support groups Plaintiff or Patient Class members scheduled appointments for, and information regarding medical diagnoses.

145. The disclosure of medical information with PII constitutes an unreasonable, substantial, and serious interference with Plaintiff's and Patient Class members' rights to privacy.

146. Plaintiff and Patient Class members were damaged by Defendant's violation in that:

a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b. Defendant took valuable information from Plaintiff and Class members and derived benefit therefrom, including obtaining enhanced advertising and analytics services from Meta and Google, without Plaintiff's and Class members' knowledge or informed consent and without sharing the benefits with Plaintiff or Class members;

c. Plaintiff and Class members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality. Plaintiff and Patient Class members would not have used Defendant's services, or would have paid substantially less for these services, had they known their medical information and PII would be disclosed.

**COUNT III**

**BREACH OF IMPLIED CONTRACT**
**(Plaintiff Individually and on behalf of the Patient and Website User Classes)**

147. Plaintiff reiterates each of the allegations in the preceding paragraphs as if set forth at length herein.

148. Plaintiff and Patient and Website Class members sought medical care and information from Defendant through the Baystate Website.

149. In order to obtain medical care and information from Defendant through the Baystate Website, Plaintiff and Patient and Website Class members provided their user data containing PII and private medical information to Defendant.

150. When Patient and Website Class members exchanged their PII and medical information in order to obtain information and services from Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their PII and medical information to third parties without their consent.

151. Plaintiff and Patient and Website Class members reasonably believed and expected that Defendant would not disclose their PII and medical information to third parties because, inter alia, Defendant made numerous promises not to disclose their information without consent and to not use their information for any purposes other than furthering the customer/patient relationship.

152. Plaintiff and Patient and Website Class members accepted Defendant's offers and provided their PII and medical information to Defendant in exchange for information and services.

153. Plaintiff and Patient and Website Class members would not have entrusted Defendant with their medical information and PII in the absence of an implied contract between them and Defendant obligating itself to not disclose Plaintiff's and Patient and Website Class members' medical information and PII without their consent.

154. Defendant breached these implied contracts by disclosing the medical information and PII of Plaintiff and Patient and Website Class members to third parties, *i.e.*, Facebook and/or Google, and using it for non-medical purposes, i.e., to obtain enhanced marketing and analytical services.

155. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Patient and Website Class sustained damages as alleged herein, including:

a. Sensitive and confidential information that Plaintiff and Patient and Website Class members intended to remain private is no longer private; and

b. Defendant took valuable information from Plaintiff and Patient and Website Class members and derived benefit therefrom, including obtaining enhanced advertising and analytics services from Meta and Google, without Plaintiff's and Class members' knowledge or informed consent and without sharing the benefits with Plaintiff or Class members.

156. Plaintiff and the Patient and Website User Class members are entitled to nominal, compensatory, and consequential damages as a result of Defendant's breaches of implied contract.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Classes, ask for judgment in their favor and that the Court award:

a. Statutory damages of $1,000 to Plaintiff and Website User Class members pursuant to G.L. c. 272, § 99Q;

b. Damages for the violation of privacy as to Plaintiff and the members of Patient Class;

c. Contract damages to Plaintiff and members of the Patient and Website User Classes for Defendant's breach of the implied contract;

d. Punitive damages in an amount to be determined by a jury;

e. Attorneys' fees and litigation costs reasonably expended;

f. Appropriate injunctive relief enjoining the disclosures alleged herein which were made without Plaintiff's and Class members' express, informed written consent or other form of authorization;

g. Granting such other and further relief, in law or equity, as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiff, on behalf of herself and the Classes, demands a trial by jury on all issues triable by a jury.

Date: August 29, 2023

Respectfully submitted,

JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED, By Her Attorneys,

Jonathan Shapiro
BBO No. 454220
SHAPIRO & TEITELBAUM LLP
55 Union Street, 4th Floor
Boston, MA 02108
Tel.: (617) 742-5800
jshapiro@jsmtlegal.com

Sherrie R. Savett*
Lane L. Vines*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
ssavett@bm.net
lvines@bm.net

Sophia M. Rios*
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92101
Tel.: (619) 489-0300
srios@bm.net

* Pro hac vice motion to be filed

*Attorneys for Plaintiff*
*and the proposed Classes*

I HEREBY ATTEST AND CERTIFY ON
Feb.11,2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst.Clerk

perior Court - Suffolk
icket Number

2

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. 23-1949-BLS 1 | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|
| PLAINTIFF(S) JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED | | DEFENDANT(S) BAYSTATE HEALTH SYSTEM INC. |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number Jonathan Shapiro, Shapiro & Teitelbaum LLP, 55 Union Street, 4th Floor, Boston, MA 02108, Telephone: 617-742-5800, BBO No. 454220 | | ATTORNEY (if known) |

Origin Code Original Complaint

BK.1

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? * ______

BK.1 ______ (B) ☑ Yes ☐ No

Consumer matter involving complex issues; Track B.

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

This is a putative class action filed against medical provider Baystate Health Inc. for installing technology that intercepted the contents of website users' and patients' communications with Defendant on Defendant's website and transmitted the private information to unauthorized third parties, Meta and Google. Plaintiff alleges that the conduct violated her rights and those of class members under G.L. c. 272 § 99, G.L. c. 214, § 1B, and an implied contract.

This is a consumer matter involving complex issues, including the operation of Online tracking technologies deployed on Defendant's website, likely third party discovery to determine the extent of private information transmitted to Meta and Google, class claims made on behalf of two classes, and a request for injunctive relief. Case based on similar claims, e.g., Doe et al. v. Partners Healthcare System, Inc., et al., No. 1984CV01651-BLS1 and Doe v. Boston Medical Center Corporation, No. 2384CV00326 BLS1, have been assigned to the Business Litigation Session.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record Jonathan Shapiro

DATE: 8/29/2023

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

3

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.: 23-1949

9/13/23 notice sent BA (2)

9-7-23 ALLOWED after careful consideration of the parties' arguments. H. Karanjian

JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

BAYSTATE HEALTH SYSTEM INC.,

Defendant.

**PLAINTIFF'S MOTION TO PROCEED UNDER PSEUDONYM AND FOR IMPOUNDMENT OF FILINGS DISCLOSING HER NAME AND OTHER PERSONALLY IDENTIFIABLE INFORMATION**

Plaintiff Jane Doe respectfully requests that the Court permit her to proceed in this action under pseudonym.[1] In addition, Plaintiff seeks leave, under Mass. Trial Court Rule VIII, for impoundment of all filings in this case disclosing her name and other personally identifiable information.

**As reasons for this motion, Plaintiff states as follows:**

1. This Court has discretion to permit a litigant to proceed under pseudonym when justice so requires. *See Singer v. Rosenkranz,* 453 Mass. 1012, 1014 (2009); *HS. Gere & Sons, Inc. v. Frey,* 400 Mass. 326, 329 (1987). Similarly, a court possess "inherent equitable power to impound its files in a case and to deny public inspection of them ... when justice so requires." *George W Prescott Pub. Co. v. Register of Probate,* 395 Mass. 274,277 (1985). "In exercising this discretion, a judge must balance the privacy issues against 'the general principle of publicity' which governs judicial proceedings in this Commonwealth." *HS. Gere & Sons Inc.,* 400 Mass. at 329 (quoting *Commonwealth v. Blondin*, 324 Mass. 564, 571 (1949)

[1] Plaintiff will, of course, reveal her identity and all relevant personally identifiable information to Defendant in discovery in this matter, or at any time as required by the Court.

cert. denied, 339 U.S. 984 (1950), and *New Bedford Standard-Times Publishing Co. v. Clerk of the Third Dist. Court of Bristol*, 377 Mass. 404,410 (1979)).

2. In the balancing process, "a judge must determine whether 'good cause' to order impoundment exists and must tailor the scope of the impoundment order so that it does not exceed the need for the impoundment." *Id.* To determine whether good cause exists, a key question is whether public disclosure "would invade the legitimate expectation of privacy that litigants or other persons have in matters that are intensely personal or private." *Globe Newspaper Co., Inc. v. Clerk of Suffolk County Superior Court*, 14 Mass.L. Rptr. 315, 2002 WL 202464 at *5 (Mass. Sup. Ct. Feb. 4, 2002). Put another way, the Court asks whether public disclosure "would properly constitute a violation of the common law tort of invasion of privacy or statutory entitlements to privacy." *Id.*

3. Here, the answer is yes: disclosure of the information at issue invades Plaintiff's legitimate expectations of privacy that properly constitute a tortious violation of statutory and common law entitlements to privacy. This case is about Defendant's systematic violation of Plaintiff's fundamental and statutory rights to privacy via Defendant's electronic dissemination of personally identifiable information about the Plaintiff co-mingled with and attached to confidential information that includes her status as a patient and the contents of her communications with her medical provider, to third parties without Plaintiff's knowledge or consent. Plaintiff has statutory privacy claims under the Massachusetts Wiretap Act (Mass. G.L. c. 272, §§ 99 *et seq.)* and Right of Privacy (Mass. G.L. c. 214, § lB), which provide rights against dissemination of this information. *See* Mass. G.L. c. 111, § 70E (patients' and residents' rights); *Alberts v. Devine*, 395 Mass. 59, 66 (1985) ("confidentiality of the relationship is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment"). The very nature of this case provides the good cause to grant leave to file under pseudonym and to impound all other personally identifiable information of the named plaintiff in this case. To do otherwise would lead to the absurd result that, in order to effectively vindicate one's fundamental privacy rights, one must first be willing to eviscerate them.

4. Plaintiff therefore requests an order permitting her to proceed in this action under pseudonym. Plaintiff further requests an order of impoundment that permits and directs counsel to redact all portions of all publicly-filed documents that should contain Plaintiff's name or other personally identifiable information.

5. Plaintiff's request is appropriately narrowly tailored. Plaintiff seeks only that her own name and other personally identifiable information be protected from public disclosure. All other filings in the case would remain open to public view. All substantive case information would remain publicly available.

DATED: August 29, 2023

Respectfully submitted,

JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED
By Her Attorneys,

Jonathan Shapiro
BBO No. 454220
Mia Teitelbaum
BBO No. 693595
SHAPIRO & TEITELBAUM LLP
55 Union Street, 4th Floor
Boston, MA 02108
617-742-5800
jshapiro@jsmtlegal.com
mteitelbaum@jsmtlegal.com

Sherrie Savett*
Lane Vines*
Sophia Rios*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215 875 3000
ssavett@bm.net
lvines@bm.net
srios@bm.net
*to be admitted *pro hac vice*

*Attorneys for Plaintiff*
*and the proposed Classes*

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Asst.Clerk

Notify

4

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: **2384CV01949-BLS1**

Notice Sent
8/30/23
S.R.

Case: Doe v. Baystate Health System, Inc.

**NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION**

This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to **BLS1**.

Hereafter, as shown above, all parties must include the initials **"BLS1"** at the end of the docket number on all filings.

Counsel for the plaintiff(s) is hereby advised that within seven (7) days of the filing of an appearance, answer, motion or other response to the complaint by or on behalf of the defendant(s) which has been served with process within the time limitation of Mass. R. Civ. P. 4(j), or such other time as may be modified by the Court, he or she shall send notice thereof to the appropriate BLS Session Clerk at Suffolk Superior Court, Three Pemberton Square, Boston, MA 02108.

Upon receipt of such notice, the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel. Before the Rule 16 Conference, counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Project on Discovery (counsel are directed to www.mass.gov/superior-court-business-litigation-session for description of the Project). Counsel may indicate their respective client's participation by completing, filing, and serving the attached form. If by the date of the initial Rule 16 Conference, not all parties have given notice of their participation, counsel shall be prepared to discuss at that conference whether their clients will participate in the Project.

The Court requests that plaintiff's counsel serve on opposing parties a copy of this notice and the attached form.

Dated: August 29, 2023

/s/ Kenneth W. Salinger

Kenneth W. Salinger
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature] Asst.Clerk

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: ______________________

Case: ____________________________________________

As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: www.mass.gov/superior-court-business-litigation-session)

If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

___ (Check) **Yes,**______________ is willing to participate in the Discovery Project.
(Party's Name)

Case Name ______________________________________________

Docket Number CIVIL DOCKET#: ____________________________

Counsel For____________________ Date_______________

Firm Name and Address:

______________________________

______________________________

______________________________

Please complete this form and return it to:

Assistant Clerk - BLS1
BLS1, Room 1309
3 Pemberton Square
Boston, MA 02108

**OR**

Assistant Clerk - BLS2
BLS2, Room 1017
3 Pemberton Square
Boston, MA 02108

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: ______________________

Case: ____________________________________________

As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: www.mass.gov/superior-court-business-litigation-session)

If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

___ (Check) **Yes,**______________ is willing to participate in the Discovery Project.
(Party's Name)

Case Name ______________________________________________

Docket Number CIVIL DOCKET#: ____________________________

Counsel For____________________ Date______________

Firm Name and Address:

______________________________

______________________________

______________________________

Please complete this form and return it to:

Assistant Clerk - BLS1
BLS1, Room 1309
3 Pemberton Square
Boston, MA 02108

**OR**

Assistant Clerk - BLS2
BLS2, Room 1017
3 Pemberton Square
Boston, MA 02108

5

| Summons | CIVIL DOCKET NO. 2384CV01949 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: Jane Doe, Individually and on behalf of All others similarly situated, Plaintiff(s) vs. BayState Health Systems, Inc. Defendant(s) | | John E. Powers, III, Acting Clerk of Courts, Suffolk Superior Civil, County. COURT NAME & ADDRESS: Three Pemberton Square Boston, MA. 02108 |

THIS SUMMONS IS DIRECTED TO BayState Health Systems, Inc (Defendant's name)

SUFFOLK SUPERIOR COURT CIVIL CLERK'S OFFICE 2023 OCT 3 P 1:59 JOHN E. POWERS III ACTING CLERK MAGISTRATE

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Suffolk Superior Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, Suffolk Superior Court Three Pemberton Square, Boston, MA 02108 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, **AND**

b) Delivering or mailing **a copy** of your response to the Plaintiff's attorney/Plaintiff at the following address:
Shapiro & Teitelbaum LLP
55 Union St., 4th FL.
Boston, MA 02108

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M Buckley
Asst.Clerk

**3. (cont.)** Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure.** If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger , Chief Justice on ____________ , 20____ . (Seal)

Acting Clerk ____________

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is

**Office of the Sheriff**
**Hampden County** • 95 Liberty St. • PO Box 5005 • Springfield, MA 01101-5005 • 413-732-5772

October 4, 2023

I hereby certify and return that on 10/3/2023 at 10:55 AM I served a true and attested copy of the S & C W/CIVIL ACTION COVER SHEET in this action in the following manner: To wit, by delivering in hand to NANCY STEBBINS, , agent, person in charge at the time of service for BAYSTATE HEALTH SYSTEMS, INC., 280 CHESTNUT ST SPRINGFIELD, MA 01107 . Attestation X 1 ($5.00) Basic Service Fee ($30.00) Conveyance ($4.50) Mailing1 ($2.00) Travel ($24.74) COPIES ($20.00) Total: $86.24

**Deputy Sheriff JORGE DIAZ**

**Deputy Sheriff**

N.B. TO PROCESS SERVER:

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

rev. 7/2022

Date Filed 10/19/2023 4:52 PM
Superior Court - Suffolk
Docket Number 2384CV01949

ML \10/31 10.24 Notify 6

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV01949 BLS1

10/31/23 notice sent BA (2)

JANE DOE, Individually and on behalf of all others similarly situated,

Plaintiff,

v.

BAYSTATE HEALTH SYSTEM, INC.,

Defendants.

10/26/23: Allowed (Ricciuti, J) Attest: [signature] Asst Clerk

**ASSENTED TO MOTION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT**

Defendant Baystate Health, Inc. ("Baystate") files this assented to Motion for Extension of Time to Respond to Plaintiff Jane Doe's Complaint. Baystate's response to the Complaint is presently due on October 23, 2023. Baystate respectfully requests an extension to December 7, 2023 to respond to the Complaint. Baystate has not previously requested an extension of this deadline and the additional 45 day extension will not impact any case deadlines. Baystate has conferred with Plaintiff Jane Doe regarding the requested extension, and Plaintiff assents to the relief requested in this motion. Baystate respectfully requests that the Court grant an extension of time to file a response to the Complaint.

Date Filed 10/19/2023 4:52 PM
Superior Court - Suffolk
Docket Number 2384CV01949

Dated: October 19, 2023

Respectfully submitted,

**BAYSTATE HEALTH, INC.**

*/s/ Stephen I. Hansen*
Stephen I. Hansen (BBO 679134)
sihansen@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: 617.531.1411 | Fax: 617 531.1602

Tammy B. Webb (*pro hac vice* forthcoming)
tbwebb@shb.com
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: 415.544.1900 | Fax: 415.391.0281

Frederick S. Rudesheim (pro hac vice forthcoming)
frudesheim@shb.com
SHOOK, HARDY & BACON L.L.P.
1800 J Street NW, Suite 1000
Washington, D.C. 20006
Tel: 202.639.5625 | Fax: 202.783.4211

Jessica N. Wahl (*pro hac vice* forthcoming)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: 424.324.3477 | Fax: 424.204.9093

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Marguerite Buckley
Asst.Clerk

Date Filed 10/19/2023 4:52 PM
Superior Court - Suffolk
Docket Number 2384CV01949

**RULE 9C CERTIFICATION**

On October 13, 2023, counsel for Baystate Health, Inc. communicated with counsel for Plaintiff in a good faith effort to reach an agreement of the issues. Plaintiff assents to this motion.

*/s/ Stephen I. Hansen*
Stephen I. Hansen

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2023, the foregoing was served via electronic mail to all parties of record:

SHAPIRO & TEITELBAUM LLP
Jonathan Shapiro BBO No. 454220
55 Union Street, 4th Floor
Boston, MA 02108
jshapiro@jsmtlegal.com

BERGER MONTAGUE PC
Sherrie R. Savett
Lane L. Vines
1818 Market Street, Suite 3600
Philadelphia, PA 19103
ssavett@bm.net
lvines@bm.net

BERGER MONTAGUE PC
Sophia M. Rios
401 B Street, Suite 2000
San Diego, CA 92101
srios@bm.net

*/s/ Stephen I. Hansen*
Stephen I. Hansen

Date Filed 10/19/2023 4:56 PM
Superior Court - Suffolk
Docket Number 2384CV01949

7

ML

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV01949 BLS1

JANE DOE, Individually and on behalf of all others similarly situated,

Plaintiff,

v.

BAYSTATE HEALTH SYSTEM, INC.,

Defendants.

**CORPORATE DISCLOSURE STATEMENT OF DEFENDANT BAYSTATE HEALTH, INC.**

Pursuant to Massachusetts Supreme Judicial Court Rule 1:21, Defendant Baystate Health, Inc.[1] hereby provides the following disclosure statement:

1. Baystate Health, Inc. is a nonprofit corporation with its principal office at 759 Chestnut Street, Springfield, MA 01199.
2. As a nonprofit corporation, Baystate Health, Inc. does not have a parent corporation and does not have stock.

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst.Clerk

[1] The Complaint and case caption incorrectly refer to the defendant as Baystate Health System, Inc. On August 1, 2005, the defendant changed its name to Baystate Health, Inc.

Date Filed 10/19/2023 4:56 PM
Superior Court - Suffolk
Docket Number 2384CV01949

Dated: October 19, 2023

Respectfully submitted,

**BAYSTATE HEALTH, INC.**

*/s/ Stephen I. Hansen*
Stephen I. Hansen (BBO 679134)
sihansen@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: 617.531.1411 | Fax: 617 531.1602

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2023, the foregoing was served via electronic mail to all parties of record:

SHAPIRO & TEITELBAUM LLP
Jonathan Shapiro BBO No. 454220
55 Union Street, 4th Floor
Boston, MA 02108
jshapiro@jsmtlegal.com

BERGER MONTAGUE PC
Sherrie R. Savett
Lane L. Vines
1818 Market Street, Suite 3600
Philadelphia, PA 19103
ssavett@bm.net
lvines@bm.net

BERGER MONTAGUE PC
Sophia M. Rios
401 B Street, Suite 2000
San Diego, CA 92101
srios@bm.net

*/s/ Stephen I. Hansen*
Stephen I. Hansen

Date Filed 12/7/2023 3:51 PM
Superior Court - Suffolk
Docket Number 2384CV01949

BC

8

\ i13

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV01949–BLS1**

Notice sent
1/3/24
BA (2)

JANE DOE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BAYSTATE HEALTH SYSTEM INC.,

Defendant.

**JOINT STIPULATION AND PROPOSED ORDER TO STAY ALL PROCEEDINGS PENDING INTERLOCUTORY APPEAL IN THE *VITA* CASES**

Defendant Baystate Health System Inc. ("Baystate") and Plaintiff Jane Doe respectfully move to stay this case pending resolution of the appeals in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (No. 2384CV00480-BLS1; No. 2023-P-1310; No. 2023-P-1308) and *Vita v. New England Baptist Hospital* (No. 2384CV00857-BLS1). In support of this joint motion, the Parties state as follows:

Plaintiff filed this action on August 29, 2023, alleging that Defendant violated the Wiretap Statute, G.L. c. 272, § 99, and invaded Plaintiff's privacy in violation of G.L. c. 214, § 1B, by disclosing online patient and website user communications to third parties. On October 19, 2023, the parties agreed to an extension of time for Defendant Baystate to respond to Plaintiff's Complaint. On October 30, 2023, this Court granted Defendant Baystate's Motion for Extension of Time to Respond. Defendant Baystate's deadline to respond to Plaintiff's Complaint is now December 7, 2023.

On October 31, 2023, the Court denied the motions to dismiss in *Beth Israel* and *New England Baptist*. The Court also decided to report its decisions denying the motions to dismiss in those cases to the Massachusetts Appeals Court for interlocutory appellate review, pursuant to Mass. R. Civ. P. 64(a).

Defendant contends the issues raised in the *Beth Israel* and *New England Baptist* appeals overlap with Plaintiff's wiretap claims in this case. In the decisions in *Beth Israel* and *New England Baptist*, this Court identified the present matter as an analogous case.

The Parties have conferred and agreed to stay all Superior Court proceedings in this matter pending resolution of the appeals in *Beth Israel* and *New England Baptist*. Notwithstanding, Plaintiff reserves the right to seek leave of Court to have the stay lifted prior to the resolution of the appeals.

Accordingly, the Parties stipulate and agree, subject to the Court's approval, that:

1. All Superior Court proceedings, time standards, and deadlines in this matter should be stayed during the pendency of the appeals in *Beth Israel* and *New England Baptist*.

2. No discovery requests or responses will be exchanged between the Parties during the pendency of the stay, including (without limitation) interrogatories, requests for the production of documents/data, or deposition notices. Notwithstanding, Defendants remain obligated to preserve its documents relevant to the claims and defenses of this case.

3. Fourteen days after the completion of the appeals in the *Beth Israel* and *New England Baptist* (including the exhaustion or expiration of any rights to rehearing, reconsideration, or further appellate review), this stay shall be automatically lifted, and the Parties may then proceed with further litigating the case in this Court, to the extent consistent with the outcome of the appeal.

Date Filed 12/7/2023 3:51 PM
Superior Court - Suffolk
Docket Number 2384CV01949

Respectfully submitted,

/s/ Jonathan Shapiro
Jonathan Shapiro
BBO No. 454220
Shapiro & Teitelbaum LLP
55 Union Street, 4th Floor
Boston, MA 02108
Tel.: (617) 742-5800
jshapiro@jsmtlegal.com

*Counsel for Plaintiff*

/s/ Stephen I. Hansen
Stephen I. Hansen , BBO# 679134
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411
sihansen@shb.com

*Counsel for Defendant*

Dated: December 7, 2023

The Court hereby approves the Parties' Joint Stipulation above and so orders.

Associate Justice, Superior Court
Commonwealth of Massachusetts

Entered: 1/2/24 ~~2023~~

**RULE 9C CERTIFICATION**

On December 1, 2023, counsel for Baystate Health, Inc. communicated with counsel for Plaintiff in a good faith effort to reach an agreement of the issues. Plaintiff assents to this motion.

/s/ *Stephen I. Hansen*
Stephen I. Hansen



I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Asst.Clerk

Date Filed 1/10/2025 11:49 AM
Superior Court - Suffolk
Docket Number 2384CV01949

MS

1/15

01.14 NOTIFY

9

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**CIVIL ACTION NO.: 2384CV01949-BLS1**

Notice sent (4)
1/15/25
(MH)

JANE DOE, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

BAYSTATE HEALTH SYSTEM INC.,

Defendant.

**MOTION TO ADMIT SOPHIA M. RIOS PRO HAC VICE**

The undersigned, a member in good standing of the Bar of the Commonwealth of Massachusetts and the attorney of record for the plaintiff herein, hereby moves pursuant to G.L. c. 221, § 46A, that Attorney Sophia M. Rios, a member in good standing of the Bar of the State of California, be admitted to practice pro hac vice in this matter. In support of this motion, the undersigned avers that the State of California grants like privileges to members in good standing of the Bar of the Commonwealth of Massachusetts and that the registration fee required by Supreme Judicial Court Rule 3:15 has been paid, as set forth in the Registration Statement attached hereto.

1/13/25 ALLOWED

Date Filed 1/10/2025 11:49 AM
Superior Court - Suffolk
Docket Number 2384CV01949

Dated: January 10, 2025

Respectfully submitted,

JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED
By Their Attorneys,

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: ______________
Asst. Clerk

*s/Jonathan Shapiro*
Jonathan Shapiro
BBO No. 454220
Mia Teitelbaum
BBO No. 693595
Shapiro & Teitelbaum LLP
55 Union Street, 4th Floor
Boston, MA 02108
Telephone: 617-742-5800
jshapiro@jsmtlegal.com
mteitelbaum@jsmtlegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2025, the foregoing was served via electronic mail to all parties of record:

Stephen I. Hansen, BBO# 679134
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411
sihansen@shb.com

*Attorneys for Defendant*

*/s/ Jonathan Shapiro*
Jonathan Shapiro

Date Filed 1/2/2025 5:19 PM
Superior Court - Suffolk
Docket Number 2384CV01949

10

1/22

1/7/25 I will take this up at the hearing on 1/15/25.

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV01949–BLS1**

JANE DOE, individually and on behalf of all others similarly situated,
Plaintiff,

v.

BAYSTATE HEALTH SYSTEM INC.,
Defendant.

Notice sent (3)
01/23/2025

(sc)

**JOINT STIPULATION AND [PROPOSED] CONSENT ORDER**

Plaintiff Jane Doe ("Plaintiff") and Defendant Baystate Health System Inc. ("Baystate") (together, the "Parties") hereby respectfully submit the following stipulation and proposed consent order, and state as follows:

1) Plaintiff filed the instant action on August 29, 2023, asserting three claims, including that Defendant allegedly: violated the Massachusetts Wiretap Statute, G.L. c. 272, § 99; invaded Plaintiff's privacy in violation of Massachusetts G.L. c. 214, § 1B, by disclosing online patient and website user communications to third parties; and breached its implied contracts by disclosing the medical information and personally identifying information to third parties. On October 19, 2023, the parties agreed to an extension of time for Defendant Baystate to respond to Plaintiff's Complaint. On October 30, 2023, this Court granted Defendant Baystate's Motion for Extension of Time to Respond and extended Defendant Baystate's deadline to respond to Plaintiff's Complaint to December 7, 2023.

2) On October 31, 2023, the Massachusetts Superior Court denied motions to dismiss in two similar actions, captioned *Vita v. Beth Israel Deaconess Medical Center, Inc.* (No.

2384CV00480-BLS1) and *Vita v. New England Baptist Hospital* (No. 2384CV00857-BLS1) (together, "*Vita*"). The court also decided to report its decisions denying the motions to dismiss in those cases for interlocutory appellate review, pursuant to Mass. R. Civ. P. 64(a).

3) Defendant in the instant litigation contended that the issues raised in the *Beth Israel* and *New England Baptist* appeals overlap with Plaintiff's wiretap claims in this case. By joint stipulation executed on December 7, 2023, Plaintiff Jane Doe and Defendant Baystate moved to stay the instant litigation pending resolution of the appeals in the *Vita* litigation. The Court in this case approved the stipulation by Order entered on January 2, 2024.

4) Following oral argument in the *Vita* litigation on April 3, 2024, the Massachusetts Supreme Judicial Court issued an opinion on October 24, 2024. *See Vita v. New England Baptist Hosp.*, 494 Mass. 824, 825, 243 N.E.3d 1185, 1188 (2024) (Exhibit A). In its opinion, the SJC held that allegations that a defendant disclosed online website user communications to third parties did not constitute a violation of the Massachusetts Wiretap Statute. The time for filing any further requests for rehearing or appeal has been exhausted.

5) The stay in the instant litigation has expired. Defendant has not yet responded to Plaintiff's pending Complaint, and Plaintiff seeks to amend her pleading in light of the decision in the *Vita* litigation. Accordingly, the Parties stipulate and agree, subject to the Court's approval, as to the following schedule:

- Plaintiff's deadline to file an Amended Complaint shall be <u>January 31, 2025</u>;
- Defendant shall answer or otherwise respond to the Amended Complaint by <u>March 3, 2025</u>;
- If Defendant files a Motion to Dismiss by March 3, 2025, Plaintiff shall file an opposition by <u>April 2, 2025</u>; and Defendant shall file its reply by <u>April 24, 2025</u>.

Date Filed 1/2/2025 5:19 PM
Superior Court - Suffolk
Docket Number 2384CV01949

**AGREED TO:**

Dated: January 2, 2025

Respectfully submitted,

/s/ Jonathan Shapiro
Jonathan Shapiro
BBO No. 454220
Shapiro & Teitelbaum LLP
55 Union Street, 4th Floor
Boston, MA 02108
Tel.: (617) 742-5800
jshapiro@jsmtlegal.com

Sophia M. Rios*
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel.: (619) 489-0300
srios@bm.net

Sherrie R. Savett*
Lane L. Vines*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
ssavett@bm.net
lvines@bm.net

* Pro hac vice motion to be filed

Attorneys for Plaintiff
and the proposed Classes

*Counsel for Plaintiff*

/s/ Stephen I. Hansen
Stephen I. Hansen, BBO# 679134
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411
sihansen@shb.com

Tammy B. Webb*
Aubrey Kramer*
Shook, Hardy & Bacon L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900
twebb@shb.com
akramer@shb.com

Jad Sheikali*
Shook, Hardy & Bacon L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7700
jsheikali@shb.com

Anna A. Gadberry*
Shook, Hardy & Bacon L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
agadberry@shb.com

* Pro hac vice motion to be filed

*Counsel for Defendant*

**SO ORDERED:**

Dated: _______________

_______________________________
Associate Justice, Superior Court
Commonwealth of Massachusetts

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature] Asst.Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that on January 2, 2025, the foregoing was served via electronic mail to all parties of record:

Stephen I. Hansen , BBO# 679134
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411
sihansen@shb.com

*Attorneys for Defendant*

Sophia M. Rios
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel.: (619) 489-0300
srios@bm.net

Sherrie R. Savett
Lane L. Vines
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
ssavett@bm.net
lvines@bm.net

*Attorneys for Plaintiff*

*/s/ Jonathan Shapiro*
Jonathan Shapiro

494 Mass. 824
Supreme Judicial Court of Massachusetts,
Suffolk.

Kathleen VITA [1]
v.
NEW ENGLAND BAPTIST HOSPITAL (and a consolidated case [2]).

SJC-13542
|
Argued April 3, 2024
|
Decided October 24, 2024

**Synopsis**
**Background:** In consolidated cases, patient brought putative class actions against hospital and medical center, alleging that defendants violated the Massachusetts wiretap act by collecting and transmitting her browsing activities on defendants' websites with third parties for advertising purposes without her consent. The Superior Court Department, Suffolk County, Hélène Kazanjian, J., 2023 WL 9472742, denied defendants' motions to dismiss, and reported her ruling to the Appeals Court. The Supreme Judicial Court granted defendants' application for direct appellate review.

**Holdings:** The Supreme Judicial Court, Kafker, J., held that:

patient had standing to assert wiretap act claims against hospitals, but

under the rule of lenity, hospitals' alleged collection and transmission of patient's browsing activities was not a violation of the wiretap act.

Reversed.

Wendlandt, J., filed dissenting opinion

**Procedural Posture(s):** Interlocutory Appeal; Motion to Dismiss for Failure to State a Claim.

****1187** Electronic Surveillance. Hospital. Internet. Statute, Construction. Practice, Civil, Standing, Motion to dismiss. Words, "Communication," "Interception."

CIVIL ACTIONS commenced in the Superior Court Department on February 24 and April 7, 2023.

Motions to dismiss were heard by Hélène Kazanjian, J., and the cases were reported by her to the Appeals Court.

The Supreme Judicial Court granted an application for direct appellate review.

**Attorneys and Law Firms**

The following submitted briefs for amici curiae:

David Quinn Gacioch (Annabel Rodriguez also present), Boston, for the defendants.

Patrick J. Vallely (Edward F. Haber & Michelle H. Blauner also present), Boston, for the plaintiff.

J. Tucker Merrigan, Victoria Santoro Mair, Ryan M. Hawkins, Ryan P. McManus, Boston, Dylan S. O'Sullivan, & Justin Kenney, for John Doe & others.

John Pagliaro & Daniel B. Winslow, for New England Legal Foundation & another.

Michael J. Tuteur, Lawrence W. Vernaglia, & Morgan McDonald, Boston, for Massachusetts Health and Hospital Association, Inc., & another.

John Roddy & Elizabeth Ryan, Boston, for National Consumer Law Center, Inc., & another.

Michael Vatis, of New York, & Michael J. Mozes, for National Retail Federation & another.

Emily Johnson Henn, of California, Mark W. Mosier, of the District of Columbia, Geoffrey Hobart, & Michael W. Maya, for Chamber of Commerce of the United States of America.

Elka T. Sachs, Ian D. Roffman, Seth P. Berman, Natalie M. Cappellazzo, & Natalia Peña, Boston, for Greater Boston Chamber of Commerce & another.

Robert Kingsley Smith, Boston, Neal Quenzer, & Tobi Henzer, for Pioneer Public Interest Law Center.

Present: Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Dewar, JJ.

## Opinion

KAFKER, J.

***825** ****1188** The plaintiff, Kathleen Vita, alleges that the defendants, New England Baptist Hospital (NEBH) and Beth Israel Deaconess Medical Center, Inc. (BIDMC) (collectively, hospitals), violated G. L. c. 272, § 99 (wiretap act or act), by collecting and transmitting her browsing activities on the hospitals' websites. In particular, her complaints against the defendants allege that she accessed and reviewed information available to the public on the hospitals' websites regarding doctors (including their credentials and backgrounds) and medical symptoms, conditions, and procedures, and that these interactions with the websites fall within the meaning of "wire communication[s]" protected by the wiretap act. Where the hospitals allegedly shared information regarding Vita's browsing with third parties for advertising purposes without her consent, Vita alleges the hospitals violated the wiretap act by "intercept[ing]" her communications. Vita does not allege that private patient records or messages to nurses, doctors, or other healthcare providers were intercepted.

***826** Based on our review of the text of the wiretap act and its legislative history, we cannot conclude with any confidence that the Legislature intended "communication" to extend so broadly as to criminalize the interception of web browsing and other such interactions. When the statute was enacted, wiretaps involved the interception of person-to-person conversations and messages using hidden electronic surveillance devices placed in people's homes or businesses or tapping their telephone lines. See Commonwealth v. Rainey, 491 Mass. 632, 645, 205 N.E.3d 1090 (2023) (Legislature's chief concern in enacting wiretap act was "electronic eavesdropping" and wiretapping [citation omitted]). The Legislature crafted the statute to prohibit new and evolving technological means of secret electronic eavesdropping on such person-to-person conversations or messaging, whether they be face-to-face conversations, calls on a landline telephone, cell phone calls, text messages, Internet chats with other people, e-mail messages, or other interpersonal conversations or messaging utilizing future technology. However, Vita's allegations do not claim the interception of person-to-person conversations or messaging of the kind clearly within the wiretap act's ambit. The interactions here are not with another person but with a website. Nor are they personal conversations or messages being intercepted, but rather the tracking of a website user's browsing of, and interaction with, information published on a website.

As explained infra, nothing in the text of the statute makes unambiguously clear that the Legislature intended to reach so far as to criminalize the secret recording of such web browsing activities. The statute's text does not define "communication"; its text contains numerous references to communications that are person-to-person; and dictionary definitions do not provide a firm answer either way. The legislative history is focused on the secret interception of person-to-person conversations and messaging, particularly private ones. While the Legislature plainly intended the

wiretap act to prohibit future technological means of such interceptions, it is not at all clear that the Legislature intended the statute's prohibition on intercepting "communications" **1189 to include, as supposed "communications," the web browsing alleged here.

Because the meaning of "communication" in this context is ambiguous, we must therefore apply the rule of lenity. When "we find that the statute is ambiguous or are unable to ascertain the intent of the Legislature, the defendant is entitled to the benefit of *827 any rational doubt" (citation omitted). Commonwealth v. Montarvo, 486 Mass. 535, 542, 159 N.E.3d 682 (2020).

If the Legislature intends for the wiretap act's criminal and civil penalties to prohibit the tracking of a person's browsing of, and interaction with, published information on websites, it must say so expressly. Other States and the Federal government have attempted to update their wiretap laws in response to technological change and done so in a variety of ways.

Make no mistake, the hospitals' alleged conduct here raises serious concerns, and may indeed violate various other statutes and give rise to common-law causes of action more specifically directed at the improper handling of confidential information, particularly confidential medical information. And we do not in any way minimize the serious threat to privacy presented by the proliferation of third-party tracking of an individual's website browsing activity for advertising purposes. These concerns, however, should be addressed to the Legislature.

Because we conclude that the statute is ambiguous and the rule of lenity should apply, we reverse the Superior Court judge's denial of the hospitals' motions to dismiss.[3]

1. Background. a. Facts alleged. "We summarize the factual allegations set forth in the complaint[s] and in the undisputed documents incorporated by reference in the complaint[s,] ... accepting as true all well-pleaded facts alleged" (quotation omitted). Six Bros., Inc. v. Brookline, 493 Mass. 616, 618, 228 N.E.3d 565 (2024), quoting Osborne-Trussell v. Children's Hosp. Corp., 488 Mass. 248, 250, 253, 172 N.E.3d 737 (2021).

i. Hospital websites. BIDMC and NEBH operate hospitals in the Commonwealth, providing care to patients in Boston and the surrounding communities. The hospitals maintain websites, which provide general information about the hospitals and other medical information to patients and the public. Although the websites also contain separate patient portals containing patients' personal medical information, Vita does not allege that the information *828 contained on such patient portals was intercepted or transmitted to others.

Each hospital's website provided the following: general information about the respective hospital; information about healthcare services available at each provider, addressing specific practice areas and health conditions; a "Find a Doctor" function to search for physicians by specialty and

location; a portal for patients to access and to pay their medical bills online; a portal for patients to access their individualized ****1190** medical information; and a feature for users to enter search terms to query information collected on the website. BIDMC's website additionally provided medical information about specific health conditions, including information on symptoms, causes, diagnoses, and treatments, and it also allowed patients to schedule appointments through an online portal.

ii. Vita's browsing activities. While the complaints make numerous allegations regarding users of the hospitals' websites generally, which we describe below, Vita alleges that she herself regularly used the websites to (1) obtain information about doctors (including their credentials and backgrounds); (2) search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband; and (3) obtain and review her husband's medical records through the website's patient portal. She does not, however, allege that her husband's medical records or the contents of his patient portal were in any way collected, intercepted, and transferred to third parties; that any messages between her or her husband or other users and health care professionals were intercepted or transmitted to others; or that she used the hospitals' websites to schedule appointments.

iii. Data that the hospitals allegedly collected.[4] Although not specific to Vita's own use of the hospitals' websites, the complaints also allege that the hospitals tracked the following information regarding users visiting the hospitals' websites: (1) the uniform resource locator (URL)[5] of the webpages visited; (2) the titles of those webpages; (3) data about a user's web browser and ***829** device configurations (e.g., screen resolution, device information, and browser settings); (4) the unique identifiers used by third-party software providers to track individuals across the website; and (5) a user's Internet protocol (IP)[6] address. According to the complaints, this information permitted third-party software providers to create "browser fingerprints," which were capable of associating a particular individual with a unique combination of web browser settings.

Vita also alleges that certain information about a user's activities on the hospitals' websites was collected. This information included the following: (1) how, when, and where a user scrolled and clicked through different parts of a webpage;[7] (2) whether a user navigated to a webpage containing a form for new patients requesting appointments, as well as the department the user selected, and whether the user submitted the form, although not the information the user entered into the form (with the exception ****1191** of the department selection);[8] (3) the contents of any search a user made on the websites; (4) the filtering criteria selected by a user on the "Find a Doctor" webpage, including specialty, location, gender, and language; (5) whether the user "reserved a spot" in line at the hospitals' urgent care; (6) whether the user navigated to the webpage for paying medical bills; (7) whether the user navigated to the patient portal where the user could access medical records and other personal medical information, although not the contents

of records or communications within that portal; and (8) whether, when navigating to the patient portal, the user clicked the "login" button for existing patients or the "sign up now" button for patients seeking to create new accounts. [9]

iv. Third-party tracking software and the sharing of such ***830** information for marketing purposes. Vita alleges that the websites contained tracking software, developed by third parties, that allowed the hospitals and third parties to monitor the use of the hospitals' websites. These third parties included Facebook and Google, each offering similar software, "Meta Pixel" and "Google Analytics," which allowed hospitals to track user activity on their websites. The software simultaneously collected and transmitted to the third-party software providers information about the websites' users and the users' interactions with the websites. The third-party software providers, in turn, marketed the data to merchants and delivered targeted digital advertisements tailored to individual users. Vita's complaints allege that this widespread targeted marketing activity is highly significant economically. According to the complaint, "Google derives a substantial portion of its revenues through individually targeted advertising," and "Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram." [10]

v. The hospitals' disclosures. The hospitals included a pop-up message on their websites disclosing, "We use cookies and other tools to enhance your experience on our website and to analyze our web traffic." The pop-up messages linked to privacy policies summarized below. [11] Both hospitals had in place nearly identical privacy policies. The policies (inaccurately and misleadingly, according to Vita) reassured users that

> "[the hospital] is committed to protecting your privacy. The [hospital's] website allows you to visit most areas without ****1192** identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy."

The hospitals also disclosed that they "routinely gather[ed] data ***831** on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc.," to "improve site content and overall usage." However, the hospitals represented that such data "is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data." The hospitals further claimed that "[t]his information is not shared with other organizations" and that "[e]xcept for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with any outside parties."

The privacy policies also disclosed (albeit again allegedly incompletely and misleadingly) some third-party data tracking or sharing. The hospitals stated that they and their "Third Party Service

Provider[s]" collected and saved "the default information customarily logged by worldwide web server software," which included "date and time, originating IP address and domain name [12] ..., object requested, and completion status of the request." They further disclosed that this information "may be kept for an indefinite amount of time, [and] used at any time and in any way necessary to prevent security breaches and to ensure the integrity of the data on our servers."

b. Prior proceedings. Vita filed separate complaints -- one against BIDMC and one against NEBH -- each alleging, on Vita's behalf and purportedly on behalf of a class of similarly situated persons, [13] that the hospital violated the wiretap act by aiding the third-party software providers to intercept communications. Each hospital separately filed a motion to dismiss pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). A Superior Court judge denied both motions in separate opinions; she reported her decisions to the Appeals Court pursuant to Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996). Subsequently, we allowed the hospitals' consolidated request for direct appellate review.

2. Discussion. a. Standard of review. "We review the denial of a motion to dismiss under Mass. R. Civ. P. 12 (b) (6) ... de novo." ***832** Marsh v. Massachusetts Coastal R.R., 492 Mass. 641, 645, 214 N.E.3d 388 (2023), cert. denied, —— U.S. ——, 144 S. Ct. 2519, —— L.Ed.2d —— (2024), quoting Dunn v. Genzyme Corp., 486 Mass. 713, 717, 161 N.E.3d 390 (2021). "In doing so, we accept 'as true all well-pleaded facts alleged in the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor, and determining whether the allegations plausibly suggest that the plaintiff is entitled to relief.' " Marsh, supra at 645-646, 214 N.E.3d 388, quoting ****1193** Lanier v. President & Fellows of Harvard College, 490 Mass. 37, 43, 191 N.E.3d 1063 (2022). [14] See Iannacchino v. Ford Motor Co., 451 Mass. 623, 636, 888 N.E.2d 879 (2008) ("Factual allegations must be enough to raise a right to relief above the speculative level ..." [citation omitted]).

b. Standing. We first address the hospitals' argument that Vita has not alleged an actual injury arising from the hospitals allegedly aiding third-party software providers to record secretly her interactions with the hospitals' websites; thus, they contend, Vita lacks standing to pursue a claim under the wiretap act. See Murchison v. Zoning Bd. of Appeals of Sherborn, 485 Mass. 209, 218, 149 N.E.3d 334 (2020) (where plaintiffs "lack standing ... we order[ ] dismissal of the appeal without reaching the merits").

A plaintiff bears the burden of establishing standing to bring a cause of action; more specifically, at this stage, she must plead facts sufficient to "demonstrate a nonspeculative particular and personal harm" resulting from the challenged action. Murchison, 485 Mass. at 212, 149 N.E.3d 334. See Animal Legal Defense Fund, Inc. v. Fisheries & Wildlife Bd., 416 Mass. 635, 638, 624 N.E.2d 556 (1993) ("only persons who have themselves suffered, or who are in danger of suffering, legal harm can compel the courts to assume the difficult and delicate duty of passing upon the validity of the acts of [another] branch of government" [citation omitted]). "A party has standing when [she]

can allege an injury within the area of concern of the statute or regulatory scheme under which the ***833** injurious action has occurred." Penal Insts. Comm'r for Suffolk County. v. Commissioner of Correction, 382 Mass. 527, 532, 416 N.E.2d 958 (1981), quoting Massachusetts Ass'n of Indep. Ins. Agents & Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290, 293, 367 N.E.2d 796 (1977).

Thus, to determine whether a plaintiff has standing, we look to the statute itself to determine whether the Legislature intended to confer standing to a person in the plaintiff's position. See, e.g., Massachusetts State Auto. Dealers Ass'n, Inc. v. Tesla Motors MA, Inc., 469 Mass. 675, 683, 15 N.E.3d 1152 (2014). Relevant here, the wiretap act provides a private cause of action to "[a]ny aggrieved person whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception." [15] G. L. c. 272, § 99 Q. The act ****1194** further provides for statutory damages, regardless of whether the aggrieved person suffered any actual damages. Id.

Vita alleges that the hospitals violated the act by assisting third parties to record contemporaneously her interactions with the hospitals' websites without her consent or knowledge. In her case, those allegations are limited to searching for information related to doctors and symptoms on the websites. This alleged violation of the act falls "within the area of concern of the statute ... under which the injurious action has occurred." Penal Insts. Comm'r for Suffolk County, 382 Mass. at 532, 416 N.E.2d 958, quoting Massachusetts Ass'n of Indep. Ins. Agents & Brokers, 373 Mass. at 293, 367 N.E.2d 796. See Pine v. Rust, 404 Mass. 411, 414, 535 N.E.2d 1247 (1989) (wiretap act "grants a civil remedy to any aggrieved person whose communications were intercepted, disclosed, or used, except as authorized by the statute"). Thus, Vita has established standing regarding these claims because she has alleged a particular, personalized, nonspeculative, injury arising from an alleged violation of the act. [16]

***834** c. Statutory construction. As Vita has standing to pursue her personal allegations, we turn to the main issues in these cases, particularly the meaning of "communication" and "interception" under the act, which are questions of statutory interpretation.

> "[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated" (citation omitted).

Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749, 840 N.E.2d 518 (2006). We begin with a statute's plain language. See Matter of the Estate of Mason, 493 Mass. 148, 151-152, 222 N.E.3d 1082 (2023). We do not "interpret words in a statute in isolation"; rather, we "must look to the statutory scheme as a whole so as to produce an internal consistency within

the statute." Outfront Media LLC v. Assessors of Boston, 493 Mass. 811, 818, 231 N.E.3d 313 (2024), quoting Plymouth Retirement Bd. v. Contributory Retirement Appeal Bd., 483 Mass. 600, 605, 135 N.E.3d 702 (2019).

"Ordinarily, where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent." Six Bros., Inc., 493 Mass. at 622, 228 N.E.3d 565, quoting Sharris v. Commonwealth, 480 Mass. 586, 594, 106 N.E.3d 661 (2018). But "[w]here the statutory language is not conclusive, we may 'turn to extrinsic sources, including the legislative ****1195** history and other statutes, for assistance in our interpretation.' " HSBC Bank USA, N.A. v. Morris, 490 Mass. 322, 332-333, 190 N.E.3d 485 (2022), quoting Chandler v. County Comm'rs of Nantucket County, 437 Mass. 430, 435, 772 N.E.2d 578 (2002).

i. Statutory background. The wiretap act makes it a crime to "willfully commit[ ] an interception, attempt[ ] to commit an interception, or procure[ ] any other person to commit an interception or to attempt to commit an interception of any wire or oral communication." G. L. c. 272, § 99 C 1. "Wire communication" is defined as "any communication made in whole or in part through the use of facilities for the transmission of communications ***835** by the aid of wire, cable, or other like connection between the point of origin and the point of reception." G. L. c. 272, § 99 B 1. An "oral communication" is "speech, except such speech as is transmitted over the public air waves by radio or other similar device." G. L. c. 272, § 99 B 2. "Interception" means to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G. L. c. 272, § 99 B 4.

The statute provides for both criminal penalties and a civil remedy for wiretap act violations. Willful interceptions of oral or wire communications are punishable by a fine of up to $10,000, imprisonment for up to five years, or a combination of fines and imprisonment. [17] G. L. c. 272, § 99 C 1. The act also criminalizes the possession of an intercepting device or permitting another person to use such a device, which is a misdemeanor punishable by imprisonment of up to two years, a fine of $5,000, or both. G. L. c. 272, § 99 C 5. Willful disclosure or use of the contents of any wire or oral communication, knowing that the information was obtained through interception is also a misdemeanor with the same punishment. G. L. c. 272, § 99 C 3. The statute also provides a civil remedy for any "aggrieved person whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by [statute]." G. L. c. 272, § 99 Q. "[A]n interception need not rise to the level of criminal conduct covered by the penal provisions of the law" to support a civil claim; in particular, a civil claim does not require that the conduct be willful. Pine, 404 Mass. at 414, 535 N.E.2d 1247. The act provides for "actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher," as well as punitive damages. G. L. c. 272, § 99 Q 1-2. A plaintiff is also entitled to attorney's fees and other litigation costs. G. L. c. 272, § 99 Q 3.

ii. Communication. Vita contends that the meaning of "communication" is broad enough to encompass all her alleged interactions with the hospitals' websites. We conclude that the statutory term "communication" is ambiguous as applied to the web browsing activities allegedly intercepted. Neither the plain text of ***836** the statute nor dictionary definitions make clear whether such activity amounts to "communication," and the legislative history is concerned with a different type of surveillance. Thus, the rule of lenity must apply, ****1196** thereby entitling the defendants to "the benefit of any rational doubt" in the construction of the statute (citation omitted). Montarvo, 486 Mass. at 542, 159 N.E.3d 682.

General Laws c. 272, § 99, does not define the word "communication," but rather the means or method of "communication" -- i.e., wire or oral. [18] The statute does include, however, a number of examples of communications that shed at least some light on the Legislature's intended meaning. For example, one of the requirements for a warrant under the wiretap act is "[a] statement that the oral or wire communications sought are material to a particularly described investigation or prosecution and that such conversations are not legally privileged" (emphasis added). G. L. c. 272, § 99 F 2 e. The statute also repeatedly references telephones and telegraphs, carving out permissible activities in relation thereto. See G. L. c. 272, § 99 B 3, D 1, F 2, I 3, J 1, L 1 (telephone); G. L. c. 272, § 99 B 3, F 2, I 3, J 1, L 1 (telegraph). [19] The statute's text thus makes plain the Legislature's intent to address at least conversations in person or over the telephone or person-to-person messages communicated through the use of wire or cables. Accordingly, it does seem clear that the plain meaning of "communication" ***837** includes messages and conversations [20] between people through the use of wire or cable, including by means of e-mail, text message, chat, instant message, or the equivalent. Indeed, conversations and messages between people accord with our common understanding of communications. Private conversations in person or over the telephone or private person-to-person messages communicated through the use of wire or cables are the core type of communication the wiretap law was designed to address. E-mail messages and text messages also plainly involve person-to-person messaging over a wire or cable, so those too fall within the plain meaning. Similarly, online chats and instant messaging, ****1197** where actual people communicate with each other, are plainly covered as well, as they involve person-to-person messaging over a wire or cable.

Notably, however, Vita's complaints do not allege communications between people in this commonsense way. The complaints repeatedly characterize the intercepted communications as being between Vita and each hospital's website, not between Vita and hospital personnel, understandably, given that the allegedly intercepted communications consist of what would commonly be called web browsing by Vita. [21] It is far less clear based on the plain text of the statute that the term "communication" extends to all interactions between a user and a website. When a user browses a public website, and accesses databases and other information readily

available to anyone on the Internet, the user is not speaking or messaging with another person but rather interacting with the website; the user is also not engaged in ***838** personal conversation or messaging but rather browsing and interacting with the published information on the website. [22]

While we often turn to dictionaries to aid in understanding the plain meaning of undefined statutory terms, here, dictionaries do not provide a ready answer to the question whether web browsing activities of the kind Vita alleges she engaged in amount to "communication" with the website on which one is browsing or with the website's owner or author. [23] Most definitions of "communication" refer to an "interchange" or "exchange" of information, ****1198** implicitly between people, but without expressly defining ***839** who or what need be on either end. [24] Some definitions, are even more explicit, referencing persons or individuals on both sides of a communication, thereby strongly suggesting that mere accessing of information published on a website may not qualify. See, e.g., Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/communication [https://perma.cc/7VX3-KSG7] (defining communication as "a process by which information is exchanged <u>between individuals</u> through a common system of symbols, signs, or behavior" [emphasis added]); Oxford English Dictionary Online (defining communication as "[i]nterpersonal contact, social interaction, association, intercourse"); Black's Law Dictionary 350 (12th ed. 2024) (defining communication as "the process of bringing an idea to <u>another</u>'s perception" [emphasis added]).

In attempting to argue nonetheless that the term "communication" in the statute does unambiguously encompass web browsing, Vita relies on the preamble of the wiretap act. The clause Vita focuses on states that "the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the [C]ommonwealth," and thus the "secret use of such devices by private individuals must be prohibited." G. L. c. 272, § 99 A. This clause doubtless does state the Legislature's intent to protect the Commonwealth's citizens from the threat to privacy posed by evolving modern methods of electronic surveillance. [25] And, as discussed, the term "communication" in the wiretap act doubtless does extend today to protecting person-to-person communications from Internet-based means of interception. However, notwithstanding the clause's plain statement of the Legislature's intent to protect citizens' privacy against new surveillance <u>methods</u>, the clause does not directly address the nature of the protected <u>communications</u> themselves and whether, as here, ****1199** the act protects against ***840** interception of the act of browsing a website, rather than a person-to-person communication.

Ultimately, we cannot conclude that the wiretap act unambiguously prohibits and, indeed, criminalizes the interception of web browsing activity, because there appears to be a difference in kind and not degree between interactions on a website available to the public and private conversations in your house or on your telephone. In essence, we are not here dealing with just

new means of communication, such as the difference between communicating with another person on a cell phone rather than a landline, or a text message rather than a telegraph message. See Commonwealth v. Moody, 466 Mass. 196, 198, 993 N.E.2d 715 (2013) (concluding wiretap act applies to interception of cell phone calls and text messages). Browsing and accessing the information published on a website is significantly different from having a conversation or sending a message to another person.[26] As explained previously, the user is not communicating with another person but instead interfacing with pre-generated information on a website. The user is also not engaging in a conversation but accessing published information and databases. Given these differences, we cannot conclude based on the relevant text of the statute that the Legislature unambiguously intended to criminalize activities that do not capture such person-to-person communications or messaging.

In sum, the text of the wiretap act is inconclusive at best as to whether website browsing is a "communication" protected by the act.[27]

iii. Legislative history. As the text of the statute does not ***841** resolve the ambiguity, "we may 'turn to extrinsic sources, including the legislative history ... for assistance in our interpretation.' " HSBC Bank USA, N.A., 490 Mass. at 332-333, 190 N.E.3d 485. When we do so here, we conclude that the Legislature was chiefly concerned about the secret recording or monitoring of person-to-person communications. There is nothing in that legislative history suggesting that the Legislature intended to extend the act, and its criminal penalties, beyond the interception of person-to-person conversations or messaging.

From the very beginning, the Legislature repeatedly referred to eavesdropping on private conversations and the use of ****1200** covert electronic recording devices that could be placed in a home or business or used to tap a telephone. In 1964 the Legislature established a commission for the "investigation and study of the laws relative to eavesdropping and the use of any electronic recording device, or wireless tap or electronic tap" (emphasis added). Senate Bill No. 201 (1964). See Commonwealth v. Tavares, 459 Mass. 289, 294-295, 945 N.E.2d 329 (2011).

An interim committee report from April 1967 described various eavesdropping devices that were commercially available. See 1967 Senate Doc. No. 1198, at 3. These included the "parasite bug," a "subminiature transmitter less than half the size of a pack of cigarettes, which broadcasts both sides of a telephone conversation." Id. There was also the "room bug," capable of "transmit[ting] a very clear signal at least [seven] blocks in downtown Boston" and "pick[ing] up a whisper at [twenty] feet." Id. See Rainey, 491 Mass. at 645, 205 N.E.3d 1090 ("In April 1967, the commission issued an interim report, which focused on various types of 'eavesdropping devices,' namely 'bug[s]' "). The future development of such eavesdropping devices was recognized to be particularly "frightening" and unpredictable. See 1967 Senate Doc. No. 1198, at 4. See also Commonwealth v. Hyde, 434 Mass. 594, 608 n.7, 750 N.E.2d 963 (2001) (Marshall, C.J., dissenting) ("The [April] 1967 Report

makes clear that what concerned the Legislature were 'eavesdropping devices' ['bugs'] and other sophisticated inventions of then-recent origin ..."). This report also noted the recent discovery that the New England Telephone and Telegraph Company intercepted "customer-to-customer calls and customer-to-company calls" in order to check "the performance of the company's ***842** equipment and employees." 1967 Senate Doc. No. 1198, at 4. See Commonwealth v. Ennis, 439 Mass. 64, 68 n.10, 785 N.E.2d 677 (2003) (noting that special commission's concern about secret electronic eavesdropping by private citizens was spurred by not only testimony about bugging devices but also revelation that telephone company "secretly record[ed] private telephone calls").

Later commission reports also repeatedly referred to the recording of or listening in on private conversations. See, e.g., 1967 Senate Doc. No. 1469, at 2 ("the availability of instruments for overhearing secretly private conversations is immense"); 1968 Senate Doc. No. 1132, at 9 (proposing revision of wiretap act "to strictly prohibit electronic eavesdropping and wiretapping of other persons' conversations without permission"). Commissioners Elliot B. Cole and William P. Homans, Jr., concurred in the legislative recommendations, but wrote separately to emphasize the importance of the all-party consent requirement in the proposed law. 1968 Senate Doc. No. 1132, at 10. They voiced an overarching concern about the secret interception and recording of private conversations, quoting an academic who explained that "the individual expresses his personality in private conversations." Id. at 12. See Hyde, 434 Mass. at 608 n.6, 750 N.E.2d 963 (Marshall, C.J., dissenting) ("A concurring report filed by two members of the special commission, [Cole and Homans], makes abundantly clear that the 'prohibition of wiretapping and eavesdropping by the public' was to protect the privacy of citizens engaged in personal conversations").

This legislative history is therefore directed at the invasion of privacy and threat to free expression from secret surveillance of private conversations. See ****1201** Commonwealth v. Rivera, 445 Mass. 119, 127 n.10, 833 N.E.2d 1113 (2005) ("The report giving rise to the statute noted repeatedly that the commissioners were concerned with the protection of private 'conversations,' particularly by devices used to monitor telephone lines and by devices placed in private locations"). Electronic "bugs" that could be covertly placed in a home or business or that could tap a telephone line to listen in on such conversations were also of particular concern, and the Legislature recognized that scientific developments here were especially frightening. See 1967 Senate Doc. No. 1198, at 4; Rivera, supra.

As the Internet did not exist, there was, of course, no discussion of whether the tracking and sharing of a user's browsing or other activity, via software and computer code, on public websites would be considered criminal. Indeed, there was no discussion ***843** whatsoever of computers or software in the legislative history. Nor was there any discussion of what might be considered historic analogies to website analytics and advertising, such as television [28] stations monitoring what shows or commercials viewers were watching or businesses or nonprofit organizations tracking brick-and-mortar or mail-order purchasing decisions or inquiries, or compiling customer lists, and

sharing such information with other businesses or nonprofits without the customer's consent. Any such discussion in the legislative history might have provided some suggestion that the Legislature was prepared to extend the application of the act, and thus the meaning of "communication" and "interception," well beyond the covert interception of private conversations and private messages. There is, however, nothing like that in the legislative history.

The legislative history's discussion of the monitoring of person-to-person business telephone calls is also informative, as the Legislature ultimately concluded that such monitoring of person-to-person calls was permissible, at least for telephone companies and banks, if done in the ordinary course of business.[29] In allowing such monitoring even of person-to-person calls, the Legislature took into account practical business realities as well as privacy concerns.

In sum, the legislative history is focused on the secret interception of person-to-person conversations and messaging, particularly private ones. The electronic surveillance devices, and the "frightening" future of such devices, with which the Legislature was concerned were covert recording devices that could be used to "bug" one's home or business or tap one's telephone line to listen in on such conversations. The Legislature also recognized that ordinary business realities needed to be considered, allowing some monitoring of even private person-to-person conversations. While the legislative history thus evinces a focus on addressing the privacy threats posed by evolving ****1202** surveillance methods, it does not provide a basis for concluding that the ***844** Legislature intended that the term "communication" would itself over time extend beyond person-to-person communications, such as to encompass a human's interactions with a website. The legislative history therefore provides no sound basis for concluding that the tracking of human-website interactions for website analytics and digital advertising purposes, via commonly employed technologies, is a "communication" under the wiretap act.

d. Case law. Our case law has never extended the meaning of "communication" beyond person-to-person interactions. Rather, our cases have always involved the interception of person-to-person conversations and messages. See, e.g., Commonwealth v. Morris, 492 Mass. 498, 501, 212 N.E.3d 812 (2023) (defendant's interview with police recorded); Rainey, 491 Mass. at 633, 205 N.E.3d 1090 (video and audio of victim's report to police officer recorded by body-worn camera); Curtatone v. Barstool Sports, Inc., 487 Mass. 655, 657-658, 169 N.E.3d 480 (2021) (telephone conversation recorded by blogger); Moody, 466 Mass. at 198, 993 N.E.2d 715 (text messages intercepted); Tavares, 459 Mass. at 294, 945 N.E.2d 329 (informant recorded conversations with defendant using concealed recording device). None involved a person browsing or otherwise interacting with a public website. Most of the cases involved the interception of private interpersonal conversations, which we have emphasized is the core statutory concern. See Rivera, 445 Mass. at 127 n.10, 833 N.E.2d 1113. Indeed, a crucial fact in Rainey and Morris, two cases in which we found no statutory violation, was that the recording at issue "was not being used

as an investigative tool to secretly eavesdrop on an otherwise private conversation" (emphasis added). Morris, supra at 506, 212 N.E.3d 812, quoting Rainey, supra at 643-644, 205 N.E.3d 1090.

Moreover, we have previously rejected broad interpretations of the word "communication" that expand the scope of the wiretap act well beyond the secret recordings of private conversations the Legislature intended to prevent. [30] See ***845** Commonwealth v. Gordon, 422 Mass. 816, 832-833, 666 N.E.2d 122 (1996) (rejecting "literal" reading of act "as making unlawful the audiotaping of booking procedures without the knowledge of the persons being booked, and as subjecting the responsible police officers to severe penalties therefor" in absence of more specific evidence of Legislature's intent to do so). See also ****1203** Morris, 492 Mass. at 506, 212 N.E.3d 812 (recording of defendant's voluntary statements to police after receiving Miranda warnings did not violate wiretap act absent indication Legislature intended such result); Rainey, 491 Mass. at 643-644, 205 N.E.3d 1090 (rejecting application of wiretap act to body-worn camera recording by police officer of victim's statement even while acknowledging wiretap act "could be construed literally as the defendant suggests"). These cases are inconsistent with Vita's characterization of a legislative intent to provide broad protections for all website activities, even where they do not involve person-to-person conversations or messaging.

The cases Vita relies upon do not resolve the wiretap act's ambiguity in this regard. In Moody, 466 Mass. at 198, 993 N.E.2d 715, we held that the wiretap act applied to text messages and calls sent and received with cell phones. [31] It is difficult to extrapolate much from Moody's holding that cell phone text messages and calls are ***846** "wire communications" under the act because those forms of communication are clearly person-to-person conversations and messaging; the case just involved updated technology to make such calls and send such messages.

The cases cited by Vita and the dissent interpreting the Federal wiretap act, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90–351, 82 Stat. 211 (1968) (Title III), do not resolve the ambiguity presented by our State's statute. These cases do not engage in depth, if at all, with the meaning of "communication." See, e.g., In re Facebook, Inc. Internet Tracking Litigation, 956 F.3d 589, 607 (9th Cir. 2020), cert. denied sub nom. Facebook, Inc. v. Davis, — U.S. ——, 141 S. Ct. 1684, 209 L.Ed.2d 464 (2021) (characterizing "GET requests," in which website transmits user's URL information to third-party website, as communication without analyzing meaning of communication). Further, Title III was amended by the Electronic Communications Privacy Act of 1986, Pub. L. No. 99–508, 100 Stat. 1848 (1986), to cover "electronic communication," defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system." 18 U.S.C. § 2510(12). ****1204** That amendment was drafted almost twenty years after our wiretap act, during at least the dawn of the personal computer era. See Chayka, The Birth of the Personal Computer, The New Yorker (May 18, 2023), https://www.newyorker.com/culture/infinite-scroll/the-birth-of-the-personal-computer [https://perma.cc/

S6N9-PLFK] (noting that among first "microcomputer kits," was Altair 8800, which debuted in 1975, followed shortly by first Apple computer in 1976, and Apple II in 1977, which is considered precursor to modern personal computers). It is also no surprise then that cases applying Title III do not struggle over the definition of "communication," because the broad definition of "electronic communication" would appear to cover many website browsing activities. However, our wiretap act was never similarly amended to add a separate definition of "electronic communication." Moody, 466 Mass. at 207-208, 993 N.E.2d 715.[32]

***847** Title III also differs importantly from our wiretap act in providing a one-party consent exception. See 18 U.S.C. § 2511(2)(d) ("It shall not be unlawful ... for a person ... to intercept a wire, oral, or electronic communication, where such person is a party to the communication or where one of the parties to the communication has given prior consent ..."). Thus, the scope of liability under the Federal law is significantly limited in a way that our wiretap act, which requires the consent of all parties to a communication, is not. See G. L. c. 272, § 99 B 4 (permitting interception only by "a person given prior authority by all parties to such communication"). The Federal law therefore provides no basis for resolving the ambiguity here.

e. Rule of lenity. After examining the statute's text and legislative history, and reviewing our own case law, we are left with serious doubts as to whether browsing and interacting with a public website are a "wire communication" under the wiretap act. Accordingly, the statute is ambiguous. "Under the rule of lenity, if we find that the statute is ambiguous or are unable to ascertain the intent of the Legislature, the defendant is entitled to the benefit of any rational doubt" (citation and quotation omitted). Montarvo, 486 Mass. at 542, 159 N.E.3d 682.

While the instant cases concern civil liability under the wiretap act, the act also has significant criminal penalties, including up to five years in State prison, and accordingly, the rule of lenity should be applied. See 3 S. Singer, Statutes and Statutory Construction § 59:4 (8th ed. Nov. 2023 update) ("If a law has both criminal and civil applications, the rule of lenity governs its interpretations in both settings"). See also Leocal v. Ashcroft, 543 U.S. 1, 11 n.8, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) ("Because we must interpret the statute consistently, whether we encounter ****1205** its application in a criminal or noncriminal context, the rule of lenity applies").[33]

***848** We therefore cannot conclude, in "the absence of an express textual provision or an indication of legislative intent," that browsing and other similar website interactions of the kind Vita alleges she engaged in on the hospitals' websites are "wire communication[s]" under the wiretap act. See Anderson v. National Union Fire Ins. Co. of Pittsburgh PA, 476 Mass. 377, 386, 67 N.E.3d 1232 (2017). Activities such as entering a URL, accessing a specific webpage, clicking on links, and scrolling through a webpage are clearly not the type of person-to-person conversation or messaging unambiguously protected by the act. Similarly, the transmission of

Date Filed 1/2/2025 5:23 PM
Superior Court - Suffolk
Docket Number 2384CV01949


data about a user's web browser configuration and IP address bear little resemblance to person-to-person conversation.

We also cannot deem as communications the interception of which might lead to criminal penalties the act of simply running searches on the websites or accessing information about doctors published on the websites, as alleged by Vita. These interactions with a website, as explained above, differ in material respects from person-to-person conversations and messaging. The website user is interacting with the website, not another person, and accessing publicly available data, not having a personal conversation or sending a personal message.

In analyzing whether the interception of this information constitutes a criminal violation, we must keep in mind that the statute does not distinguish medical information from other information, or hospital websites from other websites.[34] Consequently, we must impose a common definition of communication of information for all websites. For example, would it be a criminal violation if a user browses a music or sports website, to inquire about particular songs or athletes, and the music website or sports website tracks its users, and shares that information with Internet advertisers without the user's consent? Under this interpretation, it would appear that thousands of website owners could potentially face severe criminal and civil penalties for using tracking ***849** tools needed to support an advertising-based business model that is so common on the Internet. See Amended Opening Brief for Defendants-Appellants, at 24-25; Brief for National Retail Federation and Retailers Association of Massachusetts, as Amici Curiae, at 3 ("The technologies at issue in this case are found on all manner of websites ...").[35]

****1206** The dissent likens the hospitals' websites to a virtual "customer service representative or healthcare provider, receiving inquiries from patients about, inter alia, a particular medical condition or specific physicians and, in exchange, providing the hospitals' response." Post at ——, 243 N.E.3d at ——. The same can of course be said for all other businesses' websites. The dissent's interpretations would also appear to apply to automated telephone directories that ask us to dial particular numbers to access different types of information. Is each one of these interactions a wiretap violation subject to criminal penalties, including a prison sentence of up to five years, if it is monitored? Moreover, unlike a call to a customer service representative to seek information, there is not another person engaged in a conversation when a website user searches for or requests information, and the website provides pre-generated content that is publicly accessible.

We emphasize that Vita does not allege that her communications with a particular physician, nurse, or other medical professional were intercepted.[36] If such communications were intercepted, these would be much different cases.

We also emphasize that the Legislature has provided other statutory and common-law causes of action to address allegedly false, misleading, or deceptive activity on the Internet, including

statutory and common-law protections more directly applicable to misrepresentations or misuse of private medical information. See, e.g., Doe vs. Tenet Healthcare Corp., U.S. Dist. Ct., No. 23-12978-PBS, — F.Supp.3d ——, 2024 WL 1756075 (D. Mass. Apr. 23, 2024) (plaintiff stated claims for negligence, breach of implied contract, unjust enrichment, ***850** breach of fiduciary duty, right to privacy, and G. L. c. 93A violation, where hospital website allegedly tracked and shared with third parties plaintiff's website browsing activities). For example, G. L. c. 214, § 1B, provides a "right against unreasonable, substantial or serious interference with [an individual's] privacy." Deception or misrepresentation in a privacy policy may also support a cognizable claim under G. L. c. 93A, and the powerful remedies that statute provides. See Connor v. Marriott Int'l, Inc., 103 Mass. App. Ct. 828, 836, 231 N.E.3d 375 (2024) ("An act or practice will be found deceptive if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material" [quotation and citation omitted]). There are also, of course, many laws that strictly protect patient information. See, e.g., G. L. c. 111, § 70E (giving every patient or resident of medical facility right "to confidentiality of all records and communications to the extent provided by law"); 42 U.S.C. § 1320d-6(a) (crime to knowingly obtain or disclose "individually identifiable health information").

In sum, the statutory language is ambiguous, and the legislative history is not ****1207** helpful regarding whether the alleged interceptions of Vita's uses of the hospitals' websites are interceptions of "communications" within the meaning of the wiretap act and thereby potentially subject to both civil and criminal penalties. Therefore, the rule of lenity applies, and Vita's claims against the hospitals, which are based on the wiretap act alone, should be dismissed. See Commonwealth v. Constantino, 443 Mass. 521, 525, 822 N.E.2d 1185 (2005) (where statute can "plausibly be found to be ambiguous" defendant should receive "the benefit of the ambiguity" [citation omitted]).

3. Conclusion. For the foregoing reasons, we reverse the Superior Court orders denying the hospitals' motions to dismiss the complaints.

So ordered.

WENDLANDT, J. (dissenting).
Individuals in the Commonwealth increasingly conduct their affairs over the Internet, sharing often sensitive personal information with companies by using company websites rather than landline telephones. The defendants New England Baptist Hospital (NEBH) and Beth Israel Deaconess ***851** Medical Center, Inc. (BIDMC) (collectively, hospitals), created their own online presence to communicate with their patients, encouraging engagement with this electronic medium -- their websites -- as an alternative to the telephone for patients to obtain information from and about the

hospitals, and for the hospitals to elicit information from patients related to their specific medical needs and care.

The hospitals well understood that their websites were a means to communicate privately with patients -- an inference that is not only reasonable, but almost inescapable when one reads the hospitals' representations. Mirroring protocols attendant to face-to-face interactions between healthcare providers and patients, the hospitals assured patients that they could use these platforms to share their individualized medical concerns and inquiries privately and, in turn, to receive the hospitals' tailored responses. Patients were invited to visit the hospitals' websites "without identifying" themselves; for those who "elect[ed] to provide identifiable information," the hospitals promised to "make every effort to protect [their] privacy." Come, they told patients like the plaintiff Kathleen Vita, use our websites as a virtual space where you can share your private medical concerns, and start receiving our professional medical advice, confidentially.

Then, unbeknownst to their patients, the hospitals aided third parties to record this healthcare information, allowing the third parties to create detailed portraits of the patients' medical needs and to monetize this information for advertisements targeted to those patients. Rather than candidly disclose this arrangement, the hospitals assured patients that, on their websites, the patients' identities and privacy would be maintained. In short, the hospitals lied.

Words matter. I agree with the court that the words of a statute must be read in context, but they must be read. To be sure, the Legislature in the 1960s, when it passed G. L. c. 272, § 99 (wiretap act or act), may not have divined how the Internet would revolutionize the way we communicate. But because the Legislature chose particular words, this understandable shortcoming does not mean, as the court concludes, that the act is hopelessly ambiguous and unable to protect against the surreptitious recordings that occurred here.

****1208** Pertinent to our query, the Legislature chose the term "communication" -- specifically, "any communication" -- to define the subject matter of the act's protections (emphasis added), ***852** G. L. c. 272, § 99 B 1; it did not limit protections to the "person-to-person conversations or messaging" that the court finds were the "core type of communication" with which the Legislature expressed specific concern, ante at ——, 243 N.E.3d at ——. In my view, the words "any communication" leave no room for ambiguity. Where a technological advance (like the telephone before it) revolutionizes how we communicate -- by selecting dropdown filters specifying preferences to find and to book an appointment with an available physician on a website, for example, rather than doing the same by dialing a keypad and placing a call to the hospital using a telephone -- the Legislature chose to protect these new ways of exchanging information against electronic eavesdroppers.

Indeed, in an apparent attempt to avoid any lingering doubts about the protections it envisioned, the Legislature made pellucid its intent by choosing specific words, codifying them in the act's preamble. In words too clear to support any claimed ambiguity, the Legislature expressly set forth its finding

> "that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited." (Emphases added.)

G. L. c. 272, § 99 A. The Legislature had the clairvoyance to choose these particular words to indicate that it was the tremendous power of electronic surveillance devices -- like the tracking software at issue in the instant cases -- to enhance the ability to snoop far beyond what could be done by the human ear alone that defined the scope of the act's protections.

The court loses sight of this aim, apparently blinded by its determination that "tracking tools [are] needed to support an advertising-based business model that is so common on the Internet," ante at ——, 243 N.E.3d at ——, and by the stated assumption that candidly disclosing this tracking to patients threatens Facebook's and Google's bottom line, id. at ——, 243 N.E.3d at ——. As a result, it concludes that when a patient and her physician discuss frequently asked questions regarding the symptoms and treatment options of a particular disease, either in person or by telephone, that discussion cannot be "bugged" under the act. But when the hospitals create an electronic forum to allow that same information to be exchanged over the hospitals' website, they can implant tracking code to ***853** record the discussion secretly and then sell the information to the highest bidder without recourse in the act. When a patient telephones the doctor's office to schedule an appointment, that conversation cannot be recorded secretly by a modern surveillance device under the act; but when that same exchange occurs on a website designed to facilitate such scheduling, it bewilders the court to conclude that the act extends so far. Under the court's construction (or lack thereof), the act permits the hospitals to market their websites as purportedly private spaces for dispensing medical information on a confidential basis, and then, as alleged by Vita, to assist "silent third-part[ies] [to] watch[ ] whatever [their patients are] doing." I disagree.

Of course, public policy decisions regarding the protections afforded to our ****1209** communications over evolving technologies against electronic surveillance by private parties need to be left to the Legislature; but once those decisions have been made and set forth in clear language, as the Legislature has done in the wiretap act, it is our function to enforce them. Because, in words too plain to question, the Legislature told us that the secret recordings alleged to have occurred here fall squarely within the threat to privacy it enacted the wiretap act to curb, and because those same words show that the Legislature intended that such secret surveillance would not escape the act's reach when it occurs over a website on the Internet rather than over a telephone or telegraph, I respectfully dissent.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

1. Standard of review. "We review the denial of a motion to dismiss under Mass. R. Civ. P. 12 (b) (6)[, 365 Mass. 754 (1974),] de novo." Marsh v. Massachusetts Coastal R.R., 492 Mass. 641, 645, 214 N.E.3d 388 (2023), cert. denied, — U.S. —, 144 S. Ct. 2519, — L.Ed.2d — (2024), quoting Dunn v. Genzyme Corp., 486 Mass. 713, 717, 161 N.E.3d 390 (2021). "In doing so, we accept 'as true all well-pleaded facts alleged in the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor, and determining whether the allegations plausibly suggest that the plaintiff is entitled to relief.' " Marsh, supra at 645-646, 214 N.E.3d 388, quoting Lanier v. President & Fellows of Harvard College, 490 Mass. 37, 43, 191 N.E.3d 1063 (2022). See Iannacchino v. Ford Motor Co., 451 Mass. 623, 636, 888 N.E.2d 879 (2008) ("Factual allegations must be enough to raise a right to relief above the speculative level ..." [citation omitted]).

Straying from this standard, the court focuses on certain website features that Vita "regularly" used, discussing Vita's putative failure to state with sufficient clarity whether she also was among ***854** those healthcare consumers who took advantage of each of the myriad of options made available by the hospitals on their websites. Such an application of what appears to be a heightened pleading standard, or a premature analysis of whether Vita is an appropriate class representative, is inconsistent with the liberal rules applicable to Vita's complaints. Cf. Mass. R. Civ. P. 9, 365 Mass. 751 (1974) (heightened pleading standards applicable to claims of fraud); [1] Mass. R. Civ. P. 23, as amended, 471 Mass. 1491 (2015) (setting forth rules for class certification). Drawing all reasonable inferences in Vita's favor, as we must on a motion to dismiss, her "regular" use of certain features on the hospitals' websites does not limit our analysis on a motion to dismiss.

2. Communication. Enacted in 1968 in response to "the uncontrolled development and unrestricted use of modern electronic surveillance devices," the wiretap act generally precludes aiding another to record secretly the "contents" of "any wire or oral communication." G. L. c. 272, § 99 A, C. A "wire communication" is defined as "any communication made in whole or in part through the use of facilities for the transmission ****1210** of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception" (emphasis added). G. L. c. 272, § 99 B 1.

The instant cases present the questions whether the electronic exchanges of information between Vita and the hospitals by means of the hospitals' websites constituted "communication[s]" protected against surreptitious monitoring as "wire communication[s]" by the wiretap act, and, if so, whether Vita's complaints allege that the "contents" [2] of those communications were intercepted in violation of the act.

***855** a. Plain meaning. The word "communication" is not defined by the act. In the absence of an express statutory definition of the term, "[w]e derive the word['s] usual and accepted meanings from sources presumably known to the statute's enactors, such as [its] use in other legal contexts and dictionary definitions." Curtatone v. Barstool Sports, Inc., 487 Mass. 655, 658, 169 N.E.3d

480 (2021), quoting Commonwealth v. Matta, 483 Mass. 357, 372, 133 N.E.3d 258 (2019). See Matter of the Estate of Mason, 493 Mass. 148, 151, 222 N.E.3d 1082 (2023), quoting Metcalf v. BSC Group, Inc., 492 Mass. 676, 681, 214 N.E.3d 1043 (2023) ("In construing a statute, we begin with its plain language"); Garcia v. Steele, 492 Mass. 322, 326, 211 N.E.3d 602 (2023), quoting Sandifer v. United States Steel Corp., 571 U.S. 220, 227, 134 S.Ct. 870, 187 L.Ed.2d 729 (2014) ("words will be interpreted as taking their ordinary, contemporary, common meaning"). It is for this reason that we turn to dictionaries as the first and primary source for the construction of words that the Legislature used but left undefined. [3] See Millis Public Sch. v. M.P., 478 Mass. 767, 775, 89 N.E.3d 1170 (2018), quoting Commonwealth v. Samuel S., 476 Mass. 497, 501, 69 N.E.3d 573 (2017) ("We look initially 'to dictionary definitions as a guide to a term's plain or ordinary meaning' ").

i. Dictionary definitions. The definition of the term "communication" is the "exchange of information, knowledge, or ideas, by means of speech, writing, mechanical or electronic media, etc." Oxford English Dictionary Online. See Black's Law Dictionary 350 (12th ed. 2024) (defining communication as "[t]he interchange of messages or ideas by speech, writing, gestures, or conduct; the process of bringing an idea to another's perception"); Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/communication [https://perma.cc /7VX3-KSG7] ("a process by which information is exchanged between individuals through a common system of symbols, signs, or behavior"); American Heritage Dictionary of the English Language 269 (1970) ("The exchange of thoughts, messages, or the like, as by speech, signals, or writing"); ****1211** Random House Dictionary of the English Language 298 (1967) ("the imparting or interchange of ***856** thoughts, opinions, or information by speech, writing, or signs").

Considering these definitions, I agree with the court that the plain meaning of "communication" thus includes messages and conversations [4] between people, including by means of e-mail, text message, chat, and instant message. Ante at ——, 243 N.E.3d at ——. However, I conclude that the term also encompasses the "exchange" of medical "information" and "knowledge" that occurred between Vita and the hospitals "by means of" the hospitals' websites on the Internet, an "electronic media." [5] See Oxford English Dictionary Online. This plain meaning derives directly from dictionary definitions.

While the court misapprehends the hospitals' websites as repositories for "published," "pre-generated" medical data, the hospitals know better. As Vita asserts, they created the websites as confidential dynamic forums on which they communicated "interactive[ly]" with patients about the patients' "personal" medical needs. The hospitals' websites were "designed for communications with healthcare consumers," Vita contends.

It is important, then, to clarify the precise allegations that the court has labeled sweepingly as "web browsing." Vita alleges that by means of the hospitals' websites, for example, patients asked

questions about physicians who met the patients' gender preferences, geographic limitations, and desired areas of specialization relevant to the patients' unique healthcare needs, and the hospitals ***857** answered by identifying available doctors to meet these specified requirements. Employing the websites, patients inquired about the hospitals' ability to provide specific treatments and procedures tailored to the particular maladies with which patients were afflicted; and they received the hospitals' responses. On these websites, patients completed forms and dispatched requests to the hospitals to book appointments with physicians specializing in the patients' illnesses or to reserve a spot in the urgent care line, just as they might by e-mail or by telephone.

The "private healthcare information" exchanged with the hospitals using their websites, Vita alleges, included "individual's ****1212** medical conditions, doctors they might be seeing, medical searches the individual performs on the websites, and personal medical information the user enters into forms on the websites." Inconvenient as these factual allegations may be to the court's reframed narrative as to the nature of the information exchanged between patients and the hospitals over the websites, they cannot be disregarded as "embellish[ments]." Ante at note 14. Instead, because the allegations are ones of fact, I accept them as true, drawing all reasonable inferences therefrom in Vita's favor, as we must at this early stage in the pleadings. Recasting these factual allegations as "web browsing" does not alter their nature;[6] they involve exchanges of information over an electronic media. As such, they fall within the plain meaning of "communication."

Confirming the dictionary definitions, courts generally describe exchanges of information on the Internet between website owners and website users as "communications," applying that word's plain and ordinary meaning.[7] While not dispositive, their use of the word "communication" to refer to these web-based exchanges ***858** of information and the absence of any confusion as to its scope bolsters the conclusion that the exchange of medical information alleged by Vita falls within the plain meaning of the term.

ii. Context. Our analysis does not end with dictionaries; words must be read in the context of the "statutory scheme as a whole." Six Bros., Inc. v. Brookline, 493 Mass. 616, 622, 228 N.E.3d 565 (2024), quoting Plymouth Retirement Bd. v. Contributory Retirement Appeal Bd., 483 Mass. 600, 605, 135 N.E.3d 702 (2019).

A. "Any communication." Significantly, the act defines the phrase "wire communication" to encompass "any communication" ****1213** so long as it is transmitted, at least in part, by aid of a wire, cable, or similar connection (emphasis added). G. L. c. 272, § 99 B 1. The use of the word "any" to modify the word "communication" evinces the Legislature's intent to provide sweeping protection for communications "of whatever kind."[8] Department of Hous. & Urban Dev. v. Rucker, 535 U.S. 125, 131, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002) ("[T]he word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind" [quotation and

citation omitted]). See Commonwealth v. Moody, 466 Mass. 196, 208, 993 N.E.2d 715 (2013) (wiretap act "define[s] 'wire communication' broadly").

This, in turn, should clarify the court's present bewilderment. The word "any" indicates the legislative intent not to limit the act's protections to direct "person-to-person" communications, to "personal" communications, to "private" communications, to "substantive" "particularized" communications or to the "core ***859** type" of communications available when the act was passed. Ante at & note 8. In this manner, the Legislature demonstrated its intent to capture new communications technologies that employ wire, cable, or other like connections even if those technologies altered the manner by which we communicate.

Dismissing this obvious statutory context and rich resource for determining legislative intent, the court instead places great weight on a subsection of the search warrant provision of the act, which uses the terms "wire and oral communications" interchangeably with "conversations," to claim puzzlement whether "communications" are limited to direct person-to-person conversations. Specifically, to obtain a search warrant authorizing the interception of a wire or oral communication, the subsection requires that the warrant application include "[a] statement that the oral or wire communications sought are material to a particularly described investigation or prosecution and that such conversations are not legally privileged" (emphasis added). G. L. c. 272, § 99 F 2 e. In this subtle manner, the court concludes, the Legislature might have intended to narrow the breadth of oral and wire communications, previously and expressly defined expansively to include, respectively, speech and "any communication" through the requisite medium, to conversations or messages between people such as by sending or receiving by e-mail, text message, chat, instant message, or the equivalent. G. L. c. 272, § 99 B 1.

In light of the express definition of "wire communication" and the purpose conveyed in the act's preamble to protect against the threat to privacy occasioned by modern electronic surveillance devices, discussed in further detail infra, the court is mistaken. See Patel v. 7-Eleven, Inc., 489 Mass. 356, 364, 183 N.E.3d 398 (2022), S.C., 494 Mass. 562, 240 N.E.3d 765 (2024), quoting Whitman v. American Trucking Ass'ns, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) ("the Legislature 'does not, one might say, hide elephants in mouseholes' "). Instead, this singular use of the term "conversations" was intended to incorporate the breadth of the phrase "oral and wire communications," as previously discussed.

Similarly, the court concludes that, because the act uses the words "telephone" ****1214** and "telegraph" several times, protected communications might be limited to direct person-to-person conversations or messages as one might conduct on a telephone or through a telegraph. Far from sowing confusion as to the scope of the phrase "any communication," these references to telephone ***860** communications and messages by telegraph show that "when the Legislature intend[ed]" to limit a provision of the act to a particular type of communication, "it [knew] how to say so

explicitly" (citation omitted). Commonwealth v. Rossetti, 489 Mass. 589, 600, 186 N.E.3d 729 (2022).

Beyond requiring that the medium of exchange include, at least in part, a wire, cable, or like connection, [9] no qualifying phrase limits application of the act so as to exclude an exchange of medical information and knowledge occurring between a patient and a hospital by means of the hospital's website. [10] See Plymouth Retirement Bd., 483 Mass. at 605, 135 N.E.3d 702 (we "look to the statutory scheme as a whole" to derive Legislature's intent [citation omitted]). Such an exchange of information falls within "any communication."

Even if recourse to the legislative history were proper, [11] it is telling that the Legislature chose to protect "any communication" and not just the private conversations or messages discussed in the legislative record; [12] this choice to protect "any communication" must inform our construction. "We do not read into the ***861** statute a provision which the Legislature did not see ****1215** fit to put there, nor add words that the Legislature had an option to, but chose not to include." Commonwealth v. Dones, 492 Mass. 291, 297, 211 N.E.3d 47 (2023), quoting Commonwealth v. Williams, 481 Mass. 799, 807-808, 119 N.E.3d 1171 (2019).

Accordingly, while the Legislature was concerned principally with privacy, we have concluded that the act's protections were not limited to situations where there existed a reasonable expectation of privacy in the oral or wire communications. Commonwealth v. Hyde, 434 Mass. 594, 601, 750 N.E.2d 963 (2001), quoting Commonwealth v. Jackson, 370 Mass. 502, 506, 349 N.E.2d 337 (1976) ("[W]e would render meaningless the Legislature's careful choice of words if we were to interpret 'secretly' as encompassing only those situations where an individual has a reasonable expectation of privacy"). The same principles counsel rejection of any proposed limit of "communications" to direct person-to-person conversations or, as the court suggests, ante at ——, 243 N.E.3d at ——, to conversations involving no "pre-generated" content on the part of one of the parties to the communication. [13] See Dones, 492 Mass. at 297, 211 N.E.3d 47, quoting Williams, 481 Mass. at 807-808, 119 N.E.3d 1171.

B. Preamble. Additional context informing the construction of the word "communication" comes from the act's preamble, on which we have placed particular import in connection with our construction of the act. See Commonwealth v. Rainey, 491 Mass. 632, 642, 205 N.E.3d 1090 (2023) ("Where the Legislature has set forth its intent in the form of a codified preamble, we consider the preamble as part ***862** of the whole statute ... to the extent that it does not conflict with the more specific statutory provisions"). [14] See also Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749, 840 N.E.2d 518 (2006) ("a statute must be interpreted ... in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished" [citation omitted]).

The preamble codifies the Legislature's intent to provide comprehensive protections to the privacy of individuals against surreptitious surveillance by private parties. It emphasizes the Legislature's concern that "the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth," and it sets forth the legislative ****1216** intent that the "secret use of such devices by private individuals must be prohibited." G. L. c. 272, § 99 A. See Curtatone, 487 Mass. at 657, 169 N.E.3d 480 (act prohibits all secret interceptions subject to "a few narrow exceptions"). Narrowing the scope of the act's protections against secret eavesdropping and secret recording to exclude exchanges of information, knowledge, or ideas that occur between a patient and a hospital by means of the hospital's website would contravene the Legislature's stated purpose as codified in the preamble; the legislative purpose to protect against the dangers of electronic eavesdropping is particularly relevant where, as here, that information exchange reveals potentially sensitive medical information. The preamble confirms the deliberate breadth of the language "any communication" regardless of whether the communication mirrors the manner by which telephone conversations were conducted.

Consistent with the preamble, the legislative record reveals a concern over conduct analogous to that which Vita alleges transpired here. The report of a special commission tasked with studying electronic eavesdropping and wiretapping prior to adoption of the present act suggests that the Legislature was concerned by the ease with which "newly developed inventions" permitted individuals to eavesdrop electronically. Commonwealth v. Ennis, 439 Mass. 64, 68 n.10, 785 N.E.2d 677 (2003), citing 1967 Senate Doc. No. 1198, at 3. The ***863** software-based eavesdropping tool used by the hospitals is precisely the sort of "modern electronic surveillance device[ ]" that the Legislature sought to prohibit. Contrary to the court's assertion, the fact that the code was deployed on a personal computing device by the hospitals despite their assurance of confidentiality is not less "frightening" than placing a bug in a home or a telephone. [15] Ante at ——, 243 N.E.3d at ——. Certainly, the historical review does not support the court's view that it is unclear whether the kinds of interceptions at issue here would fall within the ambit of concerns motivating passage of the act and set forth in its preamble. [16]

C. Person-to-person communications. The court asserts that a communication ****1217** between a patient and a hospital using a website is not a communication between individuals in a "commonsense way," ante at ——, 243 N.E.3d at ——; instead, the court declares that it is an interaction "with a website," which the court describes as "published information" -- a repository for a large volume of generic medical information, id. at ——, 243 N.E.3d at ——. But this is not how the hospitals themselves describe this online forum, and for good reason. The hospitals' websites function as interactive mechanisms through which the hospitals communicate information about, inter alia, ***864** their services and physicians to their patients and to the public at large, and the websites function as electronic forums for the hospitals to elicit information

from patients concerning, inter alia, particular medical needs, to provide patients with responsive information, and to schedule appointments with specific providers.

The result is a personalized exchange of information specific to the patient's healthcare inquiries and needs. Unlike the court, the hospitals understood that their websites were a means to communicate privately with patients. Copying protocols required for face-to-face communications between healthcare providers and patients, the hospitals assured patients that they could use the websites to share their individualized medical concerns and inquiries privately and, in turn, to receive the hospitals' tailored responses.

As amici Massachusetts Health and Hospital Association, Inc., and Massachusetts Medical Society acknowledge:

> "The [I]nternet is often the first place that patients, family members, researchers, and anyone curious about a particular medical condition or provider turn when seeking health-related information. Hospitals and health care providers seek to help individuals by providing online content designed to be responsive to those needs."

The websites, in effect, act like the hospitals' customer service representative or healthcare provider, receiving inquiries from patients about, inter alia, a particular medical condition or specific physicians and, in exchange, providing the hospitals' response in this modern medium. [17]

Of course, a patient is an individual on one end of this virtual ***865** call. That individual asks for information regarding a particular disease or procedure by clicking an available hyperlink or typing in search terms. She asks to book an appointment by filling out a form on the website.

On the other end of the "call," there are also individuals. These are the employees and representatives of the hospitals, who are knowledgeable about, for example, the diseases or procedures that were the subject of the patient's inquiry and who are responsible for creating the answers to patients' frequently asked questions. They ****1218** are the hospitals' agents who provide the information necessary to take the unique wishes of the individual patient and to develop an algorithm to provide the responsive list of qualified physicians. They are the hospitals' representatives who can take the patient's appointment request form and book the appointment with the requested physician or the individuals at the hospitals responsible for urgent care. [18] The information on the hospitals' websites does not create itself; it is designed by humans acting on the hospitals' behalf. Indeed, the hospitals do not argue to the contrary.

In short, the hospitals' websites are, by design, the hospitals' "voice" to the public and to patients on the Internet; to interact with the hospitals in this forum, patients, inter alia, direct their web browsers to launch the hospitals' websites, click on hyperlinks related to the information they

seek, type in search terms to garner more information, select filters or enter searches to identify doctors, or fill out forms to request an appointment or to reserve a spot in the urgent care line. Thus, like dialing the hospitals' main telephone number on a telephone keypad to enter the signals required to call the hospital, talking into the handset, and then being directed to a customer service representative to find, for example, the closest physician of a particular gender who specializes in fertility issues, the website fields that same "call" from Internet users. [19]

The court's conclusion that the communications alleged by ***866** Vita are "with the websites" is no more supportable than a conclusion that a communication conducted by dialing a hospital's telephone number on a keypad is "with a telephone." Both sets of communications are with the hospitals, regardless of how the technological advance connects patients to the hospitals; both are encompassed by the phrase "any communication." [20]

***867 **1219** b. Personal communications. The hospitals posit that Vita's complaints merely describe the recording of her "movements in digital space," not exchanges of information. For its part, the court concludes that Vita's "browsing activities" were not "personal." Ante at ——, 243 N.E.3d at ——. These arguments misapprehend the crux of Vita's claims.

Her claims do not center on the tracking of the Cartesian coordinates or pixel locations on her electronic device's screen where she moved her cursor and "clicked," or the keyboard strokes she entered as she typed words into the hospitals' website search engines. Instead, her claims rest principally on the personal information exchanged between her and the hospitals.

That information comprised, inter alia, the particular type of healthcare information that Vita sought and that the hospitals provided on the webpages to which she was directed in response to her inquiries; the search terms she typed into the hospitals' website search bars to garner information regarding her and her husband's ****1220** medical conditions, symptoms, and treatment, and the hospitals' responses to the same; her inquiries as to the hospitals' available physicians based on gender preferences, geographic limitations and specialization, and the hospitals' answers listing the physicians that fit her criteria and the types of maladies in which they specialized; the specific providers with whom she ***868** sought medical services; her intent to pay or view a medical bill; and her requests to schedule appointments or be seen by an urgent care provider.

Indeed, the value of the information that the hospitals allegedly assisted the third-party software providers secretly to record lies presumably in the rich portrait of Vita garnered from the treasure trove of information Vita and the hospitals exchanged during her interactions with the hospital websites. Recasting these exchanges as mere "digital movements," as the hospitals do, or concluding that they involve no "personal" information, as the court does, ignores the reality of the information that the hospitals assisted third-party software providers to track secretly. [21] As described in the complaint, the hospitals allowed the third-party software providers to be "silent

third-part[ies] watching whatever [Vita was] doing." Assuming arguendo that the act includes an unstated requirement that the communication secretly recorded is a "personal" one, Vita's allegations meet it.

c. Prior determination of act's scope. The court asserts that an amendment to the act is required to capture the interception that occurred here in order for our State act to mirror the breadth of the Federal wiretap statute, 18 U.S.C. §§ 2510 et seq. But we previously have concluded that our State act's protections of "communication[s]" is coextensive with the Federal counterpart without amendment; we explained that, even unamended, our act extends to "non-oral electronic transmissions" covered by the Federal counterpart as "electronic communications" -- a category of protected communications that Congress added in connection with the amendments to the Federal act as part of the Electronic Communications Privacy Act of 1986 (ECPA), Pub. L. No. 99–508, 100 Stat. 1848 (1986).[22] **1221 Moody, 466 Mass. at 208, 993 N.E.2d 715. See id., quoting *869 Dillon v. Massachusetts Bay Transp. Auth., 49 Mass. App. Ct. 309, 315, 729 N.E.2d 329 (2000) ("The fact that there has been no amendment of the Massachusetts [wiretap] statute comparable to the Congressional action of 1986 does not bar us from reading the [Massachusetts wiretap statute] so as to preserve it in its intrinsic intended scope and maintain its viability in the broad run of cases ...").

Today, the court reverses course. It states that our holding in Moody was based on the ground that text messages mirror person-to-person conversations by telephone or messages by telegraph. Ante at ––––, 243 N.E.3d at ––––. But this was not the basis for our holding in Moody. Instead, that decision was grounded in our conclusion that the State act was as expansive as the amended Federal counterpart, a necessary element of our analysis of the defendant's argument that the State act was otherwise preempted by the Federal act. In so holding, we relied on the definition of wire communication extending to "any communication" as well as the State act's use of the term "record." Moody, 466 Mass. at 208-209, 993 N.E.2d 715. We did not rely, as the court now states, on whether a human was directly on either side of a text message. See generally id. Critical to our decision that text messages were covered by "wire communication" was our determination that that term encompassed "non-oral electronic transmissions" covered by the Federal counterpart. Id. at 208, 993 N.E.2d 715.

Given our prior determination in Moody, it is significant that the court concludes, as have some Federal courts, that under the Federal statute, third-party interceptions that occur in the course of a user's interactions with a website, like those alleged in Vita's complaints, are prohibited recordings of protected communications. See, e.g., In re Facebook, Inc. Internet Tracking Litig., 956 F.3d 589, 596, 608 (9th Cir. 2020), cert. denied sub nom. *870 Facebook, Inc. v. Davis, ––– U.S. ––––, 141 S. Ct. 1684, 209 L.Ed.2d 464 (2021) (plaintiffs stated claim under Federal wiretap act where Facebook installed "plug-in" software that collected uniform resource locator [URL] information, which "provides significant information regarding the user's browsing history, including the

identity of the individual [I]nternet user and the web server, as well as the name of the web page and the search terms that the user used to find it"); In re Pharmatrak, Inc., 329 F.3d 9, 18 (1st Cir. 2003) (defendant who collected information on customers through "cookies" [23] "appropriate[ly]" did not contest "whether it ... obtained the contents of an electronic communication" under Federal wiretap act). [24]

Consistent with our decision in Moody and the decisions of Federal courts interpreting **1222 the Federal counterpart, the term "communication" includes online exchanges of medical information between a hospital and its patients by means of the hospitals' website. As we have recognized, the Legislature chose to enact a statute that was more protective than the Federal counterpart and comparable statutes in other States, [25] rejecting proposals that *871 would narrow protections. [26] See Hyde, 434 Mass. at 599, 750 N.E.2d 963 ("The commission [charged with restructuring the Commonwealth's wiretap statute] clearly designed the 1968 [wiretap act] to create a more restrictive electronic surveillance statute than comparable statutes in other States").

d. Absurdity. Notably, although the court's decision rests on its determination that "communication" is an ambiguous term and although the court uses that determination to justify its application of the rule of lenity, the court relies on several cases concluding that the act is not ambiguous, but instead literally reads on certain conduct. Ante at ——, 243 N.E.3d at ——. Setting aside this analytical misstep, I agree with the court that, in the cited cases, we have eschewed the literal construction because doing so resulted in an absurdity unsupported by the legislative goals of the act. Cf. Commonwealth v. Morris, 492 Mass. 498, 505-508, 212 N.E.3d 812 (2023) (act does not require suppression of audiovisual recording of voluntary statement where defendant knew police were recording his statement in writing); Rainey, 491 Mass. at 642-644, 205 N.E.3d 1090 (no suppression of body-worn camera recording of witness's statement where witness called police to report assault by defendant and knew her statement was being recorded in writing); Commonwealth v. Gordon, 422 Mass. 816, 832-833, 666 N.E.2d 122 (1996) (act did not require **1223 suppression of purely administrative booking video recording where it was not used as investigative tool).

However, these cases do not control our analysis here. Given the Legislature's focus on the threat to personal privacy occasioned by the use of modern electronic devices to surveil surreptitiously individuals' communications, see G. L. c. 272, § 99 A, I disagree with the court's implicit determination that the Legislature would regard as absurd holding hospitals liable when they *872 misstate how communications between a patient and her healthcare providers would be used and shared with third parties.

Consistent with its plain meaning as well as the context of the statutory framework as a whole, the meaning of "communication" extends to the exchange of medical information and knowledge, through speech, [27] writing, mechanical or electronic media, or equivalent means.

e. Contents. Significantly, the court confuses the act's protections of the "contents" of a communication with the "communication" itself. As discussed supra, the complaints allege that the hospitals assisted third parties to record detailed personal information exchanged between the hospitals and their patients. The act prohibits the secret recording of these communications, but it also protects their "contents," a term defined as "any information concerning the identity of the parties to [a] communication or the existence, contents, substance, purport, or meaning of that communication." G. L. c. 272, § 99 B 5. Thus, the "contents" impermissibly recorded included Vita's underlying communications with the hospitals as well as, inter alia, the existence of the communications, the URLs of the specific webpages she visited, the titles of the webpages through which she scrolled, the hyperlinks on which she clicked, data about her web browser configuration, the unique identifier used to track individuals across the website, and her Internet protocol address. [28]

The court states that these latter "activities" do not resemble person-to-person conversations. Ante at ——, 243 N.E.3d at ——. Regardless, they are ***873** "information concerning the identity" of Vita and "the existence" of the communications. As such, they are protected as "contents" of the underlying communication. G. L. c. 272, § 99 B 5.

3. Interception. Concluding that Vita did not allege any communication, the court ****1224** does reach the question whether an interception occurred. The hospitals contend that Vita's complaints failed to allege that she did not know that third parties were monitoring and recording the communications over the hospitals' websites, and that therefore no interception of her communications occurred. [29] More specifically, the hospitals assert that Vita had actual knowledge of the recordings because their privacy policies stated, "We and our Third Party Service Provider collect and save the default information customarily logged by worldwide web server software." [30]

The argument ignores the assurances also set forth in the hospitals' privacy policies that information on user activity "is not shared with other organizations" and that "we will not share any information we receive with any outside parties." [31] See In re Pharmatrak, Inc., 329 F.3d at 21 ("Deficient notice will almost always defeat a claim of implied consent"). Moreover, Vita alleges that tracking software was invisible to the average website ***874** user and not otherwise apparent to her. [32] These allegations plausibly suggest that Vita was unaware that the hospitals were assisting others to record the contents of the information she exchanged with the hospitals over their websites.

The hospitals also maintain that no interception transpired because "[i]t is common knowledge in the 2020s that websites cannot follow users' browsing commands without logging (i.e., 'recording') them[ and] [t]hat is how the [I]nternet inherently works." Under the hospital's theory, "every online communication would provide consent to interception by a third party." In re Pharmatrak, Inc., 329 F.3d at 21. To defeat a wiretap act claim, however, the aggrieved party must have had actual knowledge of the recording. See Jackson, 370 Mass. at 507, 349 N.E.2d 337. While the actual knowledge may be express or implied, constructive knowledge is insufficient. See id. Cf. ****1225** In re Pharmatrak, Inc., supra at 19 ("Consent may be explicit or implied, but it must be actual consent rather than constructive consent"); Williams v. Poulos, 11 F.3d 271, 281 (1st Cir. 1993) ("Implied consent is not ... constructive consent"). Here, nothing in the complaints' allegations, which we must accept as true at this stage in the proceedings, suggests that Vita had actual knowledge that third parties were tracking her activities. See Six Bros., Inc., 493 Mass. at 618, 228 N.E.3d 565.

The court's refusal to conclude that Vita has alleged "any communication" with the hospitals over their websites appears driven in large part by the potential exposure of other website owners who employ web analytics -- tracking software that monitors how users interact with a website to improve its delivery of information. Ante at ——, 243 N.E.3d at ——. Of course, if those website owners candidly disclosed such tracking, then the recording would not be secret and thus would not fall within the scope of the prohibited interceptions.[33] The act prohibits secret recordings, not disclosed ***875** ones.[34] Curtatone, 487 Mass. at 658, 169 N.E.3d 480 ("the definition of interception provided in the act requires that an interception of the type prohibited must be [1] secretly made and [2] without prior authority by all parties" [quotation and citation omitted]). G. L. c. 272, § 99 B 4 (interception occurs only where hearing or recording is "secret"). Here, however, the hospitals' disclosures are not forthright;[35] together with Vita's asserted lack of knowledge, the disclosures do not provide a defense that can be determined at this stage of the litigation.

4. Ordinary course of business exception. Because the court concludes that no communications occurred between the hospitals and Vita, it does not reach the hospitals' contention that the tracking software falls within an exception to the prohibition on "intercepting device[s]"[36] that applies to "any telephone or telegraph instrument, equipment, facility, or a component thereof" that the hospitals used "in the ordinary ****1226** course of [their] business." G. L. c. 272, § 99 B 3.

To be sure, the act prohibits only interceptions that are conducted through an "intercepting device." G. L. c. 272, § 99 B 4. An intercepting device is

> "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication other than ... any telephone or telegraph instrument, equipment, facility, or a component thereof, ... furnished to a subscriber or user by a communications

common carrier in the ordinary course of its business under its tariff and being ***876** used by the subscriber or user in the ordinary course of its business ..." (emphases added).

G. L. c. 272, § 99 B 3. Thus, certain telephone or telegraph equipment used in the ordinary course of business is exempted from the definition of an intercepting device. The hospitals do not contend that the tracking software is "telephone or telegraph equipment." See O'Sullivan v. NYNEX Corp., 426 Mass. 261, 265, 687 N.E.2d 1241 (1997), quoting Commonwealth v. Todisco, 363 Mass. 445, 452, 294 N.E.2d 860 (1973) (" 'telephone equipment' does not include eavesdropping devices external and extraneous to regular telephone devices"). They ask us to construe "telephone and telegraph instrument" to include the tracking software at issue here. But the Legislature chose to limit expressly the exception to "any telephone or telegraph instrument." This contrasts sharply with the Legislature's decision to define "wire communication" expansively to include technologies beyond telephone and telegraph instruments. Compare G. L. c. 272, § 99 B 3, with G. L. c. 272, § 99 B 1 ("wire communication" extends to communications over "wire, cable, or other like connection"). See Commonwealth v. Williamson, 462 Mass. 676, 682, 971 N.E.2d 250 (2012) (Legislature's choice of different words demonstrates intent for different meanings).

Moreover, Vita's complaints aver that the hospitals' ordinary course of business is caring for and treating patients; it does not appear to extend to permitting third parties to exploit communications between a patient and the hospitals concerning the patient's medical inquiries, physicians, and medical care. See Crosland v. Horgan, 401 Mass. 271, 275, 516 N.E.2d 147 (1987), quoting Watkins v. L.M. Berry & Co., 704 F.2d 577, 582 (11th Cir. 1983) ("in light of the statutory purpose of protection from invasions of privacy, neither the concept of legitimate business purpose nor 'ordinary course of business' can 'be expanded to mean anything that interests a company' ").

5. Conclusion. In sum, the hospitals created websites to communicate with their patients, inviting patients to share their personal medical needs and, in turn, providing the hospitals' responses. The hospitals assured patients that these exchanges of information would be kept confidential. Then, unbeknownst to patients, they implanted tracking code to assist third parties to record the patients' private medical concerns, padding Facebook's and Google's bottom lines. The court decides that the wiretap act provides no recourse despite its prohibition on surreptitious ***877** electronic surveillance by private parties. Lamentably, the court is right about one thing; the Legislature will need to correct today's error.

**All Citations**

494 Mass. 824, 243 N.E.3d 1185

## Footnotes

1 Individually and on behalf of all others similarly situated.

2 Kathleen Vita vs. Beth Israel Deaconess Medical Center, Inc.

3 We acknowledge the briefs of amici curiae Chamber of Commerce of the United States of America; Greater Boston Chamber of Commerce and Massachusetts Nonprofit Network; Doe plaintiffs in other pending civil actions; Massachusetts Health and Hospital Association, Inc., and Massachusetts Medical Society; National Retail Federation and Retailers Association of Massachusetts; National Consumer Law Center, Inc., and Electronic Privacy Information Center, Inc.; New England Legal Foundation and Associated Industries of Massachusetts; and Pioneer Public Interest Law Center.

4 While the dissent refers broadly to interception of "private healthcare information," post at ——, 243 N.E.3d at ——, there is no allegation that information contained within the private patient portals was accessed or shared.

5 As described in the complaint against BIDMC:

> "A 'URL' is another form of an address specifically for websites ... that a web browser can translate into an [Internet protocol (IP)] address to load the website.... Numerous URLs also point to specific pages on that website; often, a URL will contain information about the particular webpage itself."

6 Vita's complaints explain that "[a]n 'IP address' is a unique combination of ... numbers ... that serves as a particular device's address on the [I]nternet."

7 This was allegedly collected only on BIDMC's website, which implemented an optional feature offered by Google Analytics.

8 While Vita alleges that users could book appointments and reserve spots in line to be seen by an urgent care physician, nothing indicates that users could engage in substantive written conversations or draft particularized messages to health care providers using the forms. Nor does Vita allege that she herself used the form to request appointments.

9 The software on NEBH's site also would transmit the name of the user's doctor.

10 As explained in the briefing by both parties and the amicus submissions, such tracking is commonly employed. See Amended Opening Brief for Defendants-Appellants, at 24-25; Brief for National Retail Federation and Retailers Association of Massachusetts, as Amici Curiae, at 3 ("The technologies at issue in this case are found on all manner of websites[ ] and play a fundamental role in the modern digital economy ...").

11 The complaints do not allege whether Vita viewed the pop-up messages when she accessed the webpages or whether she reviewed the privacy policies. The complaints also do not allege how or when the pop-up messages first appeared to a user navigating the websites.

12 A domain name, as defined in the privacy policies, is "the unique address assigned to your Internet service provider's computer that connects to the Internet."

13 No class had been certified by the time these cases reached this court. There has also been no other plaintiff identified. Based on our decision today, we need not address whether the prerequisites of class certification, including whether Vita is an appropriate class representative, may be satisfied here. See Mass. R. Civ. P. 23, as amended, 471 Mass. 1491 (2015).

14 The dissent claims we apply "a heightened pleading standard, or a premature analysis of whether Vita is an appropriate class representative." Post at ——, 243 N.E.3d at ——. We do not. As we note infra, we need not and do not decide whether Vita is an appropriate class representative, although we are cognizant that she is the only class representative identified and her personal claims are quite limited. Although we do not ignore Vita's allegations as to what users in general did on the websites, we do not, as the dissent does, embellish those allegations or her own. See, e.g., notes 4, 8, supra; notes 21, 22, infra. As no class has been certified and Vita may not be an appropriate class representative, we also make clear, where we can, what she alleges she experienced and what unknown other members of a putative class may allege. If anyone is straining pleading standards, it is the dissent.

15 The act defines an "aggrieved person" as "any individual who was a party to an intercepted wire or oral communication ... or who would otherwise have standing to complain that his personal or property interest or privacy was invaded in the course of an interception." G. L. c. 272, § 99 B 6.

16 As discussed supra, the complaints outline various other claims presented on the behalf of currently unnamed members of the purported class. Because there are no other named plaintiffs in these cases, Vita's individual standing is particularly important. Cf. Gammella v. P.F. Chang's China Bistro, Inc., 482 Mass. 1, 20, 120 N.E.3d 690 (2019) (recognizing that whether plaintiff's claim was moot was "particularly important ... because no other named plaintiff [had] yet been identified"). As we conclude that Vita has standing regarding her claims, however, we need not decide whether she would independently have standing to pursue other claims on behalf of the class. Contrast Weld v. Glaxo Wellcome Inc., 434 Mass.

81, 84, 746 N.E.2d 522 (2001) (class representative lacked standing where he had suffered no individual injury).

17 The same punishments apply to anyone who "attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception." G. L. c. 272, § 99 C 1.

18 The dissent emphasizes the word "any" that accompanies the definition of "wire communication," asserting that the use of "any" to modify "communication" evinces a clear legislative intent to "provide sweeping protection for communications of whatever kind" (quotation and citation omitted). Post at ——, 243 N.E.3d at ——. See G. L. c. 272, § 99 B 1. The problem with this analysis, as explained supra, is that the term "wire communication" does not itself define the meaning of "communication," but rather the means of communication. We need to look to a source beyond the definition of "wire communication" to understand what "communication" means. Indeed, the dissent does this by turning to dictionaries for its interpretation of "communication." We address the problems with the dissent's dictionary analysis infra.

19 According to the dissent, these references to "telephone" and "telegraph" are just examples of the Legislature explicitly limiting a provision of the act to a particular type of communication. The act requires that warrant applications include a statement "[t]hat the oral or wire communications of the particularly described person ... will occur ... over particularly described telephone or telegraph lines" (emphasis added). G. L. c. 272, § 99 F 2 c. Similarly, a warrant must include "[a] particular description of the person and the place, premises or telephone or telegraph line upon which the interception may be conducted" (emphasis added). G. L. c. 272, § 99 I 3. It is not clear why the Legislature would want to limit the warrant requirements to telegraph or telephone lines as opposed to other types of wired communications.

20 A conversation is an "oral exchange of sentiments, observations, opinions, or ideas," and includes a similar exchange conducted by, for example, e-mail. Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/conversation [https://perma.cc/EL4B-75K2].

21 The dissent claims we rely on Vita's allegations that she communicated with the hospitals' websites but ignore places in the complaints where she characterizes the communications as between users and the hospitals. But there is nothing in the allegations to suggest that anything other than interactions with the website are at issue here. When the complaints reference communications with the hospitals, they are only referencing communications with the hospitals' websites. As discussed supra, there is a significant difference between communicating with a person and communicating with a website, a difference the dissent fails to grasp. According to the dissent, there is no meaningful difference between speaking

to a doctor about one's specific illness and searching for, and then reading, pre-generated content on a webpage discussing an illness in general. There is a difference in kind and not degree between the two as we explain throughout the opinion. One is interpersonal, the other is not.

22 The dissent says we "misapprehend[ ] the hospitals' websites as repositories for 'published,' 'pre-generated' medical data," and contends that the websites were in fact "confidential dynamic forums on which [the hospitals] communicated 'interactive[ly]' with patients about the patients' 'personal' medical needs." Post at ——, 243 N.E.3d at ——. We disagree with the dissent's characterization. Nothing in the complaints indicates that the hospitals provided specific, tailored responses in real time to users' inquiries. As alleged here, the content was no more dynamic than that contained on any other website that provides written content that is periodically updated. Nor do the complaints describe hospital websites that are more interactive than most institutional webpages that provide general information. Users had the ability to navigate and find information relevant to themselves and to schedule appointments, but nothing in the complaints indicates that, at least where third-party tracking was active on the websites, users could engage in one-on-one interactions with specific medical providers.

23 The dissent claims we disregard the dictionary definitions of "communication." We do not. "Dictionaries can be useful in interpreting statutes, but judges ... must take care not to 'overread' what dictionaries tell us" (citation omitted). Suesz v. Med-1 Solutions, LLC, 757 F.3d 636, 643-644 (7th Cir.), cert. denied, 574 U.S. 1047, 135 S.Ct. 756, 190 L.Ed.2d 628 (2014). "Although ... dictionaries can be helpful -- especially when dealing with a specialized term, or a term of art, or a word's usage at the time of the law's enactment -- more often than not, the interpretive challenge comes from the ambiguity of the word as situated in a sentence. In that situation, dictionaries can hardly be definitive." R.A. Katzmann, Judging Statutes 43 (2014). Here, the dictionary definitions are too varied and "too vague to provide meaningful guidance." Suesz, supra at 643. In everyday language and in other legal contexts, "communication" can ordinarily imply an interpersonal exchange, such as a conversation or exchange of messages. See, e.g., Clair v. Clair, 464 Mass. 205, 213, 982 N.E.2d 32 (2013) (determining whether testimony and documents sought were privileged attorney-client communications); Phelan v. May Dep't Stores Co., 443 Mass. 52, 56, 819 N.E.2d 550 (2004) ("communication" for defamation purposes defined as "conduct that brings an idea to the perception of others" [citation omitted]); Emerson, 8 Ways You Can Improve Your Communication Skills, Harvard Division of Continuing Education (Aug. 30, 2021), https://professional.dce.harvard.edu/blog/8-ways-you-can-improve-your-communication-skills [https://perma.cc/P4RD-WN75] ("A leader's ability to communicate clearly and effectively with employees, within teams, and across the organization is one of the foundations of a successful business").

24 See, e.g., American Heritage Dictionary of the English Language 269 (1970) ("The exchange of thoughts, messages, or the like, as by speech, signals, or writing"); Random House

Dictionary of the English Language 298 (1967) ("the imparting or interchange of thoughts opinions, or information by speech, writing, or signs").

25 We also note that most of the preamble is directed at the dangers presented by organized crime and the need for its secret surveillance, albeit under tight controls. See G. L. c. 272, § 99 A ("[O]rganized crime constitute[s] a grave danger to the public welfare and safety.... [L]aw enforcement officials must be permitted to use modern methods of electronic surveillance, under strict judicial supervision, when investigating these organized criminal activities").

26 We note that oral communication expressly excludes speech "transmitted over the public air waves by radio or other similar device." G. L. c. 272, § 99 B 2.

27 The dissent accuses us of confusing the act's protection of the "contents" of a communication with the "communication" itself. Post at ——, 243 N.E.3d at ——. The wiretap act defines "contents" as "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G. L. c. 272, § 99 B 5. The problem is that "contents," while referencing "communication," does not define the term. Moreover, the definition refers to "parties to such communication." This only reinforces the ambiguity of the definition of communication, as "parties" seems to suggest the existence of at least two individuals (i.e., two parties to a telephone call or two parties to a text message thread). See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/party [https://perma.cc/2K4N-XPPE] ("party" can be defined as "a particular individual" or "a person or group participating in an action or affair"). Accordingly, where the meaning of "communication" is ambiguous, we cannot say with any more confidence that the information described by the dissent (e.g., URLs, titles of webpages, hyperlinks, etc.) is "contents" of a communication also protected by the wiretap act.

28 As noted earlier, speech "transmitted over the public air waves by radio or other similar device" was expressly excluded. G. L. c. 272, § 99 B 2.

29 The act allows "an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment." G. L. c. 272, § 99 D 1 a. It also allows "a financial institution to record telephone communications with its corporate or institutional trading partners in the ordinary course of its business." G. L. c. 272, § 99 D 1 f.

30 The dissent declares that we commit an "analytical misstep" in looking to cases where we interpreted the wiretap act and did not find it ambiguous, but nonetheless rejected certain literal readings. Post at ——, 243 N.E.3d at ——. We are unaware of any rule, nor does the dissent cite one, requiring that -- in determining whether a statute is ambiguous -- we only rely on cases where that same statute was declared ambiguous. Based on our citation of those same cases, the dissent further asserts that we must determine that "the Legislature

would regard as absurd" the application of the wiretap act to the alleged website activities. Id. at ——, 243 N.E.3d at ——. The dissent is incorrect. Where the statute's definition of communication clearly applies, we still consider whether its application is absurd. See Commonwealth v. Mansur, 484 Mass. 172, 175, 140 N.E.3d 384 (2020) (statute's language must be given its ordinary meaning if language is "clear and unambiguous"; however, "we do not adhere blindly to a literal reading of a statute if doing so would yield an 'absurd' or 'illogical' result" [citations omitted]). In the instant cases, however, as we have explained throughout this opinion, the term "communication" does not clearly apply here. Rather, it is ambiguous.

31 The dissent claims that we misread Moody, ignoring its conclusion that the "State act was as expansive as the amended Federal counterpart." Post at ——, 243 N.E.3d at ——. According to the dissent, Moody stands for the proposition that our wiretap act covers all forms of communication covered by the Federal wiretap act, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90–351, 82 Stat. 211 (1968) (Title III), as amended, including all forms of electronic communication as that term is defined by Title III. Post at ——, 243 N.E.3d at ——. The dissent is incorrect. Moody is, of course, a more nuanced decision. There, the court concluded only that the wiretap act, on "the several particulars challenged by the defendants, is not repugnant to the provisions of the Federal act and is accordingly not preempted" (emphasis added; citation omitted). Moody, 466 Mass. at 205, 993 N.E.2d 715. More particularly, the court concluded the "existing language of the Massachusetts wiretap statute is broad enough to protect all forms of cellular telephone calls that utilize wire, cable, or other like connections, even if the use of such connections is only in switching stations." Id. at 207, 993 N.E.2d 715. In this respect, the court found "the Massachusetts wiretap statute is as protective as the amended Federal wiretap statute." Id. To reach this conclusion, the court did not need to determine whether our State wiretap act protected every type of communication protected by the amended Title III, because the limited question before the court was whether cell phone calls and text messages were protected.

32 Vita also cites Federal court opinions, most of them unpublished, interpreting other States' wiretap statutes and concluding that the statute applies to communications between a website and a user. To the extent some of the cases involve similar fact patterns, these cases interpret different State laws; also, those State laws have been amended far more recently than our wiretap act. See, e.g., Cal. Penal Code § 632.01, inserted by Cal. Stat. 2016, c. 855 (A.B. 1671) (crime to intentionally disclose or distribute, "in any forum, including ... Internet Web sites ... the contents of a confidential communication with a health care provider" that is illegally intercepted); 18 Pa. Cons. Stat. § 5704, as amended through 2017 Pa. Legis. Serv. Act 2017-22 (S.B. 560) ("telephone calls" and "conversations" in wiretap act replaced with "oral communication, electronic communication, or wire communication").

33 Indeed, we have explicitly applied the rule of lenity to civil statutes with no criminal component if the statutory provision was penal in nature. See Anderson v. National Union Fire Ins. Co. of Pittsburgh PA, 476 Mass. 377, 386, 67 N.E.3d 1232 (2017) (applying rule of lenity to treble damages provision of civil statute, G. L. c. 93A); Libby v. New York, N.H. & H.R.R., 273 Mass. 522, 525-526, 174 N.E. 171 (1930) (statute providing civil damages for injuries caused by railroad collisions "must be construed strictly and not extended by equity, or by the probable or supposed intention of the [L]egislature as derived from doubtful words" [quotation and citation omitted]).

34 The dissent attempts to narrow the application of Vita's interpretation to the collection of medical information. But it fails to explain why such browsing is communication when one browses a public medical website, as opposed to browsing any other type of public website. The statute certainly draws no such distinction. It is not specifically directed at medical information as opposed to any other information.

35 The dissent claims we are motivated in our reasoning by "business realities." Post at note 33. To be sure, we do not ignore "business realities," as courts should, of course, take care to consider the real-world application of a proposed reading of a statute. But the principle guiding our analysis is, more simply, adherence to the rule of lenity where a criminal statute is ambiguous. Unlike the dissent, we will not impose penalties of up to five years in prison on activity that has not been clearly defined to be criminal.

36 Vita also does not allege that her or her husband's private medical records, that is, medical information prepared by doctors, nurses, or physician assistants for either of them, were transmitted to third parties without their consent.

1 For example, the court recognizes that the websites were used by a patient to communicate requests to the hospitals to book appointments and to reserve a spot in the urgent care line, but then places significance on Vita's purported failure to allege whether "users could engage in substantive written conversations or draft particularized messages to health care providers using the forms." Ante at note 8. It is not clear why or whether that additional allegation would affect the court's analysis. Certainly, nothing in the act itself requires a communication to be particularly "substantive" or "particularized" to warrant protection. As discussed infra, the act protects "any communication." G. L. c. 272, § 99 B 1.

2 As discussed in detail infra, the act makes clear that the "contents" of a communication include more than the communication itself; it defines "contents" as "any information concerning the identity of the parties to [a] communication or the existence, contents, substance, purport, or meaning of that communication." G. L. c. 272, § 99 B 5.

3 Rather than start its analysis with this trusted resource, the court takes an unusual approach, searching the act for "examples" of communications and then declaring that in light of this sampling, the dictionary definitions are "too varied and too vague" to be useful (quotation

and citation omitted). Ante at note 23. I disagree. The definitions provided by the dictionaries are neither too varied nor too vague; central to each is the exchange of information and knowledge. And, as explained infra, the samples relied on by the court comprise a subset of the broader definition of "communication."

4 The term "conversation" means an "oral exchange of sentiments, observations, opinions, or ideas," and includes a similar exchange conducted by, for example, e-mail. Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/conversation [https://perma.cc/EL4B-75K2]. Thus, a "conversation" is encompassed by the term "communication"; however, the term "communication" is broader. Cf. Commonwealth v. Zezima, 365 Mass. 238, 241, 310 N.E.2d 590 (1974) ("The adoption by the Legislature of the word 'communication' [and not 'conversation'] ... manifests an intention to include more than conversations ...").

5 "[N]early everything that makes the [I]nternet function is wired.... Individual devices like laptops and smartphones are capable of communicating with a network (Wi-Fi or cellular network), but the routers that they connect to are almost always connected by wires." Alliance for Innovation and Infrastructure, The Infrastructure of the Physical Internet (June 27, 2023), https://www.aii.org/the-infrastructure-of-the-physical-internet [https://perma.cc/S6DL-EU2K]. See In re DoubleClick Inc. Privacy Litig., 154 F. Supp. 2d 497, 501 (S.D.N.Y. 2001) ("The Internet is the physical infrastructure of the online world: the servers, computers, fiber-optic cables and routers through which data is shared online"). See also Commonwealth v. Moody, 466 Mass. 196, 198, 207, 993 N.E.2d 715 (2013) (wiretap act applies to wireless transmissions between cellular telephones because transmissions "utilize wire, cable, or other like connections, even if the use of such connections is only in switching stations").

6 After reframing Vita's alleged exchanges of information over the hospitals' websites as "web browsing," the court casts aside dictionaries because they do not provide a "ready answer" to the question whether web browsing is "with the website" or "with the website's owner." This sleight of hand does render dictionaries unhelpful in our analysis of the meaning of the term "communication," especially where the term is preceded by the word "any," as discussed infra. In any event, the information on the website did not come from the ether; the information was supplied by individuals -- representatives of the hospitals responsible for the websites' content. Accordingly, the communications alleged to have occurred here were between the hospitals and their patients by means of the hospitals' websites. See discussion infra.

7 See, e.g., Popa v. Harriet Carter Gifts, Inc., 52 F.4th 121, 124 (3d Cir. 2022) (referring to consumer's interactions with website as "communications"); In re Facebook, Inc. Internet Tracking Litig., 956 F.3d 589, 596, 607-608 (9th Cir. 2020), cert. denied sub nom. Facebook, Inc. v. Davis, ––– U.S. ––––, 141 S. Ct. 1684, 209 L.Ed.2d 464 (2021) (referring to "GET requests" between user's web browser and webpage servers, which include uniform resource

locator [URL] of webpage and sometimes information about website from which user is launching new site, as "communications"); In re Google Inc. Cookie Placement Consumer Privacy Litig., 806 F.3d 125, 130 (3d Cir. 2015), cert, denied sub nom. Gourley v. Google, Inc., 580 U.S. 814, 137 S.Ct. 36, 196 L.Ed.2d 26 (2016) (referring to Internet exchanges captured by "cookies," which enable transfer of information from web browser to web server, as "communications"); In re Zynga Privacy Litig., 750 F.3d 1098, 1101 (9th Cir. 2014) (describing how "communications occur between [Internet] 'clients' and 'servers' " in context of Facebook cookies transferring information); Brown v. Google LLC, 525 F. Supp. 3d 1049, 1068 (N.D. Cal. 2021) (referring to Internet exchanges captured by cookies as "communications"); In re DoubleClick Inc. Privacy Litig., 154 F. Supp. 2d at 504 (describing information exchanges between user and websites captured by cookies as "communication[s]"). See also note 23, infra (defining "cookie").

8 Curiously, the court dismisses dictionaries as unhelpful because "the interpretive challenge comes from the ambiguity of the word as situated in [the] sentence." Ante at note 23. Yet, the court refuses to consider the word "communication" in context. Specifically, the use of the word in the sentence defining "wire communication."

9 The Legislature expressly stated its understanding that technological advances would change the ways we communicate. In describing the scope of wire communications, it chose the words "made in whole or in part through ... wire, cable, or other like connection between the point of origin and the point of reception" to capture communications conducted over future technologies, like the Internet (emphasis added). G. L. c. 272, § 99 B 1. Faithful to that forward-looking mandate, we previously have concluded that the wiretap act applied to technologies that did not exist at the time of its enactment. See Moody, 466 Mass. at 208-209, 993 N.E.2d 715 (concluding "wire communication" includes cellular telephone calls, which only transfer through wire, cable, or like connection briefly at switching stations, as well as text messages, which are non-oral electronic communications).

10 Indeed, both telegraph and Internet systems operate through transmission of electrical signals, leading some commentators to view telegraphs as a sort of precursor to the Internet. See generally T. Standage, The Victorian Internet: The Remarkable Story of the Telegraph and the Nineteenth Century's On-line Pioneers (1998).

11 Of course, "where[, as here,] the statute is clear and unambiguous, our inquiry into the Legislature's intent need go no further than the statute's plain and ordinary meaning" (citation omitted). Commonwealth v. Mcneil, 492 Mass. 336, 337, 211 N.E.3d 615 (2023). AIDS Support Group of Cape Cod, Inc. v. Barnstable, 477 Mass. 296, 301, 76 N.E.3d 969 (2017) ("Where the language of the statute is plain and unambiguous, ... legislative history is not ordinarily a proper source of construction" [quotation and citation omitted]).

12 Contrary to the hospitals' argument, our opinion in Commonwealth v. Rivera, 445 Mass. 119, 833 N.E.2d 1113 (2005), is not to the contrary. Expressly passing over the question whether the owner who made the recording violated the act, we concluded that suppression was not required because the State had no part in ordering or encouraging the recording. Id. at 123, 833 N.E.2d 1113 ("we need not determine the predicate issue ... whether the audiotape was made in violation of the wiretap statute"). We also mused in dicta that "the defendant cannot reasonably claim that his recorded threats and obscenities were a 'conversation' " that the act would protect. Id. at 127 n.10, 833 N.E.2d 1113. However, we did not (and could not) thereby limit the scope of the act's protections to polite conversations.

13 Of course, there are differences between in-person communications, telephonic communications, e-mail communications, text messages, and communications with the hospitals conducted over a website. Each technology alters the way we communicate. In some respects, the technological advances are helpful, making it possible for us to communicate over distances previously unthinkable or to place a message during nonbusiness hours seeking an appointment with a healthcare provider for our ailing loved one. In other ways, the technological advances can detract from the qualities of direct in-person interactions. However, the Legislature was clear that these differences in how we communicate would not leave the information exchange unprotected. The act protects "any" communications, even the ones that lack the personalized touch of a bygone era, and even the ones that are less substantive than others.

14 Notably, "we have turned repeatedly to the [wiretap] statute's preamble to inform our analysis." Rainey, 491 Mass. at 642, 205 N.E.3d 1090, citing Curtatone, 487 Mass. at 659-660, 169 N.E.3d 480, Commonwealth v. Tavares, 459 Mass. 289, 295 & n.5, 945 N.E.2d 329 (2011), Commonwealth v. Ennis, 439 Mass. 64, 68, 785 N.E.2d 677 (2003), Commonwealth v. Gordon, 422 Mass. 816, 833, 666 N.E.2d 122 (1996), and Commonwealth v. Thorpe, 384 Mass. 271, 279, 424 N.E.2d 250 (1981), cert. denied, 454 U.S. 1147, 102 S.Ct. 1011, 71 L.Ed.2d 300 (1982).

15 I disagree with the court's conclusion that the Legislature, which was frightened by the capacity of cigarette pack-sized "parasite bugs" and by "room bugs" that could pick up a whisper from twenty feet away, ante at ——, 243 N.E.3d at ——, would be less abhorred by "hidden code" secretly "injected" into patients' home computers that enables observers to watch from anywhere patients' healthcare communications on hospital websites, as Vita alleges.

16 The court declares the "historic analogies" to "website analytics" to be tracking of mail order purchasing decisions, compiling of customer lists, and sharing the same. Ante at ——, 243 N.E.3d at ——. But such manual endeavors are not "modern electronic surveillance devices" with the attendant capacity of such electronic devices to surpass what can be done manually (emphasis added). G. L. c. 272, § 99 A. It thus is not surprising that the Legislature

did not discuss such basic manual business activities. By contrast, the tracking software -- indisputably a form of modern electronic surveillance device -- alleged by Vita in her complaints falls within the Legislature's area of concern.

Notably, when it enacted the statute, the Legislature was alarmed by the revelation that a telephone company was secretly monitoring and recording telephone calls between customers. Ennis, 439 Mass. at 69 n.10, 785 N.E.2d 677, citing 1967 Senate Doc. No. 1198, at 14. Secret monitoring of communications exchanged through a company's website is, in material respects, a modern-day equivalent of a telephone company secretly monitoring and recording customer's use of its landlines -- a practice that particularly concerned the Legislature. See Ennis, supra, citing 1968 Senate Doc. No. 1132, at 6-7, and 1967 Senate Doc. No. 1198, at 14 (partial motivation for wiretap act was revelation that telephone company was recording customers' calls secretly).

17 One of the Internet's most significant contributions has been to make possible instantaneous communications across vast expanses. As the United States Supreme Court described:

> "Anyone with access to the Internet may take advantage of a wide variety of communication and information retrieval methods. These methods are constantly evolving and difficult to categorize precisely.... All of these methods can be used to transmit text; most can transmit sound, pictures, and moving video images. Taken together, these tools constitute a unique medium -- known to its users as 'cyberspace' -- located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet."

Reno v. American Civil Liberties Union, 521 U.S. 844, 851, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

18 As described supra, the fact that the hospitals' responses are, in some sense, pre-generated is not dispositive; nothing in the act limits its protection of "any communication" to spontaneous or extemporaneous communications. Cf. Armata v. Target Corp., 480 Mass. 14, 19-20, 99 N.E.3d 788 (2018) (automatically dialed and delivered prerecorded telephone message constituted "communication" under debt collection regulation).

19 Accord Revitch vs. New Moosejaw, LLC, U.S. Dist. Ct., No. 18-cv-06827-VC, 2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ("request[ing] information ... by clicking on items of interest" and receiving that information in response is akin to "call[ing] to inquire about a store's products," and "[t]his series of requests and responses -- whether online or over the phone -- is communication").

20 Deviating from our standard of review on a motion to dismiss, which requires us to draw all reasonable inferences in the plaintiff's favor, see supra, the court appears to rely on Vita's characterization of her "intercepted communications" as being between Vita and "each hospital's website." Ante at ——, 243 N.E.3d at ——. If Vita's allegations are to be controlling, then, at the least on a motion to dismiss, we must consider her numerous allegations describing the use of the website features as communications with the hospitals. See, e.g., Vita vs. Beth Israel Deaconess Med. Ctr., Inc., Mass. Super. Ct., No. 2384CV00480, Complaint ¶ 1 (Suffolk County Feb. 24, 2023) (BIDMC Complaint) ("Plaintiff brings this action to remedy the secret interception of the contents of [I]nternet communications between healthcare consumers and the defendant, [BIDMC].... The Plaintiff's and Class Members' wire communications with BIDMC were secretly and contemporaneously intercepted, recorded, and transmitted to these third parties without their knowledge or consent whenever they visited any page of the BIDMC Website"); BIDMC Complaint ¶ 7 ("this case concerns communications between healthcare consumers and healthcare providers"); BIDMC Complaint ¶ 9 ("BIDMC aided interceptions by ... third parties of healthcare consumers' communications with BIDMC through the BIDMC Website"); BIDMC Complaint ¶ 18 ("Users of healthcare-related websites such as the BIDMC Website have a legitimate expectation and understanding that their communications with BIDMC through the website will be private. They also have a legitimate expectation that healthcare providers such as BIDMC will not share with third parties their communications with BIDMC without their consent"); BIDMC Complaint ¶ 20 ("Healthcare consumers would not anticipate or expect that their communications with healthcare providers, including BIDMC, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared ..."); BIDMC Complaint ¶ 25 ("The interceptions of website users' communications with BIDMC were, therefore, truly secret ..."); BIDMC Complaint ¶ 26 ("Plaintiff describes in this complaint various tracking technologies implemented on the BIDMC Website that cause the secret interception, recording, and transmission of the contents of Class Members' [I]nternet communications with BIDMC. The next section ... provides a brief overview of the third parties that intercept and record the contents of Class Members' [I]nternet communications with BIDMC ..."); BIDMC Complaint ¶ 38 ("BIDMC injects hidden code into the BIDMC Website that permits third parties to contemporaneously intercept healthcare consumers' communications with BIDMC.... This includes, for example, associating the content of the user's communications with BIDMC with the website user's Facebook profile"); BIDMC Complaint ¶ 39 ("These tracking technologies transmit to [third parties] contemporaneously with the website communications between Class Members and BIDMC, the contents of those communications and identifying information about the Class Members"); BIDMC Complaint ¶ 50 ("A third party ... can then add the content of the user's communications with BIDMC to its collection of information it already has about the individual, which it can then use for advertising purposes"); BIDMC Complaint ¶ 52 ("The tracking technologies described in this complaint intercept and

transmit to third parties the contents of communications between healthcare consumers and BIDMC contemporaneously with those communications"); BIDMC Complaint ¶ 54 ("These tracking technologies are each substantially similar to the now-removed [third party] code, both in their surreptitious deployment on the website and their contemporaneous interception of website users' communications with BIDMC"); BIDMC Complaint ¶ 63 ("After [a third party] associates the website user's communications with BIDMC with the identity of particular individuals known to [the third party], [the third party] can use that information for its own commercial purposes ..."); BIDMC Complaint ¶ 66 ("Below is an example of the contents of the communication between the website user and BIDMC, which the hidden [code] would intercept and transmit to [a third party]"); BIDMC Complaint ¶ 68 ("With that information, [a third party] could then use the contents of communications between the website user and BIDMC to serve personalized advertising to the website user in the future") (Emphases added.). The above is exemplary; other allegations are the same and repeated with regard to NEBH.

21 The tracking software captured information about Vita's and her husband's medical conditions and care. As an example, Vita posited that if she navigated to the hospitals' webpages concerning pregnancy treatments, queried the websites with pregnancy-related search terms, requested an appointment with the obstetrics department, entered the payment portal, or accessed the patient portal, the data collected by the software could be employed to discern that Vita or someone she knows was pregnant and was receiving care from physicians affiliated with the hospitals. In combination with other information known about Vita, the third-party software providers thereafter could monetize this information to sell and deliver targeted digital advertisements regarding pregnancy or prenatal care to Vita.

22 The ECPA narrowed the Federal wiretap act's definition of "wire communication" from one that essentially was identical to our State wiretap act's definition of "wire communication" by substituting the phrase "any aural transfer" for "any communication," thereby limiting wire communications under the Federal statute to those involving the human voice. Pub. L. No. 99–508, § 101(a)(1)(B), 100 Stat. at 1848, codified, as amended, at 18 U.S.C. § 2510(1). See Moody, 466 Mass. at 202-203, 993 N.E.2d 715. At the same time, however, the ECPA defined a new category called "electronic communications," which includes "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system" but not oral or wire communications as redefined in the amended Federal act. Pub. L. No. 99–508, § 101(a)(6)(B), 100 Stat. at 1848–1849, codified, as amended, at 18 U.S.C. § 2510(12). See Moody, supra at 202, 993 N.E.2d 715. The State act's definition of "wire communication" has not changed and has not been narrowed to mirror the Federal statute; it continues to cover "any communication" by the requisite means.

23 A cookie is a data file received on a computer at the time that the computer's user visits a webpage and is used to record and maintain information about the user's online activity. See

U.S. Auto Parts Network, Inc. v. Commissioner of Revenue, 491 Mass. 122, 125 & nn.6-8, 199 N.E.3d 840 (2022).

24 Amici Greater Boston Chamber of Commerce and Massachusetts Nonprofit Network contend that Vita's website interactions are not protected, citing Federal cases concluding that "contents" of a communication were not intercepted where recorded URLs did not "convey substantive information" but instead conveyed "mere dialing, routing, addressing, or signaling information" (quotation and citation omitted). In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 275 (3d Cir. 2016), cert. denied sub nom. C.A.F. v. Viacom Inc., 580 U.S. 1048, 137 S.Ct. 624, 196 L.Ed.2d 516 (2017). The Federal statute, however, defines "contents" of a communication as only "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). By contrast, our State counterpart defines "contents" to include "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication" (emphases added). G. L. c. 272, § 99 B 5.

25 Courts interpreting other States' wiretap acts also have concluded that their State act applies to communications transmitted over websites on the Internet. See, e.g., Popa, 52 F.4th at 133 (Pennsylvania's wiretap statute, which models Federal wiretap statute, protected consumer's browsing activities on website); Javier vs. Assurance IQ, LLC, U.S. Ct. App., No. 21-16351, 2022 WL 1744107 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [§ 631(a) of California's statute, which, like the Commonwealth's act, does not separately define electronic communications,] applies to Internet communications"); Smith vs. Google, LLC, U.S. Dist. Ct., No. 23-cv-03527, —— F.Supp.3d ——, 2024 WL 2808270 (N.D. Cal. June 3, 2024) (denying motion to dismiss claim under California wiretap statute where third-party tracking tools recorded information exchanges through website). See also McCulley vs. Banner Health, U.S. Dist. Ct., 23-cv-00985 (D. Ariz. May 10, 2024) (sustaining claim for violation of California wiretap statute where healthcare provider enabled third parties to record search terms plaintiff used to research "specific doctors and medical treatments").

26 For example, unlike many other States' wiretap statutes, the act generally requires consent of all parties to the communication. See G. L. c. 272, § 99 (prohibiting secret recording without prior authority by all parties to communication); Hyde, 434 Mass. at 599, 750 N.E.2d 963 (act requires consent of all parties). For this reason, the hospitals are wrong to suggest that they may secretly record patient communications and then share those communications with third parties; such recording by the hospitals would be permissible only with the patient's express or implied knowledge.

27 Amici New England Legal Foundation and Associated Industries of Massachusetts suggest we construe "communication" to mean "speech," which is how the act defines "oral communication." G. L. c. 272, § 99 B 2. If the Legislature had intended "communication" also to mean "speech," it would have used the same words. Moreover, if the Legislature

intended "wire communication" to be limited to speech over a wire, cable, or other like connection, as the amici suggest, it would have said so. Its choice instead to use the phrase "any communication" in the definition of "wire communication" evinces the Legislature's intent that "wire communication" be more expansive than "speech" over a wire, cable, or other like connection. See, e.g., Commonwealth v. Williamson, 462 Mass. 676, 682, 971 N.E.2d 250 (2012), quoting Ginther v. Commissioner of Ins., 427 Mass. 319, 324, 693 N.E.2d 153 (1998) ("Where the Legislature used different language in different paragraphs of the same statute, it intended different meanings").

28 Given the defined term "contents" in the act, the court is wrong to focus on whether Vita alleges "her husband's medical records or the contents of his patient portal were in any way collected, intercepted, and transferred to third parties." Ante at ——, 243 N.E.3d at ——. "Contents," under the act, is clearly not so limited.

29 An interception occurs only where a party "secretly hear[s], secretly record[s], or aid[s] another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G. L. c. 272, § 99 B 4.

30 Notably, the hospitals disregard that the disclosures further provided that the logged information will only be used "to prevent security breaches and to ensure the integrity of the data on our servers" (emphasis added). Here, Vita alleges that her interactions with the hospitals were used for advertisement purposes, beyond the scope of the disclosed use. See In re Pharmatrak, Inc., 329 F.3d at 19, quoting Gilday v. DuBois, 124 F.3d 277, 297 (1st Cir. 1997) ("A party may consent to the interception of only part of a communication or to the interception of only a subset of its communications.... 'Thus, a reviewing court must inquire into the dimensions of the consent and then ascertain whether the interception exceeded those boundaries' " [quotation omitted]).

31 The hospitals' reliance on our decisions in Rainey, Morris, and Curtatone is misplaced. In Rainey and Morris, each aggrieved party was on notice that the other party to the respective communication was recording the statement in some manner. Morris, 492 Mass. at 505-507, 212 N.E.3d 812. Rainey, 491 Mass. at 643-644, 205 N.E.3d 1090. Similarly, in Curtatone, the aggrieved party knew that the person with whom he was speaking was recording the conversation. Curtatone, 487 Mass. at 655-658, 169 N.E.3d 480. Here, Vita alleges that she lacked notice that third parties were intercepting her communications at all.

32 Moreover, as alleged in the complaints, even if a user used her browser settings to disable cookies, the tracking software would continue to record the user's communications with the hospitals.

33 Taking what appears to be judicial notice of "thousands" of websites that apparently do not disclose candidly their practice of sharing their tracking of website users' activities for

advertisement purposes, the court states that it is up to the Legislature to analyze the business realities. Ante at ——, 243 N.E.3d at ——. But the Legislature has demonstrated that when so-called business realities require a narrow exception to the act, it has provided the same. See, e.g., St. 1998, c. 163, §§ 7, 8 (amending act to exempt financial institutions' recording of telephone calls "with corporate or institutional trading partners").

34 The court also appears to be concerned about the potential criminal liability under the act, especially for companies unaware of tracking on their websites. Ante at ——, 243 N.E.3d at ——. Of course, the act criminalizes only "willful[ ]" recordings. G. L. c. 272, § 99 C 1.

35 Nor can the hospitals credibly claim surprise. At the least, it would appear that the now two decades old decision in In re Pharmatrak, Inc., 329 F.3d at 18, might have provided notice. Indeed, the mishandling of private healthcare information has garnered the attention of the Federal Trade Commission (FTC), including some enforcement action prior to the filing of Vita's complaints. See, e.g., Matter of Flo Health, Inc., FTC File No. 1923133 (FTC enforcement action brought in January 2021 involving disclosure of health data to third-party analytics providers).

36 The argument of amicus Chamber of Commerce of the United States of America that the tracking software does not comprise an "intercepting device" ignores that the software runs on physical infrastructure, which is a "device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." G. L. c. 272, § 99 B 3.

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

NOTIFY

11

1/31

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.** **SUPERIOR COURT**

**Doe v. Boston Medical Center Corp.,** 33 Notice sent (3) 2/3/25 (CMH)
**Case No. 2384CV000326-BLS1**

**Doe v. Children's Hospital Corp.,** 34
**Case No. 2384CV00411-BLS1**

**Vita v. Blue Cross and Blue Shield of Massachusetts, Inc.,** 18
**Case No. 2384CV00542-BLS1**

**Nova v. Boston Medical Center Corp.,** 12
**Case No. 2384CV01086-BLS1**[1]

**Doe v. Cape Cod Healthcare, Inc.,** 33
**Case No. 2384CV01236-BLS1**

**Doe v. Baystate Health Systems,** 11
**Case No. 2384CV1949-BLS1**

**Doe v. UMass Memorial Health Care, Inc.,** 56
**Case No. 2384CV02448-BLS1**

**Colleton v. UMass Memorial Health Care, Inc.,** 34
**Case No. 2384CV02450-BLS1**

**Doe v. Atrius Health Inc.,**
**Case No. 2384CV02704-BLS1** 35

## SCHEDULING ORDER

At a consolidated scheduling conference today, the parties indicated that many of the plaintiffs in the above-referenced cases sought to amend their complaint in light of the recent decision in Vita v. New England Baptist Hospital, 494 Mass. 824 (2024), if they had done so already; and that many of the defendants intend to try to remove their case to the United States

---

[1] At the hearing this date, the parties indicated that this case had been removed to federal court. No notice of removal appears on the docket.

District Court, as defendants in other similar cases have done. After conferring with counsel, it is hereby ORDERED as follows:

Plaintiffs in each of the above-referenced cases are granted leave to file an amended complaint, without prejudice to any defendant raising in a Rule 12 filing any issues that could have been presented in opposition to a motion under Rule 15. Any such amended complaint shall be filed by January 31, 2025.

On March 19, 2025, at 2 p.m., the court will conduct a Rule 16 conference in each of the above-referenced cases that has not been removed. The Rule 16 conference shall be held over Zoom (Mtg ID: 161 888 7367).

Dated: January 15, 2025

Peter B. Krupp
Justice of the Superior Court

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: ____________
First Asst.Clerk

Date Filed 1/31/2025 2:23 PM
Superior Court - Suffolk
Docket Number 2384CV01949

BC

12

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.: 2384CV01949

JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

BAYSTATE HEALTH SYSTEM INC.,

Defendant.

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Jane Doe ("Plaintiff"), individually and on behalf of the class defined below, through their undersigned counsel, bring this Amended Class Action Complaint ("Complaint") against Baystate Health System Inc. ("Baystate" or "Defendant"), and allege as follows.

1. This is a class action arising from Defendant's systematic violation of the privacy rights of its patients by wiretapping the electronic communications of visitors to its website, https://www.baystatehealth.org/ and https://providers.baystatehealth.org/ (together, the "Baystate Website"), and violating patients' rights to privacy with respect to their medical information.

2. During the relevant time period, Defendant's Privacy Policy told patients that: "Baystate Health (BH) is committed to protecting your privacy and ***we have taken steps to protect your information***. We have designed our website (baystatehealth.org) to allow you to visit most areas ***without identifying yourself*** or supplying personal information. For those areas where you are requested to provide identifiable information, we assure you that ***it will only be used to support***

***your customer/patient relationship with BH.***"[1] Defendant further states that "[a]t Baystate Health, we understand that your medical information is personal, and we are committed to maintaining the privacy of this information."[2]

3. Defendant, however, intentionally used various digital marketing tools on its website that were able to identify the patients on the Baystate Website, and purposefully and intentionally redirected to third parties Baystate patients' personal health information, including those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information"). Defendant's use of these re-routing tools caused Baystate patients' communications with Defendant and their Private Information to be automatically redirected to third parties in violation of patients' reasonable expectations of privacy, and of both the express and implied promises of Defendant.

4. Specifically, at all relevant times, Defendant disclosed information about its patients' communications—including their searches for medical information about conditions and procedures, the identities of their physicians, their requests to schedule appointments with physicians, registrations for support groups, patients' request to log in to the patient portal, and when a patient clicks to make a telephone call in order to schedule an appointment with a specific doctor through the site—to Meta Platforms, Inc. ("Meta") (formerly known as Facebook, Inc.) and/or Google without their knowledge, authorization, or consent.

5. Defendant's conduct in disclosing patients' Private Information to Meta and Google violates federal and Massachusetts law, including the federal wiretap act, known as the

[1] *See* https://web.archive.org/web/20220622132503/https://www.baystatehealth.org/privacy-policy (emphasis added).
[2] *See* https://www.baystatehealth.org/notice-of-privacy-practices.

Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1) *et seq.*), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

6. On behalf of herself and others similarly situated, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of Plaintiff's and Class members' Private Information; awarding liquidated damages in the amount of $10,000 per member of the Patient Class (defined below), contract and other damages as alleged, attorneys' fees and costs; and granting any other equitable relief the Court deems appropriate.

## PARTIES

7. Defendant Baystate Health, Inc. is a Massachusetts non-profit corporation with its principal offices at 759 Chestnut Street, Springfield, Massachusetts. Defendant touts that it is "a 716-bed independent academic medical center" and is "the community's major referral hospital," providing services that include: cancer care; critical care medicine; digestive disorder care; heart and vascular disease care; laboratory services; neurological disorders; obstetrics and gynecology care; and care for other injuries, illnesses, and conditions.[3] Baystate designs and maintains, and/or directs the design and maintenance, of the Baystate Website from its offices in Massachusetts.

8. Plaintiff is an individual residing in Ludlow, Massachusetts. Plaintiff has visited the Baystate Website numerous times and has been treated by Defendant's physicians.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business in Springfield. G.L. c. 223A, §§ 2 and 3.

[3] *See* https://www.baystatehealth.org/locations/baystate-medical-center.

10. Venue is proper in Hampden County pursuant to G.L. c. 223, sec. 8(4) because Plaintiff resides in Hampden County and Defendant might sue or be sued in Hampden County. However, Plaintiff is seeking acceptance into the Business Litigation Session pursuant to Superior Court Administrative Directive 17-1 because this case is a consumer matter involving complex issues and cases based on similar claims have been assigned to the Business Litigation Session. *See Doe et al. v. Partners Healthcare System, Inc. et al.*, No. 1984CV01651, and *Doe v. Boston Medical Center Corporation*, No. 2384CV00326.

## FACTUAL BACKGROUND

### I. Massachusetts and Federal law protect personal privacy.

11. Under Mass. G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

12. Patient health information is specifically protected by the law. The prohibitions against disclosing patient personal health information include prohibitions against disclosing Private Information such as patient names, IP addresses, and other unique characteristics or codes. Massachusetts law subjects medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. G.L. c 111B, § 11.

13. Moreover, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") requires covered entities, including Defendant, to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

14. These rules establish national standards for the protection of patient information, defined as IIHI which either "identifies the individual" or where there is a "reasonable basis to

believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. 45 C.F.R. § 160.103.

15. HIPAA further limits the permissible uses and prohibits unauthorized disclosures of PHI.[4]

16. Federal law also protects persons from having the contents of their communications intercepted without their consent. Specifically, the ECPA, prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority to do so.

17. As a health care provider, Defendant also has common law and statutory duties to protect the confidentiality of patient information and communications with individuals regarding its services.

## II. Defendant promises patients that their electronic communications on the Baystate Website will be kept private.

18. Defendant maintains the Baystate Website. The Baystate Website is designed for patients to communicate with Defendant, including by allowing individuals to research doctors and request to schedule appointments with doctors, register for support groups, research health conditions and learn about related services offered by Defendant, learn about medical procedures offered by Defendant, and sign in to a personal patient portal called MyBaystate. Patients can use search bars on Defendant's website to type in the specific information, medical condition, medical procedure, type of doctor, or doctor that they want more information about.

19. According to Joel Vengco, Vice President of Information & Technology and Chief Information Officer for Baystate Health, in or about the beginning of 2015, Defendant's website

[4] 45 C.F.R. § 164.502.

added "My Baystate Health," the online patient portal "that gives individuals access to portions of their medical records after they sign up."[5]

20. Below is an example of the top of the Baystate Website homepage as it appeared on January 18, 2023.[6] As depicted, the homepage provides patients with tools to sign into MyBaystate under the "Patient Log In" button, find a provider, explore medical services provided by Baystate and conditions that it treats, find a location, conduct a general search of the website, and more.




21. Defendant has statutory, regulatory, contractual, fiduciary, and common law duties to safeguard patients' Private Information from disclosure and ensure it remains private and confidential, and also expressly promises patients that Defendant will maintain the confidentiality

---

[5] *See* https://healthcarenews.com/think-tank-techspring-center-brings-silicon-valley-model-to-springfield/.
[6] *See* https://web.archive.org/web/20221223120755/https://www.baystatehealth.org/.

Date Filed 1/31/2025 2:23 PM
Superior Court - Suffolk
Docket Number 2384CV01949

of patient information and communications and will use that information ***"only for your customer/patient relationship with Baystate Health."***

22. As displayed at the bottom of its homepage, Defendant provides patients and website visitors links to access Defendant's Notice of Privacy Practices and Privacy Policy.




23. As shown above, Defendant's Privacy Policy is located at the bottom of the Baystate Website in small font among several other links. Before it was last updated on May 15, 2023, Defendant stated in its Privacy Policy that ***"Baystate Health (BH) is committed to protecting your privacy. We have designed our website (baystatehealth.org) to allow you to visit most areas without identifying yourself or supplying personal information."***[7] Defendant went on to promise that ***"We do not disclose your personal information unless the following conditions are met: · You provide to us a specific written consent, or · We are required by law."***[8] Defendant also misleadingly stated that ***"If you are browsing the BH web site, a cookie identifies only your browser!"***[9] As explained below, these promises of confidentiality and anonymity were illusory.

---

[7] https://web.archive.org/web/20220622132503/https://www.baystatehealth.org/privacy-policy.
[8] *Id.*
[9] *Id.*

24. Defendant's Notice of Privacy Practices is also located at the bottom of the Baystate Website. In it, Defendant states ***"At Baystate Health, we understand that your medical information is personal, and we are committed to maintaining the privacy of this information,"*** and links to the HIPAA Notice of Privacy Practices in both English and Spanish. HIPAA, short for the Health Insurance Portability and Accountability Act, is a federal law that establishes national standards to protect individuals' medical records and other individually identifiable health information.

25. The HIPAA Notice is a two-page document entitled "Baystate Health Notice of Privacy Practices – Your Information. Your Rights. Our Responsibilities" (effective March 1, 2021).[10] Those Privacy Practices explain:

> This notice describes how medical information about you may be used and disclosed and how you can get access to this information. Please review it carefully. If you have questions about this notice, please contact the Baystate Health Privacy Office at (413) 794-7955 or complianceoffice@baystatehealth.org. This notice describes the privacy practices of Baystate Health, Inc. ("Baystate") and its affiliated entities.

Those Privacy Practices also provide numerous assurances for the privacy of information and Baystate's responsibilities, including the following statements:

> **YOUR CHOICES:**
>
> **For certain health information, you can tell us your choices about what we share. …**
>
> If you are not able to tell us your preference, for example if you are unconscious, we may go ahead and share your information if we believe it is in your best interest. We may also share your information when needed to lessen a serious and imminent threat to health or safety. In these cases we never share your information unless you give us written permission:
>
> • Marketing purposes

[10] *See* https://www.baystatehealth.org/-/media/files/about-us/corporate-information/hipaa-notice-of-privacy-practice-english.pdf?la=en.

• Sale of your information ….

OUR RESPONSIBILITIES

• We are required by law to maintain the privacy and security of your protected health information.

• We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information.

• We must follow the duties and privacy practices described in this notice and give you a copy of it.

• We will not use or share your information other than as described here unless you tell us we can in writing.

26. These repeated promises by Defendant inform patients that they can use Defendant's website anonymously and that Defendant will not disclose Private Information and other sensitive information to third parties.

27. Moreover, before January 2023, Defendant's Website did not feature any notification to patients that cookies were used on the website. At some point in January 2023, Defendant began prompting patients with the following "pop up" notification at the bottom of its homepage. There was no such warning and no prompt to "accept" the use of cookies on the Baystate Website before January 2023.




28. As described above, the Privacy Policy in January 2023 did not disclose to patients that their communications on the website would be shared, along with Private Information, with third parties. The pop-up notification was therefore insufficient to obtain patients' consent to disclose their communications and Private Information to third parties.

## III. Defendant systematically violates its patients' privacy rights.

29. Despite these express promises and its legal duties, Defendant chose to share the content of its patients' communications with Meta and Google by intentionally installing tracking technology on the Baystate Website. Defendant disclosed the communications to Meta and Google without the knowledge or consent of patients.

### A. Defendant's Use of the Meta Pixel.

30. The Meta Pixel is a snippet of code, invisible to patients as they view a website, that tracks users as they navigate the web, logging which pages they visit, which buttons they click, and certain information they enter into forms or search requests.

31. Defendant began using the Meta Pixel by at least January 1, 2021. The presence of the Meta Pixel on Defendant's website can be shown using the Wayback Machine,[11] as shown in the image below reflecting the code that Defendant installed on its website to enable the Meta Pixel on January 1, 2021.[12]

```
<!-- Facebook Pixel Code -->
▼<script>
    !function(f,b,e,v,n,t,s)
    {if(f.fbq)return;n=f.fbq=function(){n.callMethod?
    n.callMethod.apply(n,arguments):n.queue.push(arguments)};
    if(!f._fbq)f._fbq=n;n.push=n;n.loaded=!0;n.version='2.0';
    n.queue=[];t=b.createElement(e);t.async=!0;
    t.src=v;s=b.getElementsByTagName(e)[0];
    s.parentNode.insertBefore(t,s)}(window, document,'script',
    'https://web.archive.org/web/20210101101705/https://connect.facebook.net/en_US/fbevents.js');
    fbq('init', '247095132483787');
    fbq('track', 'PageView');
</script>
▼<noscript>
  "<img height="1" width="1" style="display:none"
  src="https://web.archive.org/web/20210101101705im_/https://www.facebook.com/tr?
  id=247095132483787&amp;ev=PageView&amp;noscript=1"/> "
</noscript>
<!-- End Facebook Pixel Code -->
```

[11] The Wayback Machine is a digital archive of the World Wide Web founded by the Internet Archive, a nonprofit based in San Francisco, California. Created in 1996 and launched to the public in 2001, it allows the user to go "back in time" and see how websites looked in the past.
[12] *See* https://web.archive.org/web/20210101101705/https://www.baystatehealth.org//.

32. Discovery will show that Defendant programmed the Meta Pixel to send information to Facebook about all website visitors—including Facebook users and non-Facebook users.

33. The Meta Pixel sends information to Facebook via scripts running in a person's internet browser, so each data packet comes labeled with an IP address that can be used by Facebook in combination with other data to identify an individual or household.

34. An IP address is a number that identifies a specific device connected to the Internet and reveals geolocation. Under HIPAA, an IP address is considered IIHI (45 C.F.R. § 164.514(b)(2)(i)(0)).

35. If a patient is logged into Facebook when they visit a website that has installed the Meta Pixel, the communications can also be linked to a specific Facebook account which identifies a Facebook user's name, photo, and profile.

36. Facebook has over 2.9 billion active monthly users.[13] Facebook's Community Standards require users to use their real identities when signing up on the platform. This means users are only allowed one account and must use the name they use in "everyday life,"[14] including first and last name.[15] Users must also provide their birthday and gender.

37. When a user logs into Facebook using an internet browser, such as Google Chrome or Microsoft Edge, Facebook places several cookies on the user's browser.

---

[13] *See* https://www.reuters.com/technology/facebook-owner-meta-forecasts-q1-revenue-below-estimates-2022-02-02/.
[14] *See* https://transparency.fb.com/policies/community-standards/?source=https%3A%2F%2Fwww.facebook.com%2Fcommunitystandards%2Fintegrity_authenticity.
[15] *See* https://www.facebook.com/help/229715077154790/.

38. A cookie is a piece of code placed on a browser by a server that contains information. A cookie can store different types of information, but the basic premise is to identify a) you and b) the website you visited that placed the cookie to begin with.

39. One of the cookies placed by Facebook on a user's browser upon login is the "c_user" cookie which contains the user's Facebook ID number. This cookie remains on a user's browser as long as they do not hit "Log Out" when they leave Facebook. Even if the person never visits Facebook.com using that browser again, the cookie will remain on the device for one year since the last visit to Facebook.

40. The long life of the c_user cookie is intentional—not only does the cookie allow Meta to identify users when they visit Facebook.com, it also allows Meta to track the user's activity across the web on the same browser. Because the Facebook ID is specific to a person, Meta can also match up a user's activity across devices using different browsers if that user has also logged in on another device.[16]

41. Website owners can also set additional Meta cookies, such as the "fr" or "_fbp" cookies and others, that unlike the c_user cookie, collect information on all patient—not just logged in Facebook users. Like the c_user cookie, these additional Meta cookies appear to contain unique identification numbers that are disclosed to Facebook along with the information tracked by the Meta Pixel, thereby permitting Facebook to target patients with personalized ads across different websites even if they are not Facebook users.

42. By tracking a specific person's movements across the web and across devices, Facebook collects enormous amounts of data regarding patients' interests, behavior, and

[16] *See* https://www.facebook.com/business/news/cross-device-measurement.

connections.[17] The quantity and quality of this data allows Meta to generate billions in advertising revenue—allowing businesses to target people with specific interests, target advertisements to specific people who visited their site but did not complete a purchase, and analyze the types of people that are visiting their site by leveraging user demographics, interests, and behaviors on other websites.

43. Businesses—like Defendant—access these services from Meta in part by installing the Meta Pixel on their website.

44. Pixels, also known as "web beacons," are often small transparent images that an internet browser downloads like any other image on a website. When you visit a web page which contains the Meta Pixel, the pixel essentially contacts the Facebook ad server.

45. The business installing the pixel can program the pixel to record specific acts and communications, such as when a user places an item in their shopping cart, clicks a certain button, types in a search into a search bar, or otherwise interacts with the website.[18] Meta receives the event information along with personal identifying information contained in the cookies described above.

46. The disclosures to Meta occur contemporaneously with communications between the website user and the website. The code causes the communications to be recorded on the user's device and then transmitted in a package to Meta. By design, Meta receives the exact contents of the communications before the full response from the website has been rendered on the website users' screen and while the communication between the website and the website user is ongoing.

---

[17] *See* https://www.facebook.com/business/ads/ad-targeting.

[18] *See* https://developers.facebook.com/docs/meta-pixel/advanced.

47. If a business does not install the Meta Pixel, information on a user's actions on the website would not be communicated to Meta.

48. Once the information is in the possession of Meta, Meta uses it for advertising and analytics purposes. Businesses know that Meta can identify the Facebook users visiting their website and track people who are not Facebook users across websites. The value for the business in programming their website with the pixel is derived from Meta's ability to identify the website visitors, track their behavior on their website, and link them to Meta data on their interests, behaviors, and connections, and to allow the business to target advertisements to specific users.

49. In some cases, a Facebook user can confirm that a website has shared information about their visit to that website with Meta via the Meta Pixel on a certain date by reviewing their "Off-Facebook Activity." Off-Facebook activity is "a summary of activity that businesses and organizations share with [Facebook] about [a user's] interactions, such as visiting their apps or websites."[19] The Off-Facebook Activity report provided by Facebook to users, however, is an incomplete report of all activity on non-Facebook sites that has been shared with Meta by third parties such as Defendant.

50. On June 16, 2022, an article was published on The Markup titled "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[20] The Markup is a nonprofit newsroom that investigates and publishes stories regarding technology. The article detailed how hospitals using the Meta Pixel were allowing the tracking tool to collect patients' sensitive health information, including details about their medical conditions, prescriptions, and doctor's appointments, along with users' IP addresses. As detailed by the article, several hospitals removed

---

[19] *See* https://www.facebook.com/help/2207256696182627.
[20] *See* https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

the Meta Pixel from the most sensitive parts of their websites, such as pages used to book appointments, or removed the Meta Pixel altogether after the article highlighted the privacy violations occurring.

51. After the Markup article was published, and as more and more lawsuits were filed against hospitals and healthcare providers for privacy violations related to the Meta Pixel, Defendant likely recognized the privacy violations on its own website. Thus, as evidenced by the disappearance of the Meta Pixel code as viewable on the Wayback Machine, Defendant removed the Meta Pixel from its website by April 2023. Defendant also added the cookie pop up notification to its website in January 2023 and modified its Privacy Policy in May 2023 to add additional disclosures regarding the use of cookies.

**B. Defendant's Use of Google Analytics.**

52. Defendant began using Google Analytics by at least January 1, 2021. The presence of the Google Analytics code and other Google code can be shown using the Wayback Machine, as in the image below reflecting the code Defendant installed on its website to enable transmissions to Google from Defendant's website.

```
<!-- Google Tag Manager -->
▼<noscript>
  "<iframe src="//web.archive.org/web/20210101101705if_/https://www.googletagmanager.com/ns.html?
  id=GTM-W98BKP" height="0" width="0" style="display:none;visibility:hidden"></iframe>"
 </noscript>
▼<script>
  (function(w,d,s,l,i){w[l]=w[l]||[];w[l].push({'gtm.start':
  new Date().getTime(),event:'gtm.js'});var f=d.getElementsByTagName(s)[0],
  j=d.createElement(s),dl=l!='dataLayer'?'&l='+l:'';j.async=true;j.src=
  '//web.archive.org/web/20210101101705/https://www.googletagmanager.com/gtm.js?
  id='+i+dl;f.parentNode.insertBefore(j,f);
  })(window,document,'script','dataLayer','GTM-W98BKP');
 </script>
<!-- End Google Tag Manager -->
```

Date Filed 1/31/2025 2:23 PM
Superior Court - Suffolk
Docket Number 2384CV01949

53. Defendant also installed Google Analytics code on https://providers.baystatehealth.org/, the part of its website where patients can search for doctors and request appointments with specific doctors.

54. Defendant sends patient information to Google using Google Analytics, a web analytics service, which allows website owners to track visitor actions on their website and measure the effectiveness of advertising. Specifically, Defendant uses technology such as Google tag manager and cookies to send the contents of patients' communications with the Baystate Website and IP addresses to Google.

55. Google Analytics automatically collects IP addresses of individual Internet users in order to facilitate and track Internet communications. However, Google Analytics offers website owners an opt-in IP anonymization feature. According to Google, this feature is designed to help site owners comply with their own privacy policies and the recommendations of data protection authorities. If the IP anonymization feature is enabled by the website owner, an additional parameter is added to the communications between website visitors' computers and the Google Analytics server, defined as aip=1. Accordingly, when the "aip" parameter does not appear, the IP address is not anonymized, enabling Google to identify a website user's IP address connected with their communications made via the website.

56. Baystate did not opt-in to Google Analytics' IP anonymization feature, as evidenced by the absence of the aip=1 parameter on communications sent to Google from the Baystate Website.

57. Simply put, Defendant intentionally programmed Google Analytics in such a way as to disclose the content of patients' communications with the Baystate Website along with patients' Private Information in the form of IP addresses.

58. Even after Defendant removed the Google code from https://providers.baystatehealth.org/, Defendant continued to use Google Analytics on https://www.baystatehealth.org/ and to share patients' sensitive communications on that website with Google.

**C. The Nature of Defendant's Intentional, Unauthorized, Unnecessary, and Unlawful Disclosures.**

59. As intentionally implemented by Defendant, the Meta Pixel and Google Analytics tag causes Private Information, as well as the exact contents of the communications exchanged between Defendant and its patients, to be sent to Meta and Google.

60. Defendant's third-party disclosures occur contemporaneously with communications by Plaintiff and Class members to Defendant's website.

61. By design, Meta and Google receive and record the exact contents of these communications before the full response from Defendant to Plaintiff or a Class member has been rendered on the screen of the patients' devices and while the communications between Defendant and patients remains ongoing.

62. Defendant installed the Google and Meta code on its website in a way that enabled transmissions from across Defendant's website, not just the web pages detailed herein. Discovery will show the full scope of Defendant's disclosures to Meta and Google. The examples provided below are for illustrative purposes only and do not attempt to describe the full scope of Defendant's privacy and wiretap violations.

63. When a patient clicks on the "Find a Provider" links provided by Defendant on the home page, they are directed to https://providers.baystatehealth.org/, where Defendant installed the Google tracking technology.




64. At this website, patients can navigate to a page providing a list of doctors and where they are able to search for a doctor by name, condition, specialty, location, gender, language, and more.







65. As shown in the image to the right, patients can enter the parameters they would like to use to search for a doctor. When a patient entered the parameters, Defendant disclosed the parameters and search terms used by patients to Google.

66. After a patient conducts a search for a provider, Defendant displays a list of doctors that meet the search criteria, such as the list shown below.




67. Patients can then select a doctor that they are interested in. Once patients select a doctor, Defendant also sent this information to Google.




68. For example, as shown below, when a patient searches for a female doctor who specializes in infectious diseases for adults and accepts patients in Springfield, specifically in

Franklin Medical Center and speaks English, and then enters Dr. Megan C. Gallagher's profile page, Defendant sent all of this information to Google along with the patient's IP address.

▾ General
Request URL: https://www.google-analytics.com/collect?v=1&_v=j96&a=503589314&t=timing&_s=2&dl=https%3A%2F%2Fproviders.baystatehealth.org%2Fprovider%2FMegan%2BC.%2BGallagher%2F7559
71%3Fdisplay_location%3DSpringfield%252C%2520VA%252C%2520USA%26distance%3D0%26filter%3Dspecialties.specialty.untouched%253AInfectious%2520Diseases%26filter%3Dnetwork_affiliation
s.name%253ABaystate%2520Franklin%2520Medical%2520Center%26filter%3Dage_groups_seen.name%253AAdults%26filter%3Dgender%253AFemale%26filter%3Dlanguages.language%253AEnglish%26locati
on%3D38.7892801%252C-77.18720359999999%26from%3Dsearch-list&ul=he-il&de=UTF-8&dt=Dr.%20Megan%20C.%20Gallagher%2C%20MD%20-%20Springfield%2C%20MA%20-%20Infectious%20Diseases%20-%20
Schedule%20Appointment&sd=24-bit&sr=1920x1080&vp=1472x961&je=0&plt=3883&pdt=360&dns=207&rrt=3&srt=965&tcp=403&dit=2622&clt=2622&_gst=1625&_gpt=1702&_cst=1626&_cbt=1694&_u=SDCACEA
BBAAAAC~&jid=&gjid=&cid=1424047393.1554590285&tid=UA-9927205-1&_gid=498425997.1654590285&gtm=2wg660P8QWN8F&z=1321258638

69. Defendant offers patients the option to schedule an appointment with a doctor from the provider search results page and on the doctor's profile page, as reflected in the green "Schedule Appointment" buttons in the images above.

70. The fact that a person is a patient of a medical provider is PHI under HIPAA.

71. For example, as shown below, when a patient clicks the "Schedule Appointment" button, Defendant disclosed to Google that the patient was scheduling an appointment with a specific doctor, the search that led the patient to that specific doctor, and again the patient's IP address.

▾ General
Request URL: https://www.google-analytics.com/collect?v=1&_v=j96&a=499566268&t=event&
ni=0&_s=7&dl=https%3A%2F%2Fproviders.baystatehealth.org%2Fsearch%3Fdisplay_location%
3DSpringfield%252C%2520MA%252001199%252C%2520USA%26distance%3D25%26filter%3Dnetwork
s.network%253AEmployed%2520Network%26filter%3Dspecialties.specialty.untouched%253AIn
fectious%2520Diseases%26filter%3Dnetwork_affiliations.name%253ABaystate%2520Frankli
n%2520Medical%2520Center%26filter%3Dnetwork_affiliations.name%253ABaystate%2520Medic
al%2520Center%26filter%3Dage_groups_seen.name%253AAdults%26filter%3Dgender%253AFemal
e%26filter%3Dlanguages.language%253AEnglish%26filter%3Dnetwork_affiliations.name%253
ABaystate%2520Noble%2520Hospital%26location%3D42.1208719%252C-72.6029199%26sort%3Dne
tworks%252Crelevance&ul=en-us&de=UTF-8&dt=Dr.%20Megan%20C.%20Gallagher%2C%20MD%20-%2
0Springfield%2C%20MA%20-%20Infectious%20Diseases%20-%20Schedule%20Appointment&sd=24-
bit&sr=1920x1080&vp=1286x961&je=0&ec=user_action&ea=user_action.cta&el=user_action.c
ta&_u=WjCICEFBBAAAAC~&jid=&gjid=&cid=1332328207.1649685651&tid=UA-9927205-1&_gid=172
2676519.1650185520&gtm=2wg4d0P8QWM8F&z=1051408031

72. On https://www.baystatehealth.org/, Defendant offers patients the option to participate in various support groups. Patients are able to click the "Patients & Visitors" button on the main page and choose "Get Support", or search for a specific event through the search bar. Support groups offered include, for example, a virtual weight loss surgery support group which is open to patients enrolled in Baystate Health's bariatric surgery program, cancer support groups which are open to those who have been diagnosed with cancer, breast cancer support groups open to those who have been diagnosed with breast cancer, and grief support groups.




73. Information relating to past, present, or future physical or mental health or condition of an individual including specific diagnoses, is PHI under HIPAA.

74. Defendant's website allows patients the ability to register for support groups on the website.

JOURNEY THROUGH GRIEF SUPPORT GROUP

Please join us for a weekly bereavement support group

JOURNEY THROUGH GRIEF

Journey Through Grief is a weekly bereavement support group for adults who are struggling with the loss of a loved one. Registration is required. The group is free of charge.

This educational support group will provide materials and information on the grieving process, so as to better understand the grief experience and gather tools to cope with loss.

Wednesdays, 10-11 am

January 16 - March 5, 2019

330 Main St, 4th Floor, Room # 459

Springfield, MA

To register please call or email, Betsy Flores, Bereavement Coordinator, Baystate Hospice at 413-794-6559 or betsy.flores@baystatehealth.org

REGISTER

75. However, when a patient clicks the "Register" button, Defendant sends this information to Meta and Google along with the patients' IP address and identifying Facebook cookies.

Request URL: https://www.google-analytics.com/collect?v=1&_v=j96&a=1134011751&t=event&ni=0&_s
=1&dl=https%3A%2F%2Fwww.baystatehealth.org%2Fabout-us%2Fcalendar%2Fspiritual-services%2Fjour
ney-through-grief&ul=en-us&de=UTF-8&dt=Journey%20Through%20Grief%20%7C%20Baystate%20Health&s
d=24-bit&sr=1920x1080&vp=1196x961&je=0&ec=mailto&ea=REGISTER&el=https%3A%2F%2Fwww.baystatehe
alth.org%2Fabout-us%2Fcalendar%2Fspiritual-services%2Fjourney-through-grief&_u=SCCAiEABB~&ji
d=&gjid=&cid=1332328207.1649685651&tid=UA-9927205-1&_gid=126151795.1651479903&gtm=2wg4r0W98B
KP&cg1=Service%20Line&z=1082919632

76. Defendant also allows patients to request specific information by submitting requests in the search bar provided at the top of the home page. Patients can search for doctors, information about conditions that Baystate Health treats, treatment options, and more.

77. Defendant disclosed to Meta and Google the text of the searches typed into the search bar by patients, along with their IP addresses and Private Information.

78. As also shown in the images above, next to the search bar on the home page, Defendant provided a green "PATIENT LOG IN" button to patients. This button directs patients to https://mybaystate.baystatehealth.org/#/login, where they can log in to the patient portal and access medical records, make payments, view appointments and make appointments, and more. The button was provided by Defendant throughout the Baystate Website and other links to the

Date Filed 1/31/2025 2:23 PM
Superior Court - Suffolk
Docket Number 2384CV01949

patient portal were provided to patients as well, such as on the medical records page: https://www.baystatehealth.org/patients/medical-records.

79. The fact that a person is a patient of a medical provider is PHI under HIPAA.

80. When a patient clicked this button or the other links provided to the MyBaystate portal login page, Defendant programmed its website to disclose to Google the information highlighted below, which contains the fact that the patient was requesting to log in to the patient portal, along with personally identifiable data such as their IP address. The code shown below is visible using the WayBack Machine to interact with the page as it was during the relevant time

```
https://web.archive.org/web/20190801140235/https://www.google-analytics.com/r/collect?v=1&_v=j77&
a=789417493&t=event&ni=0&_s=1&dl=https%3A%2F%2Fwww.baystatehealth.org%2Fpatients%2Fmedi
cal-records&ul=en-us&de=UTF-8&dt=Medical%20Records%20%7C%20Baystate%20Health&sd=24-bit&
sr=1920x1080&vp=1718x1034&je=0&fl=32.0%20r0&ec=Outbound&ea=Click&el=https%3A%2F%2Fmy
baystate.baystatehealth.org%2F%3F_ga%3D2.222881438.460604823.1657167446-1194375229.165716744
6%23%2Flogin&_u=aGDACEABB~&jid=154672583&gjid=249462703&cid=1194375229.1657167446&tid
=UA-9927205-1&_gid=460604823.1657167446&_r=1&gtm=2wg7o0W98BKP&z=105919696
```

period:

81. These third-party disclosures were made by Defendant without the patients' knowledge, consent, or any affirmative action taken. As described above, Defendant does not provide any information to patients that would alert them to the fact that the contents of their communications on the Baystate Website are disclosed to Meta and Google. In fact, Defendant misled patients to believe that they can use the website confidentially.

## IV. Defendant chose to intercept and then disclose patients' Private Information to enrich itself.

82. Defendant is not required to make disclosures to Meta or Google in the ordinary course of business. The Baystate Website and services can function without the code that Defendant installed on the Baystate Website to enable the disclosures, as evidenced by Defendant's removal of the tracking code from many places on the website. For example, the

disclosures are not necessary for Defendant to maintain a website or use social media marketing tools.

83. It is possible for Defendant to allow patients to search for information about their health conditions and find doctors without disclosing those searches to third parties. It is also possible for Defendant to allow patients to schedule appointments with providers and register for support groups without disclosing those communications to third parties.

84. Despite these facts, Defendant affirmatively chose to provide Meta and Google secret and invisible "windows" that allowed them to intercept and then record the exact contents of patient communications on the Baystate Website and Private Information.

85. Defendant chose to install the tracking technology on the Baystate Website for marketing and/or analytics purposes. In exchange for Private Information about Defendant's patients, Meta and Google use the information to provide enhanced online advertising services and/or analytical services to Defendant.

86. Further, once the information is shared by Defendant with Meta and Google, Defendant loses the ability to further control the dissemination and use of the Private Information and the disclosed communications. Discovery will show that Meta and Google use the information disclosed by Defendant for their own purposes.

87. The monetization of the data disclosed by Defendant, both for its own purposes and those of the third parties, demonstrates the inherent value of the information collected.

88. By sending this sensitive information and communications to third parties, Defendant violates Plaintiff's and Class members' rights to privacy in that information and communications and their right not to have their Private Information shared without their knowledge or consent.

## FEDERAL REGULATORY WARNINGS

89. On July 20, 2023, the Federal Trade Commission ("FTC") and the U.S. Department of Health and Human Services' ("HHS") Office for Civil Rights ("OCR") issued a press release explicitly cautioning hospitals and telehealth providers, such as Baystate, about "the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties."[21]

90. In that press release, Samuel Levine, Director of the FTC's Bureau of Consumer Protection admonished that:

> When consumers visit a hospital's website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties .... The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation.

91. The press release further advised that HHS and the FTC had "sent the joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app."

92. In their letter to healthcare providers dated July 20, 2023, HHS and the FTC "reiterated the risks posed by the unauthorized disclosure of an individual's personal health

---

[21] *See* https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment." *Id.*[22]

93. Indeed, as reported, "HHS highlighted these concerns in a bulletin it issued late last year that reminded entities covered by the Health Insurance Portability and Accountability Act (HIPAA) of their responsibilities to protect health data from unauthorized disclosure under the law." Those admonitions even extended to companies not covered by HIPAA as providers "still have a responsibility to protect against the unauthorized disclosure of personal health information—even when a third party developed their website or mobile app. Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule."

94. Earlier this year, in a March 16, 2023, the FTC Office of Technology issued a blog posting titled "Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking," in which the FTC provided further cautionary warnings to about the use of pixel tracking, such as the Meta Pixel, and the serious privacy violations such tracking causes.[23] In that blog, the FTC discussed its recent

[22] A copy of the letter dated July 20, 2023, that was signed by the Director of HHS's Office for Civil Rights, Melanie Fontes Rainer, and the Director of the FTC's Bureau of Consumer Protection is available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf.

[23] *See* https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking.

enforcement actions against GoodRx and BetterHelp, two digital healthcare platforms, for allegedly sharing user health data with third parties for advertising.

## PLAINTIFF'S EXPERIENCE

95. Plaintiff Jane Doe has and had objectively reasonable expectations of privacy in communications with the Baystate Website that are grounded in her status as a patient of Defendant's, Defendant's legal obligations to maintain the confidentiality of wire communications and communications with patients, state and federal laws protecting the confidentiality of patient communications and medical information, and Defendant's express promises, as described above.

96. Plaintiff has been a patient of Defendant's for at least 10 years and is a current patient. Plaintiff regularly exchanged communications with Defendant on the Baystate Website during the relevant time period.

97. In the last few years, Plaintiff has communicated on the Website to obtain information related to breast cancer screenings and schedule a mammogram, to log in to the MyBaystate patient portal, and to search for providers.

98. Defendant disclosed Plaintiff's confidential communications with Defendant through the Baystate Website to Meta and Google.

99. Plaintiff has confirmed that Defendant disclosed her communications and sensitive information to Meta through the Off Facebook Activity Report. Plaintiff has been a Facebook user since at least 2010. Even though such reports provided by Facebook are incomplete, a report generated by Plaintiff captured approximately ***80 disclosures*** of Plaintiff's communications by Defendant to Meta between November 19, 2021 through April 10, 2023.

100. The presence of this data on the report confirms that the c_user cookie was present on Plaintiff's device and operating as Defendant intended when it installed it on the Baystate Website during the relevant time period.

101. Google cookies were also present on the device Plaintiff used to visit Defendant's website.

102. The demonstrated operation of the Facebook cookies on Plaintiff's device also indicates that the Google cookies supporting the Google tracking code installed by Defendant on the Baystate Website would also have operated as expected on Plaintiff's device during the relevant time period.[24]

103. The sensitive information exchanged was disclosed along with Private Information regarding Plaintiff, such as her IP address, Facebook ID, and other unique identifiers.

104. Plaintiff was not aware that Defendant was disclosing her Private Information or the contents of her communications with the Baystate Website to Meta and Google and never consented to or authorized such disclosures.

105. Plaintiff was shocked when she discovered the privacy violations and is distressed that Defendant has been disclosing her private information to third parties without her knowledge or consent.

106. Discovery will show that Defendant disclosed the information regarding Plaintiff in exchange for enhanced marketing and analytical services from Meta and Google. Defendant benefitted from Plaintiff's information without ever intending to compensate Plaintiff or to inform her that the disclosures had been made.

107. Defendant violated Plaintiff's rights to privacy in her Private Information and sensitive, confidential medical communications.

108. Defendant's conduct injured Plaintiff and will continue to injure Plaintiff.

[24] As noted the reports are incomplete and the absence of the data would not indicate that either the Meta cookies or Google cookies were not operating as expected on a given device.

109. Injuries to Plaintiff are also ongoing because her confidential and private information is now in the hands of Meta and Google who have used the information and can continue to use the information for their own purposes.

## CLASS ALLEGATIONS

110. Plaintiff brings claims on behalf of herself, individually, and on behalf of the following:

**The Patient Class (or "Class")**

All Persons for whom Defendant possesses Private who, within the statute of limitations, exchanged communications containing Private Information with the Baystate Website.

**The Massachusetts Subclass (or "Subclass")**

All Persons in the Patient Class who, within the statute of limitations, were residents of Massachusetts.

111. Excluded from the Class and Subclass are all judges and their staff assigned to this case and any members of their immediate families.

112. Plaintiff reserves the right to redefine the Class and/or divide the Class into subclasses at, or prior to, the class certification stage; in response to discovery; or pursuant to instruction by the Court.

113. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

114. Numerosity: The Class and Subclass are so numerous that joinder of all class members is impracticable. Given the volume of Defendant's business, there are hundreds or thousands of Class and Subclass members.

115. Commonality: This case presents common questions of law and fact, including but not limited to:

a. Whether Defendant's practices relating to contemporaneous disclosures of Plaintiff's and Patient Class members' communications with Defendant to Meta and Google attached to Private Information violates the ECPA;

b. Whether Defendant's practices relating to the disclosures of Plaintiff's and the Subclass members' communications with Defendant to Meta and Google attached to Private Information violates G.L. c. 214, § 1B;

c. Whether an implied contract exists between Defendant and members of the Class and Subclass;

d. Whether Defendant's alleged conduct breached the implied contract between Defendant and the Class/Subclass;

e. Whether Defendant's practices relating to disclosures of Plaintiff's and Class/Subclass members' communications with Defendant to Meta and Google were intentional;

f. Whether Defendant's conduct harmed and continues to harm Plaintiff and Class/Subclass members, and, if so, the extent of the injury;

g. Whether and to what extent Plaintiff and Class/Subclass members are entitled to damages and other monetary relief;

h. Whether and to what extent Plaintiff and Class/Subclass members are entitled to equitable relief; and

i. Whether and to what extent Plaintiff and Class/Subclass members are entitled to attorneys' fees and costs.

116. Typicality: Plaintiff's claims are typical of the members of the Class and Subclass. Plaintiff and all members of the Class and Subclass visited the same website, programmed in the

same way by Defendant, and had the same types of information sent to Meta and Google. Plaintiff and all members of the Class and Subclass are patients of Defendant.

117. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class and Subclass because she and her experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Class and Subclass.

118. Questions of law and fact common to the Class and Subclass predominate over any questions affecting only individual members of the Class and Subclass, and a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the ECPA, the Privacy Act, as well as Defendant's contractual and common law obligations. Members of the Class and Subclass do not have an interest in pursuing separate actions against Defendant, as the amount of each Class and Subclass member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class and Subclass members' claims in a single forum.

119. Defendant has acted or refused to act on grounds that apply generally to the Class and Subclass such that final injunctive relief is appropriate respecting the Class and Subclass as a whole.

120. In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate actions.

121. Yet, the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

## COUNT I

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT OF 1986 (ECPA), 18 U.S.C. §§ 2510 *et seq.* (Plaintiff Individually and on behalf of the Patient Class)

122. Plaintiff incorporates each of the allegations in the preceding paragraphs as if set forth at length herein.

123. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

124. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class members and Baystate, through the Baystate Website, were electronic communications under the ECPA.

125. The tracking technologies inserted into the hidden code of the Baystate Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class members used to access the Baystate Website; (ii) Class members' web browsers used to access the Baystate Website; (iii) Baystate's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class members' communications with the Baystate Website.

126. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Baystate and users of the Baystate Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

127. As reflected in the facts presented in this Complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, Baystate configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and Baystate, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and Baystate), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words used in searches inputted by healthcare consumers.

128. Baystate also used tracking technologies on pages that would confirm to third parties such as Google and Facebook the user's likely status as Baystate patients, including pages through which patients could make appointments and request medical records.

129. With respect to Plaintiff, the tracking technologies revealed information regarding the doctors, treatments, and patient status for Plaintiff by configuring the tracking technologies to reveal the substance of communications regarding searches for doctors, requests for information

on particular conditions, requests for appointments, and requests for medical records through the patient portal.

130. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Baystate intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class members, in violation of 18 U.S.C. § 2511(1)(a).

131. Additionally, through the above-described tracking technologies, after Baystate intercepted communications, the intercepted information was, in turn, used by third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

132. Baystate facilitated the interception of communications between the Class members and Baystate, and Baystate disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

133. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

134. Baystate intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this Complaint.

Date Filed 1/31/2025 2:23 PM
Superior Court - Suffolk
Docket Number 2384CV01949

135. Because of Baystate's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class members' Private Information, Defendant does not qualify for the party exemption.

136. As alleged above, Baystate violated a provision of HIPAA, specifically 42 U.S.C. § 320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

137. HIPAA defines IIHI as: any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual. 42 U.S.C. § 1320d-(6).

138. Plaintiff's Private Information that Baystate disclosed to third parties qualifies as IIHI, and Baystate violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Baystate used the intercepted electronic communications to increase its revenues.

139. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. Baystate specifically used tracking technologies to intercept and disclose the Private Information of Plaintiff and the Class for financial gain.

140. Baystate's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

141. Baystate's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Baystate's use of the Facebook source code was for Baystate's commercial advantage to increase revenue from existing patients and gain new patients.

142. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

143. Pursuant to the ECPA, Plaintiff seeks for herself and each Class member statutory damages of $100 for each day of Baystate's violation of the ECPA for Plaintiff and each Class member, or $10,000 with respect to Plaintiff and each Class member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## COUNT II

## INVASION OF PRIVACY IN VIOLATION OF MA G.L. c. 214, § 1B
**(Plaintiff Individually and on behalf of the Massachusetts Subclass)**

144. Plaintiff incorporates each of the allegations in the preceding paragraphs as if set forth at length herein.

145. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with her privacy. The superior court shall have jurisdiction in equity to enforce such a right and in connection therewith to award damages."

146. All health care providers owe their patients a duty not to disclose medical information about the patient without the patient's informed consent.

147. G.L. c. 111, §70E provides that every patient of a Massachusetts health care facility shall have the right "to confidentiality of all records and communications to the extent provided by law."

148. The confidentiality of the patient-provider relationship is a cardinal rule of the medical profession which has come to be justifiably relied upon by patients seeking advice and treatments.

149. Plaintiff and members of the Massachusetts Subclass are patients of Defendant.

150. Defendant owes Plaintiff and members of the Subclass a duty of confidentiality.

151. Despite their duty not to disclose without informed consent, Defendant disclosed information relating to Plaintiff's and Subclass members' medical treatment to Meta and Google without their knowledge or informed consent.

152. The information disclosed includes confidential medical information, including Private Information such as Plaintiff's and Subclass members' status as patients of Defendant, the contents of communications exchanged between Plaintiff or Subclass members with Defendant, details regarding which doctors or support groups Plaintiff or Subclass members scheduled appointments for, and information regarding medical diagnoses.

153. The disclosure of Private Information constitutes an unreasonable, substantial, and serious interference with Plaintiff's and Subclass members' rights to privacy.

154. Plaintiff and Subclass members were damaged by Defendant's violation in that:

a. Sensitive and confidential information that Plaintiff and Subclass members intended to remain private is no longer private;

b. Defendant took valuable information from Plaintiff and Subclass members and derived benefit therefrom, including obtaining enhanced advertising and analytics services from Meta and Google, without Plaintiff's and Subclass members' knowledge or informed consent and without sharing the benefits with Plaintiff or Subclass members;

c. Plaintiff and Subclass members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality. Plaintiff and Subclass members would not have used Defendant's services, or would have paid substantially less for these services, had they known their Private Information would be disclosed.

## COUNT III

## BREACH OF IMPLIED CONTRACT
**(Plaintiff Individually and on behalf of the Patient Class, or in the alternative the Massachusetts Subclass)**

155. Plaintiff incorporates each of the allegations in the preceding paragraphs as if set forth at length herein.

156. Plaintiff and the members of the Patient Class sought medical care and information from Defendant through the Baystate Website.

157. In order to obtain medical care and information from Defendant through the Baystate Website, Plaintiff and Class members provided their user data containing Private Information to Defendant.

158. When Plaintiff and Class members exchanged their Private Information in order to obtain information and services from Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information to third parties without their consent.

159. Plaintiff and Class members reasonably believed and expected that Defendant would not disclose their Private Information to third parties because, inter alia, Defendant made numerous promises not to disclose their information without consent and to not use their information for any purposes other than furthering the customer/patient relationship.

Date Filed 1/31/2025 2:23 PM
Superior Court - Suffolk
Docket Number 2384CV01949

160. Plaintiff, and Class members accepted Defendant's offers and provided their Private Information to Defendant in exchange for information and services.

161. Plaintiff and Class members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating itself to not disclose Plaintiff's and Class members' Private Information without their consent.

162. Defendant breached these implied contracts by disclosing the Private Information of Plaintiff, and Class members, to third parties, *i.e.*, Facebook and/or Google, and using it for non-medical purposes, *i.e.*, to obtain enhanced marketing and analytical services.

163. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and the Class sustained damages as alleged herein, including:

a. Sensitive and confidential information that Plaintiff and Patient Class members intended to remain private is no longer private; and

b. Defendant took valuable information from Plaintiff and Patient Class members and derived benefit therefrom, including obtaining enhanced advertising and analytics services from Meta and Google, without Plaintiff's and Class members' knowledge or informed consent and without sharing the benefits with Plaintiff or the members of the Class.

164. Plaintiff and Class members are entitled to nominal, compensatory, and consequential damages as a result of Defendant's breaches of implied contract.

**COUNT IV**

**BREACH OF FIDCUARY DUTY**
**(Plaintiff Individually and on behalf of the Patient Class, or in the alternative the Massachusetts Subclass)**

165. Plaintiff incorporates each of the allegations in the preceding paragraphs as if set forth at length herein.

Date Filed 1/31/2025 2:23 PM
Superior Court - Suffolk
Docket Number 2384CV01949

166. A fiduciary relationship existed between Baystate, a healthcare provider, and Plaintiff and members of the Class, all of whom are Baystate patients. Furthermore, Baystate assumed the role of a fiduciary by undertaking to collect the Private Information of those persons.

167. A fiduciary relationship existed between Baystate, a healthcare provider, and each member of the Class, each of whom is a Baystate patient. Furthermore, Baystate assumed the role of a fiduciary by undertaking to collect the Private Information of the members of the Class.

168. When possessing nonpublic medical information, medical providers such as Baystate have a duty to keep such information completely confidential.

169. Plaintiff and the members of the Class had a reasonable expectation of privacy in the responses and communications entrusted to Baystate through its website, which included highly sensitive Private Information. Baystate's policies bolstered that expectation, given Baystate's promises that Baystate would not disclose communications on the website to third parties.

170. Contrary to its duties as a healthcare provider and its express promises of confidentiality, Baystate installed the tracking technologies to disclose and transmit to third parties the Private Information of Plaintiff and the members of the Class, including information relating to their healthcare.

171. These disclosures were made without the knowledge, consent, or authorization of Plaintiff and the members of the Class.

172. Baystate's secret and unauthorized disclosures of Private Information constituted a breach of Baystate's fiduciary duties to Plaintiff and the members of the Class to safeguard and protect her Private Information.

173. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described herein).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class and Subclass, asks for judgment in their favor and that the Court award:

a. Statutory damages of $10,000 to Plaintiff and Patient Class members pursuant to the ECPA;

b. Damages for the violation of privacy as to the members of Massachusetts Subclass;

c. Contract and other damages as to Plaintiff and the members of the Patient Class and Massachusetts Subclass for Defendant's breach of implied contract and breach of fiduciary duties;

d. Punitive damages in an amount to be determined by a jury;

e. Attorneys' fees and litigation costs reasonably expended;

f. Appropriate injunctive relief enjoining the disclosures alleged herein which were made without Plaintiff's and Class members' express, informed written consent or other form of authorization;

g. Granting such other and further relief, in law or equity, as this Court may deem appropriate and just.

/

/

/

Date Filed 1/31/2025 2:23 PM
Superior Court - Suffolk
Docket Number 2384CV01949

**JURY DEMAND**

Plaintiff, on behalf of herself and the Class and Subclass, demands a trial by jury on all issues triable by a jury.

Date: January 31, 2025

Respectfully submitted,

By: ______________________
Sophia M. Rios (*pro hac vice*)
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel.: (619) 489-0300
srios@bm.net

Sherrie R. Savett
Lane L. Vines
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
ssavett@bm.net
lvines@bm.net

Jonathan Shapiro (BBO No. 454220)
Shapiro & Teitelbaum LLP
55 Union Street, 4th Floor
Boston, MA 02108
Tel.: (617) 742-5800
jshapiro@jsmtlegal.com

*Attorneys for Plaintiff and the proposed Class and Subclass*

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: ______________________
Asst. Clerk

Date Filed 2/10/2025 11:42 AM
Superior Court - Suffolk
Docket Number 2384CV01949

MS

13

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV01949

JANE DOE, Individually and on behalf of all others similarly situated,

Plaintiff,

v.

BAYSTATE HEALTH SYSTEM, INC,

Defendant.

USDist#25-cv-10337

**NOTICE OF FILING OF NOTICE OF REMOVAL**

PLEASE TAKE NOTICE that Defendant Baystate Health System Inc., pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, filed a Notice of Removal in the above-referenced action to the United States District Court for the District of Massachusetts. A copy of the Notice of Removal is attached as **Exhibit 1**.

Date February 10, 2025

Respectfully submitted,

*/s/ Lisa Oliver White*

Lisa Oliver White, BBO# 666841
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2620
Boston, MA 02110
Tel: (617) 531-1411
lowhite@shb.com

Tammy B. Webb*
Aubrey L. Kramer*
Shook, Hardy & Bacon L.L.P.
555 Mission Street, Suite 2300

I HEREBY ATTEST AND CERTIFY ON Feb.11,2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Asst.Clerk

Date Filed 2/10/2025 11:42 AM
Superior Court - Suffolk
Docket Number 2384CV01949

San Francisco, CA 94105
Tel: (415) 544-1900
twebb@shb.com

Jad Sheikali*
Shook, Hardy & Bacon L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7700
jsheikali@shb.com

Anna A. Gadberry*
Shook, Hardy & Bacon L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

* Pro hac vice motion to be filed

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2025, the foregoing was served via electronic mail to all parties of record:

Jonathan Shapiro (BBO No. 454220)
Shapiro & Teitelbaum LLP
55 Union Street, 4th Floor
Boston, MA 02108
Tel.: (617) 742-5800
jshapiro@jsmtlegal.com

Sherrie R. Savett
Lane L. Vines
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
ssavett@bm.net
lvines@bm.net

Sophia M. Rios
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel.: (619) 489-0300
srios@bm.net

*/s/ Lisa Oliver White*
Lisa Oliver White

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

JANE DOE, Individually and on behalf of all others similarly situated

Plaintiff,

v.

BAYSTATE HEALTH SYSTEM, INC.,

Defendant.

Case No.:

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

Certified to be a true and correct copy of the original
Robert M. Farrell, Clerk
U. S. District Court
District of Massachusetts
By: [signature]
Deputy Clerk
Date: 2/10/2025

**NOTICE OF REMOVAL**

Defendant, Baystate Health System, Inc., by and through undersigned counsel, files this Notice of Removal of this action from the Superior Court of Massachusetts, Suffolk County, Civil Action No. 2384-CV-01949-BLS1, to the United States District Court for the District of Massachusetts, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. In support of this Notice of Removal, Defendant states as follows:

**INTRODUCTION**

1. Plaintiff filed the action styled *Jane Doe, Individually and on behalf of all others similarly situated v. Baystate Health System, Inc.*, Civil Action No. 2384-CV-01949-BLS1, in the Superior Court for Suffolk County, Massachusetts, on August 29, 2023.

2. On January 31, 2025, Plaintiff filed an Amended Complaint, which added claims, including a claim under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.* Defendant was served with the Amended Complaint on February 7, 2025.

3. A copy of Plaintiff's Original Complaint and Amended Complaint, together with all process and pleadings served upon Defendant in the state action are attached as **Exhibit A**.

**TIMELINESS OF REMOVAL**

4. Pursuant to 28 U.S.C. § 1446(b)(3), this Notice of Removal is timely because it is filed within thirty (30) days of the date that Defendant received service of Plaintiff's Amended Complaint.

**NATURE OF THE CASE**

5. Baystate Health System, Inc. is a non-profit healthcare system in Springfield, Massachusetts. Baystate Health System, Inc. has a website that allows the public to view information about its services and browse other information. Plaintiff alleges that she is a user of that website.

6. Plaintiff brings the action on behalf of herself and a putative class of other individuals. Plaintiff's Amended Complaint asserts claims under the ECPA and the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, in addition to common law claims for breach of fiduciary duty and breach of implied contract. *See* **Exhibit A**, Pl.'s Amend. Compl. at ¶¶ 122–73.

7. Plaintiff's claims relate to Defendant's alleged use of various advertising technology on its public facing website, including Google Analytics and the Meta Pixel. *See* **Exhibit A**, Pl.'s Amend. Compl. at ¶¶ 4, 30–43, 52–58.

**GROUNDS FOR REMOVAL – FEDERAL QUESTION JURISDICTION**

8. For the first time in Plaintiff's Amended Complaint, Plaintiff asserts a claim against Defendant under federal law. Specifically, Plaintiff alleges violations of the ECPA. *See* **Exhibit A**, Pl.'s Amend. Compl. at ¶¶ 5, 122–43.

9. Pursuant to 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

10. This Court has subject matter jurisdiction over Plaintiff's purported ECPA claim because it "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see also, e.g., MediterraneanCoins, GmbH v. eBay.com*, 2005 WL 3096374, at *3 (N.D. Cal. Nov. 14, 2005) (recognizing that the defendant "properly removed" the case from state to federal court based on federal question jurisdiction, where the amended complaint alleged a claim under the ECPA).

11. This action is removable pursuant to 28 U.S.C. §1441(a) because it is within the original jurisdiction of this Court under 28 U.S.C. § 1331 in that it involves claims arising under the laws of the United States.

12. Further, this Court has supplemental jurisdiction over Plaintiff's state law claims because those claims "derive from a common nucleus of operative fact" such that the claims for part of the same case or controversy. 28 U.S.C. § 1367.

**PROCEDURE AND VENUE**

13. Venue lies in the United States District Court for the District of Massachusetts – Boston Division, pursuant to 28 U.S.C. § 1441(a), because the original action was filed within this District and Division. The Superior Court of Massachusetts, Suffolk County, is located within the District of Massachusetts – Boston Division. Therefore, venue is proper in this Court because it is the "district and division embracing the place where such action is pending." *See* 28 U.S.C. § 1441(a).

14. In accordance with 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders which, as of the date hereof, have been served upon Defendant in the state court action are attached to this Notice of Removal as **Exhibit A**.

15. The Civil Cover Sheet associated with this Notice of Removal is attached as **Exhibit B**.

16. In accordance with 28 U.S.C. § 1446(d), written notice of this Notice of Removal will be promptly served upon counsel for Plaintiff, and a copy will be promptly filed with the Clerk of the Superior Court of Massachusetts, Suffolk County.

17. Pursuant to Local Rule 81.1(a), within twenty-eight (28) days after the filing of this Notice of Removal, Defendant will file attested copies of all records and proceedings, as well as docket entries in the State Court Action.

18. By filing this Notice of Removal, Defendant does not waive any defenses or objections that it may have, including but not limited to, sufficiency of process, service of process, personal jurisdiction, or arbitrability of claims.

19. Defendant reserves the right to amend or supplement this Notice of Removal, and reserve all rights and defenses, including those available under Federal Rule of Civil Procedure 12.

20. WHEREFORE, Defendants respectfully request that this action be removed from the Superior Court of Massachusetts, Suffolk County to the United States District Court for the District of Massachusetts – Boston Division, pursuant to 28 U.S.C. §§ 1331, 1441 and 1446.

Date: February 10, 2025

Respectfully submitted,

*/s/ Lisa Oliver White*

Lisa Oliver White, BBO# 666841
Shook, Hardy & Bacon L.L.P.
One Federal Street, Suite 2620
Boston, MA 02110
Tel: (617) 531-1411
lowhite@shb.com

Tammy B. Webb*
Aubrey L. Kramer*
Shook, Hardy & Bacon L.L.P.
555 Mission Street, Suite 2300

San Francisco, CA 94105
Tel: (415) 544-1900
twebb@shb.com

Jad Sheikali*
Shook, Hardy & Bacon L.L.P.
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 704-7700
jsheikali@shb.com

Anna A. Gadberry*
Shook, Hardy & Bacon L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

* Pro hac vice motion to be filed

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2025, the foregoing was served via electronic mail to all parties of record:

Jonathan Shapiro (BBO No. 454220)
Shapiro & Teitelbaum LLP
55 Union Street, 4th Floor
Boston, MA 02108
Tel.: (617) 742-5800
jshapiro@jsmtlegal.com

Sherrie R. Savett
Lane L. Vines
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
ssavett@bm.net
lvines@bm.net

Sophia M. Rios
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel.: (619) 489-0300
srios@bm.net

*/s/ Lisa Oliver White*
Lisa Oliver White